# EXHIBIT 5

                          James Darren Williams
                               11/16/2022

1            UNITED STATE DISTRICT COURT

2            WESTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5    HOTHMAN MISANE, TYLER

6    SLEEP and JEROL WILLIAMS,

7         Plaintiffs,

8    -vs-                              No. 1:21-cv-004787

9                                      Hon. Hal Y. Jarbou

10   CITY OF BANGOR, TOMMY

11   SIMPSON, MAYOR DARREN

12   WILLIAMS and SCOTT GRAHAM,

13        Defendants.

14   _____/

15

16   PAGE 1 - 50

17

18   The Remote Deposition of JAMES DARREN WILLIAMS,

19   Taken at via Hanson Remote,

20   Commencing at 10:03 a.m.,

21   Wednesday, November 16, 2022,

22   Before Lucy Capobianco CSR 3061.

23

24

25



James Darren Williams
11/16/2022
Pages 2..5

**Page 2**

1 APPEARANCES:
2 MS. CAITLIN E. MALHIOT P76606
3 Marko Law, PLLC
4 1300 Broadway Street, Fifth Street
5 Detroit, Mi 48226
6 (313) 777-7529
7 jon@markolaw.com
8 Appearing on behalf of the Plaintiffs.
9
10 MR. JOHN GILLOOLY P41948
11 KATHLEEN JOZWIAK P79921
12 Garan Lucow Miller, P.C.
13 1155 Brewery Park Blvd., Suite 200
14 Detroit, MI 48207
15 (313) 446-5501
16 jgillooly@garanlucow.com
17 Appearing on behalf of the Defendants.
18
19 MR. MICHAEL S. BOGREN P34855
20 Plunkett Cooney
21 333 Bridge Street, NW, Suite 530
22 Grand Rapids, MI 49504
23 (269) 226-8822
24 mbogren@plunkettcooney.com
25 Appearing on behalf of the Defendant, Simpson.

**Page 3**

1　　　　　　　INDEX TO EXAMINATIONS
2
3 Witness　　　　　　　　　　　　　　　　Page
4
5 JAMES DARREN WILLIAMS
6 EXAMINATION BY MS. MALHIOT......................　4
7 EXAMINATION BY MR. BOGREN.......................　45
8 RE-EXAMINATION BY MS. MALHIOT...................　46

**Page 4**

1　　Via Remote
2　　Wednesday, November 16, 2022
3　　About 10:03 a.m.
4　　　　JAMES DARREN WILLIAMS,
5　　having first been duly sworn, was examined and
6　　testified on his oath as follows:
7　　EXAMINATION BY MS. MALHIOT:
8 Q. Okay. Could you please state your full name for the
9　　record?
10 A. James Darren Williams.
11 Q. Is there any way you can be a little louder? I can
12　　hear you, but it's --
13 A. James Darren Williams.
14 Q. All right. Thank you. Mr. Williams, I'm going to be
15　　asking you questions today. I ask that if there's any
16　　time that you don't understand a question, please let
17　　me know. That when you answer, you say yes and no
18　　instead of uh-huh, uh-nuh; and if you need to take a
19　　break at any time, you just let me know and we can do
20　　that, as long as it's not between a question and an
21　　answer, okay?
22 A. Yes.
23 Q. All right. Are you taking any medications or do you
24　　have any medical conditions that affect your memory or
25　　your ability to concentrate today?

**Page 5**

1 A. No.
2 Q. Have you ever been deposed before?
3 A. No.
4 Q. Have you ever given sworn testimony before?
5 A. I don't recall.
6 Q. Did you review any documents to prepare for your
7　　deposition today?
8 A. Yes.
9 Q. What did you review?
10 A. The -- whatever you guys posted.
11　　　　MR. GILLOOLY: We can't help you with the
12　　answers.
13 A. What the attorneys sent out to us, as far as other
14　　depositions that were taken.
15　　BY MS. MALHIOT:
16 Q. Were they transcripts?
17 A. Yes.
18 Q. Okay. You had -- you reviewed transcripts. What
19　　transcripts did you review?
20 A. Hothman Misane, Tyler Sleep, Jerol Williams.
21 Q. Any others?
22 A. No.
23 Q. Did you review the transcript of Tommy Simpson?
24 A. No.
25 Q. Did you review any other documents to prepare for your

Page 14

```
 1  Q.  Okay. Why are you no longer the mayor?
 2  A.  Resigned.
 3  Q.  Why did you resign?
 4  A.  Due to construction increases.
 5  Q.  All right. And when did you resign?
 6  A.  I don't recall the exact day.
 7  Q.  Were the construction increases the only reason that
 8      you left your position as the mayor?
 9  A.  Yes.
10  Q.  What were your job responsibilities as the mayor of the
11      City of Bangor?
12  A.  To make sure policies are being followed.
13  Q.  Anything else?
14  A.  Nope, that's it.
15  Q.  Would you hire city employees?
16  A.  No.
17  Q.  Could you fire city employees?
18  A.  No.
19  Q.  Did you have any sort of authority to create laws or
20      rules for the city?
21  A.  No.
22  Q.  Could you discipline employees?
23  A.  No.
24  Q.  What did you do to make sure policies were being
25      followed?
```

Page 15

```
 1  A.  I checked in with the department heads and talked to
 2      employees.
 3  Q.  Okay. And what could you do if it seemed like policies
 4      weren't being followed?
 5  A.  Go directly to the department head, let them know my
 6      concerns.
 7  Q.  Anything else?
 8  A.  Nope.
 9  Q.  Did you have any sort of decision-making authority?
10  A.  I don't recall.
11  Q.  Could you make recommendations?
12  A.  I can give my input on it, but.
13  Q.  What kind of involvement did you have in personnel
14      issues, issues with employees?
15  A.  Repeat the question.
16  Q.  What kind of involvement, as mayor, did you have with
17      personnel issues, issues involving employees?
18  A.  None that I recall.
19  Q.  Were you ever responsible for handling employee
20      disputes?
21  A.  No.
22  Q.  What about employee complaints?
23  A.  If they brought it to my attention, yes.
24  Q.  Okay. What kind of complaints could you address or did
25      you address as mayor?
```

Page 16

```
 1  A.  I need a little bit more than that.
 2  Q.  Sure. I asked if you could be involved if an employee
 3      brought a complaint to your attention. I want to know
 4      times when that happened. Can you think of some
 5      examples when somebody came to you with a complaint and
 6      how you responded?
 7  A.  Well, yeah, citizens complained about people not -- not
 8      being able to get ahold of the police department, not
 9      being able -- they're not answering phone calls, such
10      as that.
11  Q.  Okay. And what did you do about it?
12  A.  I talked with the police chief and the manager at the
13      time.
14  Q.  Okay. Can you think of any times that employees
15      brought complaints to you, not as citizens, but as
16      employees of the city?
17  A.  Yes.
18  Q.  Okay. What times are those?
19  A.  Amanda Karr.
20  Q.  Okay. What did Amanda Karr complain about?
21  A.  Sexual harassment due to Tommy Simpson.
22  Q.  And what did you do with -- about her complaint?
23  A.  I went and talked to her, asked her what her complaint
24      was. She informed me what her complaint was, and I
25      told her that I would talk with the city attorney about
```

Page 17

```
 1      it. She said she didn't want nothing to happen with
 2      the complaint.
 3  Q.  Did you talk to the city attorney about it?
 4  A.  Yes.
 5  Q.  Were you involved in her complaint any more beyond
 6      that, after talking to the city attorney?
 7  A.  No.
 8  Q.  Can you think of any other instances where employees
 9      brought complaints to you as the mayor?
10  A.  I don't recall.
11  Q.  Okay. And I'm not trying to trick you. If you think
12      of something later, feel free to go back.
13  A.  Yeah, that's fine.
14  Q.  Can you think of a time when Hothman Misane brought a
15      complaint to your attention while you were the mayor?
16  A.  Yes.
17  Q.  Okay.
18  A.  I called him in for a termination due to a sexual -- or
19      a CSC case in Van Buren County that he lost evidence
20      of, and brought him in to terminate him because the
21      case was lost, and the prosecutor said he had no -- no
22      more credibility in their courts, and said if they lose
23      the case, it would be all due to lack of Bangor's
24      evidence. I said, well --
25  Q.  We'll talk about that more later. I just want to focus
```

**Page 18**

1  right now on times employees complained to you.
2  A.  That was just after he was terminated.
3  Q.  Okay. He complained to you at that time?
4  A.  Yes.
5  Q.  Can you think of any other times that an employee
6     brought a complaint to you as the mayor?
7  A.  Jerol Williams brought a complaint to me.
8  Q.  Okay.
9  A.  Against Tommy Simpson.
10 Q.  Okay.
11 A.  And I can't recall the whole -- the whole thing, but it
12    was due to cemetery stuff him and Amanda Karr was
13    looking at, and Tommy Simpson, the manager, came in,
14    and said, don't be flirting with the staff, and he
15    brought that complaint to me.
16       And I asked him, how would you like me to
17    proceed with it?
18       He said, well, nothing. I turned it over to
19    the Lord.
20 Q.  Okay. Any other complaints that you can recall
21    employees bringing to you while you were the mayor of
22    the city?
23 A.  Tyler Sleep.
24 Q.  Okay. What was Sleep's complaint?
25 A.  Sexual harassment with Tommy Simpson.

**Page 19**

1  Q.  Any other complaints that you can recall employees
2     bringing to you while you were the mayor?
3  A.  Blankenship.
4  Q.  All right. And what was that complaint?
5  A.  Sexual harassment, Tommy Simpson.
6  Q.  Okay. Any other complaints?
7  A.  I don't recall.
8  Q.  As the mayor, what kind of involvement did you have in
9     the city's police department?
10 A.  As the mayor?
11 Q.  Yes.
12 A.  Just making sure they did -- followed their policies
13    and procedures.
14 Q.  What about the prosecutor's office?
15 A.  None.
16 Q.  Where did you learn about the various departments'
17    policies and procedures so that you could make sure
18    they were being followed?
19 A.  The policy manuals.
20 Q.  Okay. Did each department have its own policy manual?
21 A.  Yes.
22 Q.  Okay. So did you review all of those so that you'd be
23    able to enforce the policies?
24 A.  Yeah, I looked through them all, tried to study them as
25    best I could.

**Page 20**

1  Q.  Do you know the plaintiff in this case, Mr. Misane?
2     You mentioned him already, so I assume you do.
3  A.  Repeat.
4  Q.  Do you know the plaintiff, Mr. Misane?
5  A.  Yes.
6  Q.  All right. When did you first meet him?
7  A.  I don't recall the exact time.
8  Q.  Did you know him before you became the mayor?
9  A.  Yes.
10 Q.  Was he a police officer while you were a citizen before
11    you were the mayor?
12 A.  I believe he just got hired, if not shortly before.
13 Q.  Okay. Did you know him while you were campaigning?
14 A.  Yes.
15 Q.  Do you remember how you met him?
16 A.  Tommy Simpson brought him to the house.
17 Q.  Your house?
18 A.  Yes.
19 Q.  Now, how did you know Tommy Simpson?
20 A.  Born and raised with him.
21 Q.  Okay. It's because you're both from the city of
22    Bangor?
23 A.  Yes.
24 Q.  Are you and Tommy around the same age?
25 A.  I'm a couple years older, I believe.

**Page 21**

1  Q.  Did you go to school together?
2  A.  He was a couple years behind me.
3  Q.  Would you characterize your relationship with Tommy as
4     friendship?
5  A.  Yes.
6  Q.  Okay. And before you were mayor, you had a friendship
7     with Tommy Simpson?
8  A.  Yes.
9  Q.  Did Tommy help you with your campaign?
10 A.  Yes.
11 Q.  Okay. So at some point, Tommy Simpson brought
12    Mr. Misane over to your house and that's when you first
13    met him?
14 A.  Yes.
15 Q.  Was this for a party, or an event, or just --
16 A.  No.
17 Q.  Just to hang out?
18 A.  Yeah.
19 Q.  Do you recall what you did when he came over to your
20    house?
21 A.  We just sat on the couch and talked.
22 Q.  What was your impression of him at that time?
23 A.  I liked him.
24 Q.  Besides that first meeting, did you interact socially
25    with Mr. Misane?



**Page 22**

1  A.  Yes.
2  Q.  How often?
3  A.  Quite often.
4  Q.  Was Tommy Simpson present for those social
5      interactions?
6  A.  Not all of them.
7  Q.  Some of them?
8  A.  Yes.
9  Q.  How often? Maybe half? A quarter? Three-quarters?
10 A.  I can't recall that.
11 Q.  Sometimes Tommy was there, sometimes he wasn't?
12 A.  Yes.
13 Q.  What kind of things did you and Mr. Misane do?
14 A.  Just rode around in the police car, talked. Stopped by
15     the house, he'd talk to me.
16 Q.  Did that continue when you became mayor?
17 A.  Yes.
18 Q.  Did Mr. Misane help you at all with your campaign?
19 A.  No.
20 Q.  Okay. What kind of things did you do socially with
21     Tommy?
22 A.  Went out to eat, go to the casino, bar occasionally.
23 Q.  Do you and Tommy still socialize?
24 A.  Yes.
25 Q.  About the same amount as you did when you met

**Page 23**

1      Mr. Misane?
2  A.  Yes.
3  Q.  When was the last time that you recall socializing with
4      Mr. Misane?
5  A.  Before his termination.
6  Q.  How long before his termination?
7  A.  I don't recall.
8  Q.  Did you socialize with Mr. Misane as much as you
9      socialized with Mr. Simpson?
10 A.  No, not as much.
11 Q.  Okay. Did you socialize with Tommy more?
12 A.  Yes.
13 Q.  At some point, were -- while you were mayor, were you
14     aware of Mr. Misane being promoted?
15 A.  Yes.
16 Q.  Were you involved in that promotion?
17 A.  Yes.
18 Q.  What was your involvement?
19 A.  I just gave my intel on what I thought about him being
20     an officer.
21 Q.  Who did you give that intel to?
22 A.  To Chief Simpson.
23 Q.  All right. And what did you say? What was your intel?
24 A.  I told him he's a hell of an officer, and he got
25     promoted to sergeant.

**Page 24**

1  Q.  And what did you base your opinion on that he was a
2      hell of an officer?
3  A.  By his traffic stops and how he interacted with the
4      bystander while he had them on a traffic stop.
5  Q.  Okay. Were you aware of him being promoted at any
6      other time while you were mayor?
7  A.  Yes.
8  Q.  When was that?
9  A.  I don't recall.
10 Q.  Do you recall what the promotion was?
11 A.  Chief.
12 Q.  Were you involved at all in the decision to promote him
13     to chief?
14 A.  Yes.
15 Q.  What was your involvement?
16 A.  I just told them -- I explained how good of a sergeant
17     he was and how he treated other officers and I think he
18     would be a good candidate to take over as chief.
19 Q.  And who did you explain that to?
20 A.  Tommy Simpson and the council.
21 Q.  Okay. And was your recommendation taken, they promoted
22     him to chief?
23 A.  Yes.
24 Q.  Were you aware of Tommy Simpson being promoted at all
25     while you were mayor?

**Page 25**

1  A.  Yes.
2  Q.  All right. And what -- do you remember when that was?
3  A.  I don't recall.
4  Q.  All right. What was the promotion?
5  A.  City manager.
6  Q.  Were you involved in that decision?
7  A.  Yes.
8  Q.  And what was your involvement?
9  A.  I explained to the council how great of a job he does
10     as chief and how he filled in, as we did not have a
11     manager at the time. Tommy stepped into that position
12     and he was doing a fantastic job.
13 Q.  And that council took your recommendation and made him
14     city manager, correct?
15 A.  Yes.
16 Q.  So you were involved in the decision to promote
17     Mr. Misane to chief. ==How do you think he did as chief?==
18 A.  ==Not good at all.==
19 Q.  All right. Why do you say that?
20 A.  ==I was getting a lot of complaints about him not==
21     ==answering calls. The officers -- some of the officers==
22     ==didn't like him because he would do something with==
23     ==their schedules, and the council members didn't like==
24     ==him because they couldn't get a hold of him as well,==
25     ==so, yeah.==

James Darren Williams
11/16/2022
Pages 26..29

Page 26

1  Q. Okay. Anything else that made you think he didn't do a
2     great job as chief?
3  A. No.
4  Q. Okay. What did you do about those issues?
5  A. The problem -- well, there was a contract written up
6     between Chief Simpson and Hothman Misane, if the
7     council or Misane decided to go back as sergeant or
8     deputy chief, it's one of the positions, he would go
9     right back into that position, and the council voted to
10    demote him back to sergeant.
11 Q. Okay. Were you involved in the decision to demote him?
12 A. Yes.
13 Q. What was your involvement?
14 A. The recommendation to the council.
15 Q. Prior to giving that recommendation, did you take any
16    steps to try to enforce policies and correct issues?
17 A. No.
18 Q. So after Mr. Misane was demoted back to sergeant, how
19    did he perform as sergeant?
20 A. Not good at all.
21 Q. All right. Why did you say that?
22 A. He really wasn't -- he was just showing up, pretty
23    much.
24 Q. What does that mean?
25 A. That means coming into work in uniform and just riding

Page 27

1     around in a squad car.
2  Q. You said before that, you thought he did a good job as
3     sergeant, correct, before he was promoted?
4  A. Absolutely.
5  Q. What changed?
6  A. If you ask me, I don't know. I mean, I don't know if
7     something clicked in his head or something, I don't
8     know.
9  Q. Okay. From what you observed, how was his work
10    different after the demotion?
11 A. Lazy.
12 Q. Lazy, okay.
13    Any other complaints about his work?
14 A. I don't recall.
15 Q. Okay. And you started to talk about it before, when
16    you talked about firing him, but did you at some point
17    become aware of an issue with a CSC case involving Mr.
18    Misane?
19 A. Repeat that question.
20 Q. Yes. At some point did you become aware of issues with
21    a CSC case involving Hothman Misane?
22 A. Yes.
23 Q. When did you become aware of that?
24 A. I don't recall the exact date, but it was like two
25    weeks before his termination.

Page 28

1  Q. All right. How did the issue come to your attention?
2  A. Tommy Simpson and Sergeant Weber at the time.
3  Q. Okay. What did they tell you?
4  A. They told me that the prosecutor has been trying to get
5     Sergeant Misane to give her the journal, and he said he
6     gave it to her already, and she's been trying to e-mail
7     him, call him, that they need this journal, the kid's
8     journal for the case, and that he wasn't responding to
9     the phone calls and wasn't responding to the e-mails.
10 Q. Okay. So what did you do when you heard that?
11 A. Went and talked to the prosecutor directly myself.
12 Q. Okay.
13 A. And that's when she explained to me what was going on
14    and how she's tried to get ahold of Misane and
15    e-mailing him, letting him know that she needed the
16    journals for this case because it would win the case
17    and that she can't trust him in the courtroom, so she
18    asked to put Sergeant Weber on the trial for the City
19    of Bangor Police Department.
20 Q. And what did Mr. Misane say when you talked to him
21    about it?
22 A. He just told me, she's got everything. She's already
23    got it all. I don't know what else to do.
24 Q. All right. And did you do anything after talking to
25    them?

Page 29

1  A. Repeat that question.
2  Q. Did you do anything about the issue after talking to
3     them?
4  A. Yes. Well, after I found out that they lost the
5     case -- and their closing arguments was that the City
6     of Bangor Police Department is the reason that the case
7     was lost. That was the jury. All the jury said that
8     Bangor -- that's the reason why the Bangor Police
9     Department lost the case, was because lack of evidence.
10    And I told the prosecutor when I was in her office if
11    they lose the case, I will be firing Hothman Misane.
12 Q. Do you have the authority to do that?
13 A. At the time, Manager Simpson was on leave due to the
14    Amanda Karr's sexual harassment.
15 Q. Who put him on leave?
16 A. Attorney Graham.
17 Q. Okay. Were you involved in the decision to put Tommy
18    Simpson on leave?
19 A. No.
20 Q. Okay. So Tommy Simpson was on leave, the city manager.
21    Was there an acting city manager because he was on
22    leave?
23 A. Me.
24 Q. Okay. So at the time, you were acting city manager?
25 A. Yes.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Page 30

1  Q. As acting city manager, did you have the authority to
2     fire?
3  A. Yes.
4  Q. Okay. And we previously discussed this, but that's
5     authority you didn't normally have as mayor, correct?
6  A. No.
7  Q. Were you the one who made the decision to fire Misane?
8  A. Yes.
9  Q. Was anyone else involved in the decision?
10 A. No.
11 Q. Is there anyone besides Misane who you made the
12    decision to fire during the time you were mayor or
13    acting city manager?
14 A. Repeat that.
15 Q. Sure. Was there any other city employee you've ever
16    fired?
17 A. No.
18 Q. No. Okay. So Mr. Misane is the only employee for the
19    City of Bangor who you ever decided to fire?
20 A. Yes.
21 Q. How long were you acting city manager?
22 A. A couple months. Maybe three, possibly.
23 Q. Okay. Was Mr. Misane the only one fired during that
24    time or just the only one where you were involved?
25 A. I don't recall.

Page 31

1  Q. Does the city have a human resources department?
2  A. Yes.
3  Q. Did you consult with them before firing Mr. Misane?
4  A. No.
5  Q. Did you review any sort of handbooks, policies, labor
6     agreements, or anything like that before firing Misane?
7  A. Yes.
8  Q. All right. What all did you review to assist you in
9     making your decision to fire Mr. Misane?
10 A. The evidence policy.
11 Q. What evidence policy?
12 A. Pardon me?
13 Q. What evidence policy did you review?
14 A. For police officers in handling evidence and -- which,
15    actually, in looking at the policy, there was actually
16    evidence laid out that was not properly stored, and
17    that was another indication of why he needs to be
18    terminated because he was the one that handled all
19    evidence.
20 Q. Okay. Are there any other policies you reviewed before
21    firing Mr. Misane?
22 A. No.
23 Q. Did you review the city's discipline policy before
24    firing him?
25 A. No.

Page 32

1  Q. Were there any people you talked to for advice or a
2     second opinion to assist in the decision to fire
3     Misane?
4  A. I cannot answer that question.
5  Q. You cannot answer that question?
6     MR. GILLOOLY: Because it was the city -- you
7     can tell her it was the city attorney, but you cannot
8     tell her what you said with the city attorney.
9  A. Okay.
10    BY MS. MALHIOT:
11 Q. I'm not asking for the contents of those discussions,
12    but who were those discussions with?
13 A. Attorney Scott Graham.
14 Q. Okay. Was there anyone else you consulted with to
15    assist you in making the decision to fire Misane?
16 A. No.
17 Q. All right. And you talked to Mr. Graham in his
18    capacity as a city attorney?
19 A. Yes.
20 Q. And seeking his advice and counsel as an attorney?
21 A. Yes.
22 Q. Okay. And you relied -- whatever that information was,
23    I don't want to know what he said, but whatever he
24    said, that was advice that you used in -- to assist you
25    in making your decision to fire Misane?

Page 33

1  A. Yes.
2  Q. So ultimately, as the decision-maker, what was the
3     reason for Misane being terminated from his employment
4     with the city?
5  A. He was improperly storing evidence and losing the case
6     with the CSC.
7  Q. I know I asked about reviewing policies. Did you
8     review Misane's personnel file in deciding to fire him?
9  A. No.
10 Q. Were you aware if he'd ever been disciplined before you
11    fired him?
12 A. No.
13 Q. Were you aware of the city having a progressive
14    discipline policy?
15 A. Repeat that question.
16 Q. Sure. Were you aware of the city having a progressive
17    discipline policy?
18 A. I don't recall.
19 Q. And you were the one who ultimately told Misane he was
20    fired, correct?
21 A. Yes.
22 Q. Who else was there when that happened?
23 A. Sergeant Weber.
24 Q. All right. Can you tell me, as best you recall,
25    everything that happened in that meeting?



hansonreporting.com
313.567.8100

James Darren Williams
11/16/2022
Pages 34..37

Page 34

1  A.  Yes, I called him in and told him to please turn over
2      his duty weapon and he said okay. He sat down, and I
3      told him that at this time he is no longer employed
4      with the City of Bangor Police Department. And he
5      asked why. I explained to him that it was due to the
6      CSC case, which I had bullet points that I went off of
7      and showed him, and he said okay, and that was it.
8  Q.  Nothing else happened, that you recall, in that
9      meeting?
10 A.  That's -- yeah, and he said, can I talk to you now
11     about my sexual harassment with Tommy Simpson? And I
12     said --
13 Q.  Did he talk to you about that --
14 A.  Pardon me?
15 Q.  Oh. Go on. And you said?
16 A.  Yes, and he turned over a big, thick folder, and I
17     looked at it, and due to our policy we have 30 days to
18     return an answer or an investigation on it. I told him
19     I would contact Attorney Scott Graham to look into the
20     sexual harassment claims he was making.
21 Q.  Okay. And did you do that?
22 A.  Yes.
23 Q.  Was that the first you ever heard any complaint from
24     Misane about Simpson?
25 A.  Yes.

Page 35

1  Q.  And Simpson was already on leave because of the
2      complaint by Amanda Karr, correct?
3  A.  Correct.
4  Q.  Did Amanda Karr mention any issues between Misane and
5      Simpson when you investigated her complaint?
6  A.  No.
7  Q.  As a friend of both of them, Misane and Simpson, were
8      you aware of any issues between them?
9  A.  No.
10 Q.  Did you have any more contact with Misane after firing
11     him?
12 A.  Just to get his property.
13 Q.  Did you engage with him socially at all after that?
14 A.  No.
15 Q.  Did you text with him after that?
16 A.  I don't recall.
17 Q.  Okay. Did you talk to him any more about his complaint
18     about Tommy Simpson after that?
19 A.  No.
20 Q.  And so you were and still are friends with Tommy
21     Simpson. Did you talk to him about Amanda Karr's
22     complaint?
23 A.  Did I talk to who?
24 Q.  Simpson, did you talk to Simpson about Amanda Karr's
25     complaint?

Page 36

1  A.  I told him that was the reason why he is on leave.
2      And --
3  Q.  Okay. Did you discuss anything beyond that?
4  A.  He wanted to know the details of what she was saying.
5      I said, well, I can't disclose that, I have to talk to
6      our city attorney first.
7  Q.  Okay. Were you the one to investigate her complaint?
8  A.  Initially.
9  Q.  Initially, okay.
10     And did you have any more discussions with
11     Tommy Simpson, beyond what you just said, that you need
12     to talk to the city attorney?
13 A.  No.
14 Q.  You didn't question Tommy about the substance of her
15     complaint?
16 A.  No.
17 Q.  Okay. Did you ever discuss it with him socially?
18 A.  No.
19 Q.  Did you talk to Tommy Simpson about Misane's complaint?
20 A.  No.
21 Q.  Not ever in any way?
22 A.  I just told him there was another complaint with
23     Hothman Misane. I mean --
24 Q.  And you didn't discuss anything more than that with him
25     about it?

Page 37

1  A.  No.
2  Q.  All right. What about Jerol Williams's complaint?
3  A.  I -- the same thing. I told him there was another
4      complaint with Jerol Williams, and that was the end of
5      it. I couldn't tell him nothing.
6  Q.  All right. What about Tyler Sleep's complaint?
7  A.  Same -- same ordeal.
8  Q.  Okay. And Justin Blankenship's?
9  A.  Same ordeal.
10 Q.  Okay. So, as friends, you guys have never discussed
11     these complaints outside of work?
12 A.  No.
13 Q.  Were you involved in the investigation of all of those
14     complaints?
15 A.  I was present --
16 Q.  Did you do any questioning?
17 A.  -- for some.
18     No.
19 Q.  All right. What involvement did you have in
20     Mr. Williams's complaint?
21 A.  Are you talking about the first one or the second one?
22 Q.  Mr. Williams's first complaint.
23 A.  Oh, this -- I had total involvement in that.
24 Q.  Okay.
25 A.  And I referred back to the Attorney Scott Graham for



HANSON RENAISSANCE  hansonreporting.com
COURT REPORTERS & VIDEO  313.567.8100

James Darren Williams
11/16/2022
Pages 42..45

Page 42

1 Q. Okay. Were you friends with him?
2 A. I wouldn't say friends. I would say acquaintance.
3 Q. Did you ever socialize with him outside of work?
4 A. No.
5 Q. All right. And you recommended that he become a
6 full-time officer?
7 A. Yes.
8 Q. Why did you recommend that?
9 A. Because he was good at doing traffic stops, catching
10 speeders, and dealing with the public.
11 Q. All right. So would you say you had a favorable
12 impression of his work as a police officer?
13 A. Repeat the question.
14 Q. So would you say you had a favorable impression of his
15 work as a police officer?
16 A. Yes.
17 Q. All right. And that continued after he became
18 full-time?
19 A. Yes.
20 Q. Okay. And to the extent that you're familiar or know
21 about his work, do you have any complaints about his
22 work as a police officer?
23 A. There at the end he got real lazy, was getting caught
24 sleeping in the cemetery and at the school, not doing
25 his job, and being real belligerent with dispatch.

Page 43

1 Q. Were you involved in any discipline against Officer
2 Sleep?
3 A. No.
4 Q. Are you aware of him being disciplined ever?
5 A. I don't recall.
6 Q. Have you had any contact with Officer Sleep since he
7 left his employment with the City of Bangor?
8 A. No.
9 Q. Okay. What about Jerol Williams, do you recall when
10 you first met him?
11 A. I don't recall exactly when.
12 Q. Was it before you were mayor?
13 A. No.
14 Q. Okay. So when -- you didn't meet him until you were
15 mayor of the city?
16 A. Absolutely.
17 Q. Was he an officer when you met him?
18 A. Yes.
19 Q. Did you ever interact with him socially outside of
20 work?
21 A. Yes.
22 Q. All right. How often?
23 A. I would see him at the gas station or Hardy's and stuff
24 like that.
25 Q. Okay. So if you saw him around town, you'd interact?

Page 44

1 A. Yes, yeah.
2 Q. Okay. Did you ever have planned social meetings with
3 him, go out to dinner, hang out at your house, things
4 like that?
5 A. No.
6 Q. What was your impression of him as a police officer?
7 A. I really didn't get to see much of his work because he
8 was at -- he was working nights.
9 Q. Were you ever made aware of any issues with him as a
10 police officer?
11 A. I was told that he was lazy.
12 Q. Who told you that?
13 A. Juan Mata and Chief Simpson at the time.
14 Q. Did they explain what they meant when they said he's
15 lazy?
16 A. He's not making traffic stops. Just -- he's not
17 getting -- I mean, because any company has got to have
18 a minimum of what they want to bring in a day or a
19 week, and he just wasn't doing it.
20 Q. Okay. Did you do anything about that?
21 A. No.
22 Q. Any other impression about his work as a police
23 officer?
24 A. He was a good people person.
25 Q. Anything else?

Page 45

1 A. No.
2 Q. Were you ever involved in any discipline of Officer
3 Williams?
4 A. No.
5 Q. Were you ever aware of any discipline issues with
6 Officer Williams?
7 A. No.
8     MS. MALHIOT: I have no more questions at
9 this time. Thank you.
10     MR. BOGREN: Can we take a quick five minutes
11 so I can check my notes?
12     MS. MALHIOT: Yes. Yep.
13     MR. BOGREN: I appreciate it.
14     MR. GILLOOLY: Yes, please. Thank you.
15     (An off-the-record
16     break was held)
17 EXAMINATION BY MR. BOGREN:
18 Q. Okay. Mr. Williams, my name is Charles Bogren. I
19 represent Tommy Simpson in this case. I just have a
20 couple of questions for you.
21     So you testified a little earlier that with
22 Hothman Misane, his termination, that, at the time,
23 Tommy Simpson was on leave, correct?
24 A. Administrative leave.
25 Q. I'm sorry. I didn't hear you.

HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

```
 1                    CERTIFICATE OF NOTARY
 2
 3   STATE OF MICHIGAN   )
 4                       ) SS
 5   COUNTY OF MACOMB    )
 6   I, Lucy Capobianco, Certified Shorthand Reporter, a
 7   Notary Public in and for the above county and state, do
 8   hereby certify that the above examination under oath
 9   was taken before me at the time and place hereinbefore
10   set forth; that the witness was by me first duly sworn
11   to testify to the truth, and nothing but the truth,
12   that the foregoing questions asked and answers made by
13   the witness were duly recorded by me stenographically
14   and reduced to computer transcription; that this is a
15   true, full and correct transcript of my stenographic
16   notes so taken; and that I am not related to, nor of
17   counsel to either party nor interested in the event of
18   this cause.
19
20
21              [signature: Lucy B. Capobianco]
22              Lucy Capobianco CSR3061
23              Notary Public,
24              Macomb County, Michigan
25   My Commission expires: January 20, 2027
```