UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HOTHMAN MISANE, et al.,

     Plaintiffs,

                                   Case No. 1:21-cv-487

v.

                                   Hon. Hala Y. Jarbou

CITY OF BANGOR, et al.,

     Defendants.

_____/

## **OPINION**

Plaintiffs Hothman Misane, Tyler Sleep, and Jerol Williams bring this civil rights action against Defendants Tommy Simpson, Scott Graham, Darren Williams,[1] and the City of Bangor. Plaintiffs allege that all Defendants violated the Elliot-Larsen Civil Rights Act ("ELCRA"), the Michigan Whistleblower Protection Act ("WPA"), 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964. Plaintiffs also assert claims under 42 U.S.C. § 1983 against Simpson, Williams, and Graham for violating their First and Fourteenth Amendment rights. Finally, Plaintiffs bring a municipal liability claim against the City of Bangor. Before the Court are Graham and Williams's motion for summary judgment (ECF No. 52); the City of Bangor's motion for summary judgment (ECF No. 54); and Simpson's motion for summary judgment (ECF No. 56).

---

[1] The Court will refer to Defendant Darren Williams as "Williams" and Plaintiff Jerol Williams as "Jerol."

## I. FACTUAL BACKGROUND

Misane, Sleep, and Jerol were all employees of the Bangor Police Department ("BPD") prior to their termination, suspension and/or resignation.  At the time of the events in question, Simpson was the City Manager and Chief of Police; Graham was the City Attorney; and Williams was the Mayor.

### A. Misane

Misane began his employment with BPD in August of 2017 as a road patrol officer. (Misane Dep. 10, ECF No. 60-2.)  Misane was promoted to sergeant in April of 2019 and "acting chief position as the sergeant" in July of 2020.  (*Id.* at 11-12.)  In this role, he assumed duties that a chief of police would be responsible for but maintained the title of sergeant instead of chief.  (*Id.* at 11.)  Misane became deputy chief in October of 2020, and in November of 2020, the City Council appointed him to chief of police.  (*Id.* at 17-18.)  Approximately three or four months later, Simpson gave Misane a choice to go back to deputy chief or sergeant, and he chose to go back to being a sergeant.  (*Id.* 18, 22.)  Misane is unsure whether Simpson or the City Council made the ultimate decision to demote him.  (*Id.* at 22.) On March 12, 2021, Misane was terminated. (Misane Termination Letter, ECF No. 52-2.)

The Mendoza Case

In April 2019, Misane investigated a criminal sexual conduct case involving suspect Antonio Lee Mendoza and two minors.  (Misane Dep. 23.)  The victims were four and eight years old at the time of the alleged inappropriate sexual contact.  (Graham Mem., ECF No. 52-4, PageID.465.)  As part of his investigation, Misane conducted a series of interviews recorded on his body camera including with both victims and their family members.  (*Id.*)  One of the victims also journaled her thoughts as part of her therapy after the events in question and gave the original journal pages to Misane.  (*Id.*, PageID.466.)

2

On March 1, 2021, the prosecutor advised BPD of problems with the case because of missing evidence, including the body camera footage and the journal pages.  (*Id.*)  On March 5, 2021, Simpson and Sergeant Weber met with the elected prosecutor for Van Buren County and the assistant prosecuting attorney handling the Mendoza case.  (*Id.*, PageID.467.)  The prosecutors informed them that they did not have the evidence necessary to go to trial and expressed their concern about Misane's investigation and report.  (*Id.*, PageID.467-468.)  Misane uploaded the bodycam video but did not copy it to a disc—BPD policy is to copy all bodycam footage of evidentiary value to a disc.  (*Id.*, PageID.467; Misane Dep. 31.)  Misane testified that he placed the victim's journals in "the court box," a box BPD uses for documents that are to be forwarded to and used in trial.  (Misane Dep. 25.)  The prosecutors also noted that Misane cancelled two pre-trial preparation meetings in February.  (Graham Mem., PageID.467.)  Misane testified that Simpson ordered him to cancel both meetings to attend to other matters.  (Misane Dep. 28.)

The case proceeded to trial and the jury acquitted the defendant of all charges.  (Graham Mem., PageID.468.)  Jurors interviewed after the trial stated that a lack of evidence weakened the prosecution's case.  (*Id.*)  On March 12, 2021, Williams terminated Misane for his performance in relation to this case.  (Misane Termination Letter.)

Sexual Harassment Complaint

Misane alleges that Simpson made sexually inappropriate comments to him throughout their working relationship including, but not limited to:

- In 2018, Simpson asked Misane if he had ever considered being with a man.

- In 2019, 2020, and 2021, Simpson described the sexual intercourse he was having with his boyfriend at the time.

3

- At a 2019 training at the Michigan State Police Headquarters in Lansing, Simpson told Misane he had sexual intercourse with a male hotel clerk the prior night.  Simpson further stated that Misane could have watched the encounter and that Simpson was willing to watch Misane engage in sexual intercourse with a female.

- In 2019, Simpson told Misane that a Berrien County officer requested that Simpson urinate on his back.

- In 2020, Simpson and Misane traveled to the Blue Chip Casino Hotel together.  They shared a room with two separate beds.  Simpson asked Misane if he wanted to come to his bed and cuddle.  Simpson further stated that after Misane fell asleep, he found an individual at the hotel who was willing to watch Misane have sexual intercourse with his wife and participate as well.

- In 2021, Simpson told Misane that he was engaging in sexual intercourse with a Bangor firefighter.

(*See* Misane's Answers to Simpson's First Interrogs., ECF No. 62-3, PageID.2453-2458.)

Misane likewise discussed matters of a sexual nature with his coworkers, including his own sex life.  (Misane Dep. 86-88; Misane Text Messages, ECF No. 52-8.)   He also drew a pornographic picture of individuals engaging in anal sex.  (Misane Drawing, ECF No. 52-9.)

Misane informed Williams of the sexual harassment over the phone on March 9 or 10, 2021.  (*Id.* at 72, 120.)  He formally filed a sexual harassment complaint against Simpson on March 12, 2021, after his termination.  (*Id.*)

Graham's Investigation

Graham formally investigated Misane's handling of the Mendoza case as well as his sexual harassment complaint.  With respect to the Mendoza case, Graham interviewed Weber, Simpson,

and defense attorney Gary Stewart.  (Graham Dep. 19, ECF No. 60-4.)  He also attempted to interview the prosecutor for Van Buren County and the assistant prosecuting attorney who was handling the case.  (*Id.*)  Graham did not interview Misane.  He also reviewed the evidence and applicable BPD policies.  (*Id.* at 27.)  Graham deemed Misane's termination appropriate.  (Graham Mem., PageID.469.)

With respect to the sexual harassment complaint, Graham first interviewed Simpson.  (Graham Dep. 27-30.)  He asked to speak with Misane on a few separate occasions, but Misane declined.  (*Id.* at 34; 3/14/2021 Text Message & 3/19/2021 Email from Graham to Misane, ECF No. 52-10; Misane Dep. 114.)  Graham also interviewed the following individuals: Officer Juan Mata, Officer Justin Blankenship, Councilman Jermy Uplinger, Councilwoman Lynn Farmer, Weber, Officer Phil Garcia, Officer Tyler Sleep, Department of Public Words ("DPW") Director John Saylor, DPW employee John Hagel, and the Director of the Bangor Housing Commission.  (Graham Dep. 30-35.)  Graham attempted to interview Williams, and he responded with conditions on the interview that Graham viewed as unacceptable.  (*Id.* at 33.)  Graham concluded that "[t]here is no viable claim of an adverse employment decision in this case" because "Simpson did not terminate Sgt. Misane's employment [and] had nothing to do with the decision."  (Graham Mem., PageID.473.)

**B. Sleep**

Sleep worked as a police officer for the BPD from May 2019 till July 2021.  (Sleep Dep. 9, ECF No. 60-7.)  Like Misane, Sleep alleges that Simpson made sexually inappropriate comments to him throughout his time at the BPD.  On one occasion, Sleep picked up Simpson, and, upon entering the car, Simpson said he had just finished "doing the McNasty."  (*Id.* at 46.)  On another occasion, while the two were driving around, Simpson pointed to a home and told Sleep he had engaged in sexual intercourse with the married man who lived there.  (*Id.*)  Also, like

Misane, Sleep discussed matters of a sexual nature with his coworkers.  (Sleep Dep. 47, 56-57; Sleep Text Messages, ECF No. 52-12.)

On April 22, 2021, Sleep was suspended for his work-related performance.  Sleep allegedly told fellow officers that he would participate in the "blue flu," meaning calling in sick to disrupt scheduling and that he would do as little work as he could.  (Graham Dep. 40.)  Sleep was also found sleeping while on-duty.  (*Id.* at 41.)  Sleep submitted a sexual harassment complaint the night of April 22, 2021, after he had been suspended.  (Sleep Dep. 91.)  After returning to work, Sleep met with Graham on April 30, 2021, to discuss his complaint.  (*Id.* at 93.)  Sleep resigned from the BPD on July 18, 2021.  (Sleep Resignation Email, ECF No. 52-13.)

### C. Jerol

Jerol began working for BPD in January of 2020.  (Jerol Dep. 23, ECF No. 60-5.)  Jerol worked as an officer but had also served as a taser instructor and school resource officer.  (*Id.* at 24.)  Like Misane and Sleep, Jerol also alleges that Simpson made sexually inappropriate comments to him.

- In February of 2020, Simpson asked Misane if Jerol was "well hung" and called him a "poon hound."

- In the spring of 2020, Simpson described the genitalia of the Benton Harbor Deputy Director of Public Safety to Jerol.

- Around the same time, Simpson told Jerol that a male deputy from the Berrien County Sherriff's Department asked to urinate on him.

- In the summer of 2020, Simpson described a sexual encounter he had at the University of Notre Dame.

- Around the same time, Simpson described the sexual preferences of an Internet Technician who worked for the City.

6

- Also in 2020, Simpson inquired about Jerol's neighbors and expressed his desire to engage in sexual intercourse with the male neighbor.

- In February of 2021, Simpson accused Jerol of "flirting with the help" while Jerol spoke with his assistant, Amanda Karr.

- In March of 2021, Simpson allegedly accused Jerol of frisking a young girl at a park while on-duty.

(Jerol's Answers to Simpson's First Interrogs., ECF No. 62-6, PageID.2683-2690.)  Also, like Misane and Sleep, Jerol discussed matters of a sexual nature with his coworkers.  (Jerol Dep. 51-52; 119-121; Jerol Text Messages, ECF No. 52-15.)

Jerol further alleges that Simpson racially discriminated against him.  Jerol believes that Simson did not want to hire him because he disfavors the people from Benton Harbor.  (Jerol Dep. 37.)  Jerol understood this as a reference to African-Americans.  (*Id.*)  Jerol also testified that Simpson declined to interview two African-American candidates.  (*Id.* at 47-48.)  In the winter of 2021, Simpson allegedly said, "I don't mean to sound racist, but Jerol and his child support . . . ." to another BPD officer.  (*Id.* at 45.)  Jerol believes he was passed over for positions at the BPD due to his race, including promotion to the position of sergeant and re-instatement to the position of school resource officer.  (*Id.* at 40-42.)

Jerol submitted a sexual harassment complaint against Simpson on March 13, 2021.  (Jerol Dep. 54.)  Graham attempted to interview Jerol about his complaint, but Jerol stated that he would not be answering any questions due to the City's "untimely and late response."  (Graham & Jerol Text Messages, ECF No. 52-16.)  Jerol alleges that it took Graham, Williams, and the City longer to investigate his complaint when compared to the complaints of his white counterparts, Misane

and Sleep.  (Jerol Dep. 96-97.)  Jerol resigned in May of 2021.  (Jerol Resignation Letter, ECF No. 52-17.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.*  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. ELCRA

Plaintiffs brings hostile work environment, discrimination, and retaliation claims against all Defendants under ELCRA.  ELCRA prohibits employers from discriminating against employees on the basis of sex or race.  *See* Mich. Comp. Laws § 37.2102.  ELCRA defines an "employer" as "a person who has 1 or more employees, and includes an agent of that person."  *Id.* § 37.2201(a).  Individuals can be considered "employers" under ELCRA.  *See Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 860-61 (Mich. 2005) (concluding that the "inclusion of an 'agent' within the definition of the word 'employer' is not limited to establishing vicarious liability for the agent's employer, but in fact means agents are considered employers.")

### 1. Hostile Work Environment

Plaintiffs allege that they "were subjected to unwelcome and offensive verbal and/or physical conduct due to their sex and/or gender" which created a hostile work environment.  (Am. Compl. ¶ 55, ECF No. 20.)  Jerol also alleges he was "subjected to unwelcome and offensive verbal and/or physical conduct due to his race" that created a similar environment.  (*Id.* ¶ 56.)

To establish a prima facie hostile work environment claim under ELCRA, a plaintiff must demonstrate that:

> (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of the protected status; (3) the employee was subjected to unwelcome conduct or communication on the basis of the protected status; (4) the unwelcome conduct or communication was intended to, or in fact did, interfere substantially with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.

*Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (quoting *Downey v. Charlevoix Cnty. Bd. of Rd. Comm'rs*, 576 N.W.2d 712, 716 (Mich. Ct. App. 1998)).  There is "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory."  *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).  The workplace must be "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 564-65 (6th Cir. 2021) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998)).

### (a) Individual Liability

As an initial matter, Plaintiffs allege that Simpson, Graham, and Williams are liable as agents of the City under ELCRA.  The Michigan Supreme Court has held that liability under ELCRA "applies to an agent who sexually harasses an employee in the workplace."  *Ford Motor Co.*, 697 N.W.2d at 861.  "[P]ersons to whom an employing entity delegates supervisory power

and authority to act on its behalf are 'agents,' as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority[.]" *Elezovic v. Bennett*, 731 N.W.2d 452, 458 (Mich. Ct. App. 2007). "If this agent is also the alleged sexual harasser, the agent is considered an employer under [ELCRA] and may be directly and individually liable for this tort against the victim, whether or not the employing entity is liable." *Id.* Graham and Williams themselves did not engage in any form of sexual or racial harassment, and Plaintiffs cite no caselaw in support of their proposition that Graham and Williams may be liable as agents under ELCRA "based on their own actions, inactions and knowledge" of Simpson's alleged sexual or racial harassment. (Pls.' Br. in Opp'n to Graham & Williams's Mot. for Summ. J., ECF No. 62, PageID.2274.) Rather, it appears that Michigan courts only intended to extend ELCRA liability to the individual harassers themselves. Graham and Williams are entitled to summary judgment on this claim. The Court will proceed to analyze the hostile work environment claims as they relate to Simpson and the City.

### (b) Hostile Work Environment Based on Sex

Discrimination on the basis of sex includes sexual harassment. *See* Mich. Comp. Laws § 37.2103(i). ELCRA "defines 'sexual harassment' as 'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature' under circumstances where submission to the conduct or communication is made a 'quid pro quo' of gaining or keeping employment or where the conduct or communication 'has the purpose of substantially interfering with an individual's employment[.]'" *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469-70 (6th Cir. 2012) (quoting Mich. Comp. Laws § 37.2103(i)).

Protected Group

"The Michigan Supreme Court has held that 'all employees are inherently members of a protected class in hostile work environment cases because all persons may be discriminated against

10

on the basis of sex.'"  *Kalich*, 679 F.3d at 470 (quoting *Haynie v. State*, 664 N.W.2d 129, 133

(Mich. 2003)); *see also Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993).  Plaintiffs have met

their burden under the first element.

<u>Communication or Conduct on the Basis of Sex</u>

The second element of a hostile work environment claim requires a plaintiff to demonstrate

that "'*but for* the fact of [his] sex, [he] would not have been the object of harassment.'"  *Kalich*,

679 F.3d at 470 (quoting *Haynie*, 664 N.W.2d at 133) (emphasis added); *see also Radtke*, 501

N.W.2d at 163.  "[T]he inference of discrimination based on sex may become more complicated

when the alleged harasser and victim are of the same sex."  *Smith v. Rock-Tenn Servs., Inc.*, 813

F.3d 298, 307 (6th Cir. 2016) (internal citation omitted).  The Supreme Court has cautioned courts

and juries not to mistake "ordinary socializing in the workplace—such as male-on-male horseplay

or intersexual flirtation—for discriminatory 'conditions of employment.'"  *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  This is so because

> [t]he real social impact of workplace behavior often depends on a constellation of
> surrounding circumstances, expectations, and relationships which are not fully
> captured by a simple recitation of the words used or the physical acts performed.
> Common sense, and an appropriate sensitivity to social context, will enable courts
> and juries to distinguish between simple teasing or roughhousing among members
> of the same sex, and conduct which a reasonable person in the plaintiff's position
> would find severely hostile or abusive.

*Id.* at 81-82.  Following *Oncale*, the Sixth Circuit "allows a plaintiff alleging same-sex harassment

in hostile work environment cases to establish the inference of discrimination based on sex in three

ways: '(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the

harasser is motivated by general hostility to the presence of men in the workplace; and (3) where

the plaintiff offers direct comparative evidence about how the alleged harasser treated members of

both sexes in a mixed-sex workplace.'"  *Smith*, 813 F.3d at 307-08 (quoting *Vickers v. Fairfield*

*Med. Ctr.*, 453 F.3d 757, 765 (6th Cir. 2006)); *see also Robinson v. Ford Motor Co.*, 744 N.W.2d

363, 369 (Mich. Ct. App. 2007) (endorsing *Oncale*'s three "evidentiary routes" when analyzing a same-sex sexual harassment claim).

Plaintiffs argue that because the conduct at issue "was directed towards men by a homosexual male" the Court "may conclude that the harassment would not have been directed at both sexes and is thus based on sex." (Pls.' Br. in Opp'n to Simpson's Mot. for Summ. J., ECF No. 60, PageID.925.) But Plaintiffs provide no direct comparative evidence demonstrating how Simpson treated women in the workplace. Despite this, the evidence Plaintiffs' present suggests that at least some of Simpson's alleged harassment stemmed from sexual desire. Simpson asked Misane if he had ever considered being with a man, offered to let Misane watch him engaging in sexual intercourse with a male, and asked to cuddle. (*See* Misane's Answers to Simpson's First Interrogs., PageID.2453-2458.) Simpson inquired as to whether Jerol was "well hung." (Jerol's Answers to Simpson's First Interrogs., PageID.2684, 2690.) And Sleep testified that Simpson would inappropriately put his hands on him without consent. (Sleep Dep. 53.) Plaintiffs have met their burden as to the second element.

Intimidating, Hostile, or Offensive Work Environment

Plaintiffs testified that Simpson's comments were unwanted. At issue is whether his comments substantially interfered with the plaintiff's employment or created an intimidating, hostile, or offensive work environment. To succeed on this element, "'the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.'" *Hunter v. Gen. Motors, LLC*, 807 F. App'x 540, 545 (6th Cir. 2020) (quoting *Wharf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013)). The Court must "consider the totality of the circumstances in assessing objective severity or pervasiveness and look to the following factors

12

for guidance: 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)).

With respect to pervasiveness, "'offhand comments' and 'isolated incidents' do not suffice." *Id.* (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)); *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708, 715 (6th Cir. 2007) (finding that fifteen incidents of "offensive utterances" over a two-year period were not severe or pervasive); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (finding harassment to be severe or pervasive when there were more than a dozen incidents, many of which involved aggressive behavior, over a period of one-year).  Plaintiffs have alleged that Simpson made sexually-explicit comments to them over a period of approximately three years.  The aforementioned precedent suggests that these comments were offhand or isolated rather than severe or pervasive.

Moreover, Simpson's comments were not threatening in nature.  When viewed in light of the sexualized environment that existed at the BPD, Simpson's comments were mere "offensive utterance[s]" and not "physically threatening or humiliating" statements.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  Most, if not all, of Plaintiffs' allegations are one-off comments that took place over a period of multiple years.  "Even considering them in the totality, [the Court] can hardly say the environment was permeated with discriminatory intimidation, ridicule, and insult" by Simpson because Plaintiffs all admit to engaging in similar conduct.  *Baughman v. Battered Women, Inc.*, 211 F. App'x 432, 439-40 (6th Cir. 2006) (citing *Harris*, 510 U.S. at 21).  Misane discussed his relationship with Deputy Andrea Walker of the Van Buren County Sheriff's Office with Simpson and other co-workers.  (Misane Dep. 89.)  In 2019, Misane sent Jerol a photo of a

13

female's genitals to which Jerol replied "Man that looks delicious!!!! Lol[.]"   (Jerol Text Messages, PageID.546.)  On another occasion, Misane messaged Jerol saying "Night night . . . . . keep your butthole tight[.]"  (Jerol Text Messages, PageID.549.)  Sleep sent intimate photos of two men to a colleague, Phil Garcia, who responded by saying "What does Beth think when she sees gay men in your photo gallery?"  (Sleep Text Messages, PageID.520.)  Sleep then responded by saying, "I delete them. Silly."  (*Id.*)  It appears that Plaintiffs themselves freely discussed matters of a sexual nature, including their own private lives, and made jokes relating to homosexuality.  In light of this environment at the BPD, Simpson's comments were neither severe nor threatening in nature.  Plaintiffs cannot make out a prima facie claim of a hostile work environment based on sex.  Both Simpson and the City are entitled to summary judgment on this claim.

### (c) Hostile Work Environment Based on Race

The primary issue with respect to Jerol's race-based hostile work environment claim is whether Simpson's statements were severe or pervasive enough to create an intimidating, hostile, or offensive work environment.  Here, Jerol alleges that Simpson said he disfavors "the people from Benton Harbor," which Jerol interpreted as a reference to African-Americans.  (Jerol Dep. 37.)  In the winter of 2021, Simpson allegedly said to another BPD officer, "I don't mean to sound racist, but Jerol and his child support . . . ."  (*Id.* at 45.)

In *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421 (6th Cir. 2014), the African-American plaintiff heard a Caucasian employee speak about eating watermelon and fried chicken to another Caucasian employee.  (*Id.* at 432-33.)  The plaintiff also believed a different employee formed a noose out of a telephone cord when the plaintiff walked into a room.  (*Id.*)  The Sixth Circuit found that two of the instances—the verbal comments—were offensive but not particularly serious or threatening.  (*Id.* at 433.)  It also deemed the telephone cord incident "more troubling" but "isolated."  (*Id.*)

14

Similarly, here, Jerol recounts isolated instances of racial harassment that he learned of secondhand.  Although "incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may 'contribute to a work environment that was hostile[,]'" the few isolated instances recounted by Jerol are not severe or pervasive enough to create a racially hostile work environment.  *Strickland v. Detroit*, 995 F.3d 495, 504 (6th Cir. 2021) (quoting *Jackson v. Quantex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999)).  Jerol cannot make out a prima facie claim of a hostile work environment based on race.  Simpson and the City are entitled to summary judgment on this claim.

### 2. Retaliation

Plaintiffs claim that they were retaliated against for reporting Simpson's sexual harassment.  ELCRA prohibits individuals from

> [r]etaliat[ing] or discriminat[ing] against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in a investigation, proceeding, or hearing under this act.

Mich. Comp. Laws § 37.2701(a).  To establish a prima facie case of retaliation under ELCRA, Plaintiffs must demonstrate that:

> (1) [they] engaged in protected activity, (2) the defendant was aware of the protected activity, (3) "the defendant took an action that was materially adverse to the plaintiff," and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action.

*Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

A "plaintiff may prove retaliation either through direct evidence or circumstantial evidence."  *Id.* at 344.  Because Plaintiffs rely upon circumstantial evidence, their claims are evaluated using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.*  Under this framework, if the plaintiff establishes a prima facie case, then the

burden shifts to the defendant to produce a "legitimate, nondiscriminatory reason" for the action. *McDonnell Douglas*, 411 U.S. at 802.  "If defendant produces such a reason, the burden shifts back to plaintiff to show that the proffered reason was a mere pretext for discrimination." *Jackson*, 999 F.3d at 344.  "The ultimate burden, however, remains with the plaintiff to convince the factfinder that defendant retaliated against [him] for engaging in protected activity." *Id.*

### (a) Causation

Williams and the City argue that Plaintiffs cannot establish the fourth prong of a prima facie case, i.e., causation.  The Court will address causation as it relates to each Plaintiff individually.

<u>Misane</u>

Misane alleges that Williams called him on either March 9 or 10, 2021, to discuss a sexual harassment complaint filed against Simpson by another employee, Amanda Karr.  (Misane Dep. 109-10.)  Karr filed a formal complaint on March 10, 2021 and wrote that Simpson "has repeatedly made, inappropriate comments about [her] husband Benjamin Karr's physical appearance," including that "Ben is his favorite of the Karr men [and] that he is well built and looks strong[.]" (Karr Compl., ECF No. 60-12, PageID.1562.)  Simpson also allegedly asked Karr "what Ben would do if a gay guy hit on him."  (*Id.*)

Misane believes that Karr told Williams that there were several other officers who had similar complaints.  (Misane Dep. 112.)  Misane testified that he informed Williams of his intent to file a sexual harassment complaint against Simpson during the phone call.  (*Id.* 109.)  Williams allegedly told Misane that they would meet during Misane's next scheduled workday, March 12, 2021.  (*Id.*)  On that day, Misane and Williams met at approximately 5:00 p.m.  (*Id.* at 110.)  Williams terminated Misane, and Misane then handed over his sexual harassment complaint.  (*Id.* at 119-20.)  Williams had the authority as Mayor to fire Misane because Simpson, the Chief of

Police and City Manager, was on leave due to Karr's sexual harassment complaint.  (Williams Dep. 29, ECF No. 54-5.)

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Ziedler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008); *accord Kirkland v. City of Maryville*, 54 F.4th 901, 912 (6th Cir. 2022); *cf Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (less than three weeks between protected conduct and adverse action was sufficient to show causal connection).  Thus, taking Misane's allegations as true, the short time period between his phone call and termination is sufficient to show a causal connection.

Sleep

On April 22, 2021, Sleep was suspended for his work-related performance.  Sleep submitted a sexual harassment complaint the night of April 22, 2021, after he had been suspended.  (Sleep Dep. 91.)  After returning to work, Sleep met with Graham on April 30, 2021, to discuss his complaint.  (*Id.* at 93.)  Sleep resigned from the BPD on July 18, 2021.  (Sleep Resignation Email.)  Because Sleep submitted his complaint *after* he had already been suspended, no reasonable juror could conclude that Sleep was suspended because of his complaint against Simpson.  Sleep provides no other evidence demonstrating that he informed the BPD, Graham, or Williams of his sexual harassment complaint prior to his suspension.  Indeed, Sleep testified that he did not discuss his complaint with Williams prior to his suspension.  (Sleep Dep. 91.)

Jerol

Jerol submitted a sexual harassment complaint against Simpson on March 13, 2021.  (Jerol Dep. 54.)  Jerol admits that no adverse employment actions were taken against him after he turned

in his complaint.  (*Id.* at 55, 99.)  To the extent that Jerol argues his non-promotions were materially adverse actions, these occurred before he turned in his complaint.  Jerol provides no evidence demonstrating that he informed anyone of Simpson's alleged sexual harassment prior to any adverse employment action.

Because a genuine dispute of material fact exists as to whether Misane was terminated for complaining of Simpson's sexual harassment, the Court will proceed to analyze pretext as it relates to Misane.  However, Sleep and Jerol cannot establish a prima facie claim of retaliation.

### (b) Pretext

Defendants assert a legitimate, non-retaliatory reason for Misane's termination.  They contend that Misane was fired for his mishandling of the Mendoza case.  Accordingly, the burden shifts to Misane to prove that the stated reason was a pretext for retaliation.

To show pretext, Misane "must demonstrate both (1) that [Defendants'] proffered reason[] for [firing him] [was] not [their] actual reason[] for doing so and (2) that unlawful retaliation was the actual reason."  *Kirkland*, 54 F.4th at 911.  He "'can show pretext in three interrelated ways: (1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [the proffered reason was] insufficient to motivate the employer's action.'"  *Jackson*, 999 F.3d at 351 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).

> At its core, pretext is a common sense inquiry: did the employer fire the employee for the stated reason or not?  The plaintiff's burden is not heavy, and summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual.

*Id.* (internal citations and quotation marks omitted).

Misane appears to argue that the proffered reason for his termination had no basis in fact or was insufficient to warrant his termination.  To be sure, the record includes evidence that Misane

18

mishandled the Mendoza investigation, which supports Defendants claim that he was fired because of his faulty investigation.  Misane began investigating the Mendoza case in 2019.  (Graham Mem., PageID.466.)  On or about March 1, 2021, the prosecutors advised BPD of lost evidence in the case, including lost journal entries and videos.  (*Id.*)  On March 5, 2021, the elected prosecutor and the assistant prosecuting attorney handling the Mendoza case met with Simpson and Weber to express their concern regarding Misane's handling of the evidence and cancellation of pre-trial preparation meetings.  (*Id.*, PageID.467.)  The case proceeded to trial, and the defendant was acquitted of all charges.  (*Id.*, PageID.468.)

Other facts in the record, however, cut against the proffered reason.  Misane testified that he placed the victim's journals in "the court box," a box BPD uses for documents that are to be turned over to the prosecutor's office.  (Misane Dep. 25.)  Jay Blair, an assistant prosecuting attorney, denies ever receiving the original copies.  (Graham Mem., PageID.468.)  However, Blair had previously apologized to Misane via email when Blair lost and then found some case-related text messages that were stuck to other pages.  (Misane's Answers to Simpson's First Interrogs., PageID.2459.)  Misane believes that this email supports his claim that the journal pages could have been lost by anyone.  On March 10, 2021, Misane met with the elected prosecutor to discuss the Mendoza case.  (*Id.*, PageID.2460.)  During this meeting, the elected prosecutor advised Misane that no proof exists as to who actually lost the evidence and mentioned that the assistant prosecuting attorney handling the case, Rachel Keeley, was simply upset.  (*Id.*)  Finally, with respect to the cancellation of trial preparation meetings, Misane testified that Simpson ordered him to cancel both meetings to attend to other matters.  (Misane Dep. 28.)  In short, Misane challenges

the factual premise of his termination and believes that his conduct related to the Mendoza investigation did not warrant termination.[2]

Moreover, Graham was simultaneously investigating Misane's role in the Mendoza case *and* the sexual assault complaints against Simpson.  (*See generally* Graham Mem.)  At the time of Misane's termination, Williams was aware of both issues.  "'Where . . . there are two reasonable interpretations of the evidence, we must allow the jury to resolve the issue of whether the evidence [Plaintiff] cites is sufficient evidence to conclude that [Defendants] retaliated against [Plaintiff] for opposing an unlawful employment practice.'"  *Jackson*, 999 F.3d at 351 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015)).  When viewing the facts in the light most favorable to Misane, a reasonable juror could find that Williams terminated Misane because of his sexual harassment complaint rather than his handling of the Mendoza investigation.

### (c) Individual Liability

Misane argues that Simpson, Graham, and Williams should be held individually liable for retaliation.  Similar to an ELCRA hostile work environment claim, an ELCRA retaliation claim "can be maintained against individuals apart from employers."  *Rymal v. Baergen*, 686 N.W.2d 241, 254 (Mich. Ct. App. 2004).

However, to be liable for retaliation under ELCRA, an employer or agent must have taken a materially adverse employment action against the employee.  *Naylor v. Michigan State Police*, No. 355353, 2022 WL 815368, at *2 (Mich. Ct. App. Mar. 17, 2022) ("'[I]n order to be actionable, an employment action must be materially adverse to the employee—this is, it must be more than a mere inconvenience or minor alternation of job responsibilities.'" (quoting Chen *v. Wayne State*

---

[2] Misane's own factual allegations related to the Mendoza investigation are not included in Graham's memorandum because Graham did not interview Misane as part of his investigation into the Mendoza case.  (Graham Dep. 19.)

*Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009))).  Misane's termination is unquestionably an adverse employment action.  But neither Simpson nor Graham terminated Misane.  At the time of Misane's termination, Simpson was on leave due to Karr's sexual harassment complaint, and Misane provides the Court with no evidence suggesting that, while on leave, Simpson was involved in the termination decision.  Graham was likewise not the ultimate decision-maker. Graham investigated Misane's handling of the Mendoza case and the sexual harassment allegations against Simpson and provided a recommendation to Williams.  "[I]t is settled in this circuit that a threat to discharge is not an adverse employment action."  *Plautz v. Potter*, 156 F. App'x 812, 817 (6th Cir. 2005) (citing *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). Graham's recommendation does not amount to an adverse employment action, and Misane cites no caselaw that supports holding Graham individually liable under these circumstances.

In sum, Sleep and Jerol have not met their burden of establishing a prima facie case of retaliation under ELCRA.  All Defendants are entitled to summary judgment on the retaliation claim as it relates to Sleep and Jerol.  However, Misane has established a prima facie case of retaliation and there is a genuine dispute of material fact as to whether the stated reason for his termination was a pretext for retaliation.  Despite this, Simpson and Graham are still entitled to summary judgment on Misane's retaliation claim because they cannot be held individually liable for retaliation under ELCRA.  But the City and Williams—who made the ultimate decision to terminate Misane—are not entitled to summary judgment on the retaliation claim as it relates to Misane.

21

### 3. Discrimination

Misane, Sleep, and Jerol allege that all Defendants discriminated against them on the basis of sex.[3] Jerol further alleges Defendants discriminated against him on the basis of race.  Section 202 of ELCRA provides that "[a]n employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  Mich. Comp. Laws § 37.2202(1)(a).  There are two broad categories of claims under this section: disparate treatment and disparate impact.  *Vredevelt v. GEO Grp., Inc.*, 145 F. App'x 122, 127 (6th Cir. 2005) (citing *Dep't of Civil Rights ex rel. Peterson v. Brighton Area Schs.*, 431 N.W.2d 65, 69 (Mich. Ct. App. 1988)).  Plaintiffs raise disparate treatment claims.

A plaintiff may demonstrate discrimination through direct or indirect evidence.  Where a plaintiff relies on indirect evidence, he must satisfy the *McDonnell Douglas* framework.  *Redlin v. Grosse Pointe Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)).  To succeed under the *McDonnell Douglas* framework a plaintiff must make out a prima facie case of discrimination by a preponderance of the evidence.  To make out a prima facie case, a plaintiff must demonstrate that he:

> (1) is a member of a protected class; (2) was qualified for his job; (3) suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.

---

[3] Count II of Plaintiffs' amended complaint raises a disparate treatment claim under ELCRA as it relates to discrimination against Jerol because of his race.  (*See* Am. Compl. ¶¶ 61-66.)  Count II makes no mention of disparate treatment on the basis of sex, but Plaintiffs' responses to Defendants' motions for summary judgment argue this claim.  The Court will liberally construe Plaintiffs complaint to include a disparate treatment claim on the basis of sex under ELCRA.

*Id.* at 606-07 (internal citation and quotation marks omitted).  "Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for' the adverse employment action."  *Id.* (quoting *Baxter Healthcare*, 533 F.3d at 397 n.9).  "Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination."  *Id.* (citing *Baxter Healthcare*, 533 F.3d at 391).

### (a) Disparate Treatment Based on Sex

Plaintiffs argue that "similarly situated coworkers who tolerated and even participated in Simpson's sexual harassment were treated more favorably than they were."  (Pls.' Br. in Opp'n to Graham & Williams's Mot. for Summ. J., PageID.2275.)  The alleged favorable treatment came in the form of promotions and lack of discipline for infractions.  For example, Plaintiffs allege that Taylor Freelove, a BPD officer who kissed Simpson on the forehead, violated department policies without consequence.  (*Id.*)  Justin Weber, a BPD officer who "tolerated" Simpson's alleged sexual harassment, also violated department policies without consequence and still received two promotions—first to sergeant and then to chief of police.  (*Id.*)

ELCRA's prohibition of discrimination on the basis of sex encompasses sexual orientation.  *See Rouch World, LLC v. Dep't of Civil Rights*, 510 Mich. 398, 420-23 (Mich. 2022) ("To discriminate on the basis of sexual orientation, then, also requires the discriminator to intentionally treat individuals differently because of their sex.").  However, Plaintiffs have not shown that they were treated differently than similarly situated homosexual BPD officers.

First, it is not clear whether Freelove and Weber are themselves homosexual or what "tolerated" means in this context.  Moreover, "[t]o satisfy the similarly situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'"  *Howley v. Fed. Express Corp.*, 682 F. App'x 439, 445 (6th Cir. 2017) (quoting *Martin v. Toledo*

*Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008)).  "This includes examining whether a plaintiff's proposed comparators engaged in acts of comparable seriousness."  *Id.* (citing *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).  To demonstrate that Freelove and Weber were similarly situated, Plaintiffs' rely on Misane's deposition.  (*See* Pls.' Br. in Opp'n to the City's Mot. for Summ. J., ECF No. 61, PageID.1603.)  Misane testified that Freelove

> would conduct - - he would actually violate the law, commit crimes and violate policy; yet would not be subject to certain disciplinary actions and would be promoted, in fact, at one point, as equal, that I was promoted, he was promoted, yet I have a clean record and he had these issues.

(Misane Dep. 69.)  Misane stated that Weber also

> caused several issues at the department with several other employees, to include Tommy Simpson himself directly.

(*Id.*)  These generalized allegations shed no light on Freelove and Weber's qualifications, the timing of their promotions, and circumstances of their alleged policy or legal infractions.  Nor do they demonstrate that Plaintiffs own circumstances were similar in all relevant aspects.  Plaintiffs do not cite any other evidence that potentially answers these questions.  Plaintiffs have not met their burden of demonstrating that they were treated differently than similarly situated homosexual BPD officers.  All Defendants are entitled to summary judgment on this claim.

### (b)  Disparate Treatment Based on Race

Defendants dispute whether Jerol suffered an adverse employment action at all.  Jerol claims that he was not considered for the sergeant and school resource officer positions because of his race.  Simpson offered the sergeant position to Weber, and although Jerol previously held the position of school resource officer, Simpson offered it to Sleep.  Defendants argue that these cannot be considered adverse employment actions because Jerol admitted that he never applied for either position.  (Jerol Dep. 40-41.)  However, Jerol testified that "[t]he promotional process for

any standard police department is for it to be offered to all the officers and then the response from each officer and who's interested and it just goes from there." (*Id.* at 41.)  The Court cannot discern whether officers must apply for the sergeant and school resource officer positions or whether officers are chosen for these positions.  Construing the facts in the light most favorable to Jerol and adopting the latter interpretation, Jerol claims that the BPD failed to promote him because of his race, which constitutes an adverse employment action.

"In a direct-evidence case involving mixed motives—that is, where 'the adverse employment decision could have been based on both legitimate and legally impermissible reasons'—a plaintiff 'must prove that the defendant's discriminatory animus was more likely than not a substantial or motivating factor in the decision.'"  *Lowe v. Walbro LLC*, 972 F.3d 827, 832 (6th Cir. 2020) (quoting *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 192-93 (Mich. 2003)).  "Put slightly differently, the plaintiff must show that 'the defendant was predisposed to discriminating against members of the plaintiff's protected class' and that 'the defendant actually acted on that predisposition in visiting the adverse employment action on the plaintiff.'"  *Id.* (quoting *Wilcoxon v. Minn. Mining & Mfg. Co.*, 597 N.W.2d 250, 257 (Mich. Ct. App. 1999)).  "Once a plaintiff meets the initial burden of proving that the illegal conduct 'was more likely than not a substantial or motivating factor in the defendant's decision, a defendant has the opportunity to show by a preponderance of the evidence that it would have reached the same decision without consideration of the protected status.'"  *Id.* (quoting *Downey v. Charlevoix Cnty. Bd. of Rd. Comm'rs*, 576 N.W.2d 712, 718 (Mich. Ct. App. 1998)).  In cases involving indirect or circumstantial evidence, Jerol must satisfy the *McDonnell Douglas* burden-shifting framework. "Under either the direct evidence test or the *McDonnell Douglas* test, a plaintiff must establish a

causal link between the discriminatory animus and the adverse employment decision." *Sniecinski*, 666 N.W.2d at 193.  Jerol fails to do so.

Jerol argues that Simpson "was predisposed to discriminate against Jerol on the basis of his race" due to Simpson's previous commentary about African-Americans.  (Pls.' Br. in Opp'n to Graham & Williams's Mot. for Summ. J., PageID.2276.)   The comments include Simpson inquiring as to whether Jerol was "well hung" and referencing his obligation to pay child support. (Jerol Dep. 45, 129.)   Jerol also alleges that Simpson did not want to hire him because of his race and later declined to interview two qualified African-American officers from the Benton Harbor Department of Public Safety.  (*Id.* at 47.)

Accepting these facts as true, Jerol provides no evidence that Simpson actually acted on his alleged animus towards African-Americans in promoting other candidates to the sergeant and school resource officer positions.  Rather, Simpson's statements are "more properly characterized as 'stray remarks,' or comments that do not evince discriminatory animus." *Schutter v. Harold Zeigler Auto Grp., Inc.*, 416 F. Supp. 3d 708, 720 (W.D. Mich. 2019).

> Factors to consider in determining whether comments are so-called 'stray remarks' include: "(1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment action."

*Id.* (quoting *Sniecinski*, 666 N.W.2d at 194 n. 8).  Simpson's comments about Jerol's genitalia and obligation to pay child support are vague and unrelated to either Jerol's qualifications or Simpson's decision to promote other candidates over Jerol.  Jerol's allegations that Simpson did not want to hire him and later refused to interview two African-American candidates do relate to Jerol's employment but are weakened by Jerol's own admission that Simpson previously promoted him to school resource officer.  Jerol served as the school resource officer for five to seven months

before the school shut down due to COVID-19 and no longer needed a school resource officer. (*See* Jerol Dep. 41.)  In short, Jerol provides no evidence that Simpson acted on his alleged animus towards African-Americans in promoting other individuals.   All Defendants are entitled to summary judgment on this claim.

### B. Title VII

Plaintiff likewise brings hostile work environment, discrimination, and retaliation claims against all Defendants under Title VII of the Civil Rights Act of 1964.  Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2; *see also Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 827 (6th Cir. 2019).

However, unlike ELCRA, individuals cannot be held liable under Title VII. Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person."  42 U.S.C. § 2000e(b).  Plaintiff relies on *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994) for the proposition that an "agent" under Title VII includes any "individual who serves in a supervisory position and exercises significant control over plaintiff's hiring, firing or conditions of employment."  *Id.* at 803. However, after *Pierce*, the Sixth Circuit in *Wathen v. Gen. Elec. Co.*, 115 F.3d 400 (6th Cir. 1997) found it "inconceivable that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees."  *Id.* at 406 (internal citation and quotation marks omitted).  The Sixth Circuit held that "Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII."  *Id.*  Rather, "[t]he obvious purpose of this agent provision was to incorporate respondeat superior into the statute."  *Id.* at 405-06 (internal citation and quotation marks omitted).  The Sixth Circuit has since

27

affirmed *Wathen's* holding.  *See, e.g.*, *Post v. Trinity Health-Michigan*, 44 F.4th 572, 577 (6th Cir. 2022); *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001).  Accordingly, Simpson, Graham, and Williams are not "employers" under Title VII and are entitled to summary judgment on the Title VII claims against them.

The City, however, may be held liable for the conduct of its employees as an "employer" under Title VII.  The Sixth Circuit has recognized that the same analytical framework applies to claims under both ELCRA and Title VII.  *See, e.g.*, *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482, 488 (6th Cir. 2020) (analyzing ELCRA and Title VII hostile work environment and retaliation claims under the same standard); *Hunter*, 807 F. App'x at 543 n. 1 (6th Cir. 2020) (analyzing ELCRA and Title VII hostile work environment, retaliation, and discrimination claims under the same standard).  Accordingly, based on the ELCRA analysis described above, the City is entitled to summary judgment on Plaintiffs' hostile work environment and discrimination claims as they relate to both sex and race.  The City is also entitled to summary judgment on Sleep and Jerol's claims of retaliation.  However, there is a genuine dispute of material fact as to whether the stated reason for Misane's termination was pretext for retaliation.  The City is not entitled to summary judgment on the retaliation claim as it relates to Misane.

### C. 42 U.S.C. § 1981

Jerol brings a claim under 42 U.S.C. § 1981 against all Defendants for discriminating against him on the basis of race.  Enacted as part of the Civil Rights Act of 1866, § 1981 provides that all persons have the same right to "make and enforce contracts," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981.  Under this section, "employees have 'a cause of action for racial harassment in the work place' against private

employers." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 503 (6th Cir. 2021) (quoting *Quanex Corp.*, 191 F.3d at 657).

However, § 1981 does not provide a cause of action against state actors in their official or individual capacities.  *Boxill v. O'Grady*, 935 F.3d 510, 519 (6th Cir. 2019).  Despite this, "plaintiffs may still bring § 1983 claims premised on violations of § 1981." *Id.* (citing *McCormick v. Miami Univ.*, 693 F.3d 654, 661-62 (6th Cir. 2012) ("[T]he more specific and express cause of action contained in § 1983 provide[s] a mechanism to address a violation of § 1981.").)

§ 1981 likewise does not provide a cause of action against municipalities.  *See Arendale v. City of Memphis*, 519 F.3d 587, 598-99 (6th Cir. 2008) (holding that "'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units[.]'" (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989))); *see also Direct Constr. Servs., LLC v. City of Detroit*, 820 F. App'x 417, 428 (6th Cir. 2020) (affirming the dismissal of plaintiff's claim against a municipality and municipal entities under § 1981).

Here, Jerol attempts to bring a § 1981 claim against the City as well as Simpson, Graham, and Williams in their individual capacities.  (*See* Am. Compl. ¶¶ 85-89.)  The individual Defendants and the City cannot be sued under § 1981, and the amended complaint does not state their § 1981 claim against Defendants under § 1983.  Consequently, all Defendants are entitled to summary judgment on this claim.

Even if Jerol properly brought § 1983 claims premised on violations of § 1981, all Defendants are still entitled to summary judgment.  Courts "review claims of alleged race discrimination brought under § 1981 and the Elliot-Larsen Act under the same standards as claims of race discrimination brought under Title VII[.]"  *Rogers v. Henry Ford Health Sys.*, 897 F.3d

763, 771 (6th Cir. 2020) (internal citations and quotation marks omitted). Jerol's § 1981 claim of racial discrimination fails for the same reasons his ELCRA and Title VII claims of racial discrimination fail.

### D. 42 U.S.C. § 1983

Pursuant to 42 U.S.C. § 1983, Plaintiffs allege that Simpson, Graham, and Williams violated their rights under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. Plaintiffs also bring a municipal liability claim against the City for these alleged constitutional violations.

Defendants Simpson, Graham, and Williams argue that they are entitled to qualified immunity. "Qualified immunity is an affirmative defense that protects government officials from liability 'when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights.'" *Webb v. United States*, 789 F.3d 647, 659 (6th Cir. 2015) (quoting *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007)). Government officials are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. at 589. This legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590. Accordingly, "[t]he relevant, dispositive inquiry" under the clearly established prong is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

"[C]ourts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The plaintiff bears the burden of showing that a government official is not entitled to qualified immunity. *See LeFever v. Ferguson*, 645 F. App'x 438, 442 (6th Cir. 2016).

### 1. Equal Protection Claim

Plaintiffs allege that Simpson, Graham, and Williams violated their Equal Protection rights by discriminating against them on the basis of sex. Jerol further alleges that these Defendants violated his Equal Protection rights by discriminating against him on the basis of race. Plaintiffs have not established constitutional violations.

"In order to properly make out a claim under § 1983, a plaintiff must demonstrate that she has been deprived, by one acting under color of state law, a right secured by the Constitution or Federal laws." *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *4 (6th Cir. Dec. 19, 2022). "In general, the Sixth Circuit reviews constitutional discrimination claims alleging violation of Equal Protection under § 1983 in a similar manner as Title VII discrimination claims, and looks at Title VII precedent in analyzing § 1983 discrimination claims." *Id.* (citing *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000)); *see also Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 917-18 (6th Cir. 2014) ("The elements for establishing an Equal Protection claim under § 1983 and the elements for establishing a [] Title VII disparate treatment claim are the same.").[4] "In a § 1983 discrimination case, the plaintiff must prove that 'the employer made

---

[4] When addressing the merits of their Equal Protection claim, Plaintiffs state that they "have briefed above how they were discriminated against and deprived of rights for discriminatory reasons" and "by, reference, incorporate those same arguments" into their Equal Protection claim. (Pls.' Br. in Opp'n to Graham & Williams's Mot. for Summ. J., PageID.2282.)

an adverse employment decision with a discriminatory intent and purpose.'"  *Yerkes*, 2022 WL

17753528, at *4 (quoting *Boger v. Wayne Cnty.*, 950 F.2d 316, 324-25 (6th Cir. 1991)).

Plaintiffs' Equal Protection claims of sexual and racial discrimination fail for the same

reasons that Plaintiffs' ELCRA and Title VII discrimination claims fail.  Consequently, Simpson,

Graham, and Williams are entitled to summary judgment on the Equal Protection claims against

them.

### 2. First Amendment Claim

Simpson, Graham, and Williams are entitled to qualified immunity on Plaintiffs' First

Amendment claims against them.  Simpson, Graham, and Williams move for summary judgment

on all claims against them, but only Graham and Williams substantively address Plaintiffs' First

Amendment claim.  (*See* Graham & Williams's Mot. for Summ. J., ECF No. 52, PageID.430.)

However, all three Defendants assert qualified immunity as an affirmative defense to any

constitutional violations.  (*See id.* ("[B]oth Graham and Williams are entitled to qualified immunity

for the same reasons that they are entitled to qualified immunity for Plaintiffs' equal protection

claim as described above."); Simpson's Br. in Supp. of Mot. for Summ. J., ECF No. 57,

PageID.748 ("Tommy Simpson's actions were hardly violative of any constitutional rights that

have been established subsequently or were established at the time.").)  Accordingly, Plaintiffs

bear the burden of showing that Simpson, Graham, and Williams are not entitled to qualified

immunity.  *See LeFever*, 645 F. App'x at 442.

Plaintiffs have not substantively addressed their First Amendment claim in any of their

responsive briefings.  Nor have Plaintiffs cited caselaw demonstrating that their First Amendment

rights were clearly established at the time.  Plaintiffs have not met their burden.  Simpson, Graham,

and Williams are entitled to qualified immunity as to the First Amendment claims against them.

### 3. *Monell* Liability

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held

that municipalities could be liable under § 1983 for constitutional violations, but they "cannot be

liable for the constitutional torts of [their] employees." *Powers v. Hamilton Cnty. Pub. Def.*

*Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007). This means that "[a] municipality may not be held

liable under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs

a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436

U.S. at 691) (emphasis in original)).

To succeed on a *Monell* claim against a municipality, Plaintiffs must demonstrate that the

alleged federal violation occurred because of a municipal policy or custom. *Burgess v. Fischer*,

735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell*, 436 U.S. at 694). And they must establish that

the policy or custom was the "'moving force' behind the deprivation of the plaintiff's rights."

*Powers*, 501 F.3d at 607 (quoting *Monell*, 436 U.S. at 691). There are four ways Plaintiffs can

show an illegal policy or custom: "(1) the existence of an illegal official policy or legislative

enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the

existence of a policy of inadequate training or supervision; or (4) the existence of a custom of

tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (citing *Thomas*

*v. City of* Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)).

Plaintiffs' amended complaint appears to rely on the first, third, and fourth theories.[5] At

the summary judgment stage, however, Plaintiffs did not substantively address their *Monell* claim

in response to the City's motion. Accordingly, the Court declines to consider the merits of this

---

[5] Plaintiffs' amended complaint states that the City "fail[ed] to adequately train and supervise Defendant Simpson, implicitly condon[ed] the behavior of Defendant Simpson, manifest[ed] deliberate indifference to the ongoing harassment of Plaintiffs, and other policies customs, and practices to be discovered through the course of litigation." (Am. Compl. ¶ 95.)

claim.  *See Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011) (finding that the district court did not err in granting summary judgment to the defendant and "properly declined to consider the merits of th[e] claim because [the plaintiff] failed to address it" in his response to the motion for summary judgment); *see also Kolestar v. Allstate Ins. Co.*, 814 F. App'x 988, 990-91 (6th Cir. 2020) (relying on *Hicks* to affirm the district court's grant of summary judgment on a claim that the plaintiff failed to address in response to the defendant's motion for summary judgment).  The City is entitled to summary judgment on this claim.

### E. WPA

Misane and Sleep allege that all Defendants violated the WPA.  The WPA provides that

> [a]n employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.  To establish a prima facie case under the WPA, "a plaintiff must show that '(1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action.'"  *Pace v. Edel-Harrelson*, 878 N.W.2d 784, 787 (6th Cir. 2016) (quoting *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471-72 (Mich. 2003)).  "To establish a prima facie case, a plaintiff can rely on either direct evidence of retaliation or indirect evidence."  *McNeill v. Midmichigan Med. Center-Gratiot*, 891 N.W.2d 528, 536 (Mich. Ct. App. 2016) (citing *Debano-Griffin v. Lake Co.*, 828 N.W.2d 634, 638 (Mich. 2013)).

Similar to ELCRA retaliation claims, WPA claims are analyzed under a burden shifting framework.

> If the plaintiff establishes a prima facie case, a presumption of retaliation arises, which the employer can rebut by offering a legitimate reason for its action. To avoid summary disposition after the employer offers such a reason, the plaintiff must show that a reasonable fact-finder could still conclude that the plaintiff's protected activity was a motivating factor for the employer's adverse action, i.e., that the employer's articulated legitimate reason was a pretext disguising unlawful animus.

*Id.* (internal citations and quotation marks omitted).

### 1. Causation

As with Plaintiffs' retaliation claims under ELCRA, Defendants dispute causation. The Court will address this element as it relates to Misane and Sleep. To establish causation, the Court must also determine when Misane and Sleep engaged in protected conduct. An employee engages in protected conduct when he or she "reports or is about to report, verbally or in writing, a violation or a suspected violation[.]" Mich. Comp. Laws § 15.362.

Making a report "involve[s] 'the making of a charge against' or the 'making known' a violation or suspected violation of law" to a public body. *McNeill-Marks v. MidMichigan Med. Center-Gratiot*, No. 348987, 2022 WL 413592, at *4 (Mich. Ct. App. Feb. 10, 2022); *see also Riviera v. SVRC Indus., Inc.*, 934 N.W.2d 286, 296-97 (Mich. Ct. App. 2019). A "public body" includes "[a] state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government." Mich. Comp. Laws § 15.361(d)(i). "It does not matter if the public body to which the suspected violations were reported to was also the employee's employer." *Brown v. Mayor of Detroit*, 734 N.W.2d 514, 517 (Mich. 2007).

The WPA also permits "about to report claim[s]" so long as the plaintiff "support[s] that claim with 'clear and convincing evidence that he or she or a person acting on his or her behalf was about to report, verbally or in writing, a violation or a suspected violation . . . to a public body.'" *McNeill*, 891 N.W.2d at 536 (quoting Mich. Comp. Laws § 15.363(4)).

Sleep

On April 22, 2021, Sleep was suspended for his work-related performance. Sleep submitted a sexual harassment complaint the night of April 22, 2021, after he had been suspended. (Sleep Dep. 91.) Because Sleep brought his complaint after his suspension, no direct causal link can be established between the two. To the extent Sleep relies on the "about to report" theory under the WPA, his claim also fails because he has not presented clear and convincing evidence that he was about to report Simpson's conduct prior to his suspension.

Misane

As explained in the Court's analysis of Plaintiffs' ELCRA retaliation claim, the Court construes the facts in the light most favorable to Misane and accepts as true his allegation that during his phone conversation with Williams on March 9 or 10, 2021, he expressed his intention to file a sexual harassment complaint against Simpson. (Misane Dep. 109.) However, Misane testified that he did not delve into the specifics of his complaint during this conversation. (*Id.* at 110.) Despite this, it appears that Misane charged Simpson with sexual harassment during his phone call with Williams prior to his termination.

Even if Misane's phone call with Williams does not qualify as a "report" under the WPA, Misane succeeds under the "about to report" theory. Misane stated his intention to file a formal sexual harassment complaint against Simpson to Williams during the phone call. Misane also believes that Karr told Williams that there were several other officers who had similar complaints. (*Id.* at 112.) Such evidence clearly evinces Misane's intention to file his complaint. A causal connection exists between Misane's reporting and his termination.

Graham and Williams argue that the Court should find no causal connection here because Misane held off blowing the whistle until it became most advantageous for him to do so. (*See*

Graham & Williams Mot. for Summ. J., PageID.425.)  They cite *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571 (Mich. 1997) for the proposition that "[t]he primary motivation of an employee pursuing a whistleblower claim 'must be a desire to inform the public on matters of public concern, and not personal vindictiveness.'"  *Id.* at 576 (quoting *Wolcott v. Champion Int'l Corp.*, 691 F. Supp. 1052, 1065 (W.D. Mich. 1987)).  However, the Michigan Supreme Court disavowed *Shallal's* proposition "that the employee must act out of an altruistic motive of protecting the public" as dicta in *Whitman v. City of Burton*, 831 N.W.2d 223 (Mich. 2013).  *Id.* at 233.  "[A]s long as a plaintiff demonstrates a causal connection between the protected activity and the adverse employment action, the plaintiff's subjective motivation for engaging in the protected activity in the first instance is not relevant to whether the plaintiff may recover under the act."  *Id.*  Misane has established a prima facie case under the WPA.

## 2. Pretext

However, Defendants assert a legitimate, non-retaliatory reason for Misane's termination. They contend that Misane was fired for his mishandling of the Mendoza case.  Accordingly, the burden shifts to Misane to prove that the stated reason was a pretext for retaliation.  A plaintiff can establish pretext

> "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision."

*McNeill*, 891 N.W.2d at 536 (quoting *Feick v. Monroe Co.*, 582 N.W.2d 207, 212 (Mich. Ct. App. 1998)).

As with the ELCRA claim, Misane appears to argue that his alleged mishandling of the Mendoza case has no basis in fact, and, even if it has some merit, was insufficient to warrant termination.  When viewing the facts in the light most favorable to Misane, genuine dispute of material fact exists as to whether the proffered reason for his termination was pretext for retaliation.

### 3. Individual Liability

Misane and Sleep bring WPA claims against all Defendants.  The WPA defines "employer" as "a person who has 1 or more employees"; this definition includes "an agent of an employer and the state or a political subdivision of the state."  Mich. Comp. Laws § 15.361(b).  By its terms, the WPA applies to the "agent" of an employer.  Neither Plaintiffs nor Defendants cite any authority discussing whether or not an individual employee can be liable under the WPA.  In an unpublished decision, the Michigan Court of Appeals has held that an individual "to whom an employing entity delegates supervisory power and authority to act on its behalf" could be liable under the WPA. *Glover v. Pontiac Housing Comm'n*, No. 281737, 2008 WL 5431174, at *5 (Mich. Ct. App. Dec. 20, 2008) (internal quotation marks omitted).  It reasoned that the Michigan Supreme Court has interpreted a similar definition of employer in the ELCRA context to permit suit against an individual. *See Bennett*, 697 N.W.2d at 863.  The Court agrees with that reasoning.

As explained in the Court's analysis of Plaintiffs' ELCRA retaliation claim, Williams terminated Misane.  Simpson and Graham did not make the ultimate termination decision.  Misane neither cites evidence that suggests the contrary nor provides the Court with precedent that supports holding Simpson or Graham individually liable under these circumstances.

In sum, Sleep has not met his burden of establishing a prima facie claim under the WPA.  All Defendants are entitled to summary judgment on the WPA claim as it relates to Sleep.  However, Misane has established a prima facie case and there is a genuine dispute of material fact as to whether the stated reason for his termination was pretext for retaliation.  Despite this, Simpson and Graham are still entitled to summary judgment on Misane's retaliation claim because they cannot be held individually liable under the WPA.  But the City and Williams—who made the ultimate decision to terminate Misane—are not entitled to summary judgment on the WPA claim as it relates to Misane.

## IV. CONCLUSION

For the reasons stated above, the Court will grant summary judgment to the following Defendants on the following claims.

- All Defendants are entitled to summary judgment on Plaintiffs' claims of a hostile work environment and discrimination under ELCRA as well as Jerol's claim of retaliation based on race under ELCRA.

- Simpson and Graham are entitled to summary judgment on Plaintiffs' claim of retaliation based on sex under ELCRA.

- Simpson, Graham, and Williams are entitled to summary judgment on all Title VII claims against them.

- The City is entitled to summary judgment on Plaintiffs' Title VII hostile work environment and discrimination claims as well as Jerol's Title VII claim of retaliation on the basis of race.

- All Defendants are entitled to summary judgment on Jerol's § 1981 claim.

- Simpson, Graham, and Williams are entitled to summary judgment on the Equal Protection and First Amendment claims against them.

- The City is entitled to summary judgment on the *Monell* claim.

- Simpson and Graham are entitled to summary judgment on the WPA claim.

The Court will deny summary judgment to the following Defendants on the following claims.

- The City is not entitled to summary judgment on the ELCRA and Title VII claims of retaliation on the basis of sex only as they relate to Misane.

- Williams is not entitled to summary judgment on the ELCRA claim of retaliation based on sex only as it relates to Misane.

- Williams and the City are not entitled to summary judgment on the WPA claim only as it relates to Misane.

An order will enter consistent with this opinion.


Dated: April 10, 2023                              /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   CHIEF UNITED STATES DISTRICT JUDGE