EXHIBIT 3

# SCOTT GRAHAM PLLC
# Memorandum

| | |
|---|---|
| To: | Mayor Darren Williams and the Bangor City Council |
| From: | Scott Graham, City Attorney |
| Date: | March 15, 2021 |
| Subject: | Employment Termination / Employee Complaints |

THIS MEMORANDUM IS AN ATTORNEY OPINION AS DEFINED BY THE MICHIGAN OPEN MEETINGS ACT. IT IS SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE AND THE ATTORNEY WORK PRODUCT DOCTRINE AND IS SUBJECT TO THE MAXIMUM PROTECTION ALLOWED BY LAW

## INTRODUCTION

This opinion memorandum relates to two issues: the employment termination of Sgt. Misane ▮▮▮▮▮▮▮▮ This opinion is subject to the attorney/client privilege and the attorney work product doctrine. The content of this opinion will be protected to the fullest extent allowed by law. It is not subject to disclosure under FOIA.

The Council should recall the following points:

- The Council must be careful not to rush to judgment in considering how to deal with any of these issues.

- It is crucial to gather all relevant facts before any decisions are made.

- All employees are entitled to make any complaints about their employment and working conditions.

- An employee's right to complain is absolute as long as the complaint is subjectively real and is made in good faith.

- The employee against whom complaints are made has the right to learn the nature of the allegations and to respond to any claim.

- After all facts have been gathered and evaluated, the Mayor and the Council need to proceed based on the applicable laws, City Policies, City Procedures, and the exercise of judgment.

- Matters discussed in closed session must be kept private.

**AMANDA KARR'S COMPLAINT ON MARCH 10, 2021**

1. On March 10, 2021, Amanda Karr complained about statements made by Manager Simpson. Exhibit 1.

2. The written complaint is attached to this Memorandum.

3. Mayor Williams interviewed Ms. Karr about the complaint.

4. The investigation regarding the complaint is ongoing.

**FACTS REGARDING THE CSC CASE LOST AT TRIAL ON MARCH 11, 2021**

1. In 2019, a 4 year old victim (V1) made a complaint to her grandmother about inappropriate touching by the Defendant.

2. This touching occurred in 2011 and/or 2012.

3. V1 was 4 years old at the time.

4. The grandmother contacted CPS.

5. An investigation began.

6. The investigation expanded to include possible inappropriate contact by the Defendant with V1's sister, who was 8 years old (V2) at the time of the incident.

7. The BPD became involved after CPS contact.

8. Sgt. Misane was assigned by the BPD to investigate the case.[1]

9. He conducted a series of interviews recorded on a body camera.

10. He interviewed the Defendant.

11. He interviewed both victims and their family members.

12. He talked with V2 about a journal that V2 kept.

---

[1] The precise assignment process is unknown at this time.

13. V2 had journaled thoughts about the criminal touching by Defendant.

14. The journaling was done as part of the counseling and therapy process occurring after the events in question.

15. V2 journaled on loose paper.

16. V2 had a number of journals, but some were lost during her repeated moves.

17. V2 lives now in a foster home.

18. V2 says that during the course of the investigation she gave her original journal pages about the incidents with Defendant to Sgt. Misane.

19. At some point the pages were copied. The copies are not legible.

20. Sgt. Misane submitted a charging request to the Van Buren County Prosecutor's Office.

21. It appears that the request went to APA Blair.

22. The Defendant was charged with a series of felonies involving *both victims*.

23. The most serious allegations were CSC 1 with a mandatory minimum sentence of 25 years in prison.

24. Prior to trial, questions arose about the evidence obtained by the BPD.

25. It became clear that the BPD could not account for some or all of the evidence that it obtained, including the body camera footage and the journal pages.

26. On or about March 1, 2021, the prosecutor advised the BPD that problems existed with the case because of the lost evidence.

27. The charges involving V1 were dismissed because of the state of the evidence.[2]

---

[2] The Circuit Court entered an order suppressing evidence relating to V1. I am in the process of obtaining the Court's order and related materials.

3

28. The charges against V2 were on track for trial.

29. On Friday, March 5, 2021, Chief Simpson and Sgt. Weber met with the Prosecutor and the APA handling the case. They learned the following:

    a. The prosecutors did not have the evidence that they felt they needed in order to proceed to trial.

    b. The case was challenging because of the delay between the criminal conduct and the investigation.

    c. The prosecutors scheduled a trial preparation meeting with Sgt. Misane for February 19 in order to discuss the situation and the evidence.

    d. Sgt. Misane cancelled the meeting at the last minute.

    e. Another meeting was scheduled for February 23, 2021 and Sgt. Misane again cancelled the meeting at the last minute.

    f. The prosecutor's office was very concerned about the conduct of the BPD.

30. Chief Simpson called Sgt. Misane during the March 5 meeting in order to discuss the matter. The following occurred:

    a. Sgt. Misane said that he provided the original journal from V2 to Jay Blair of the prosecutor's office.

    b. Sgt. Misane said that the bodycam video was uploaded and is now gone because the vendor did not tell him that video was saved for only 30 days.

    c. APA Blair said that the original journal was not forwarded to him.

    d. Sgt. Misane did not say why he did not copy the video footage to a disc or other medium in order to preserve it.

    e. Department policy is to copy all bodycam footage of evidentiary value to a disc.

31. The Prosecutor told Chief Simpson and Sgt. Weber:

4

  a. "Misane has lost all credibility."

  b. Misane's report was "full of holes."

  c. The investigation was "terrible."

  d. The investigation was put together "like he didn't give a shit."[3]

32. The case proceeded to trial.

33. The prosecutors did not allow Sgt. Misane to sit at the prosecution table during trial, as would normally be the case, because of the problems with evidence.

34. V2 testified at trial.

35. An expert testified for the prosecution regarding the victim impact.

36. The xerox copies of the original journal entries were illegible.

37. The Defendant was acquitted of all charges.

38. Jurors were interviewed and said that the weakness in the prosecution's case was the fact that the BPD lost all of the evidence.

39. The City Attorney interviewed Sgt. Weber and obtained his notes from the case.

## THE TERMINATION DECISION

1. The Mayor followed the problems regarding the CSC case.

2. He discussed the matter with the City Attorney after the charges involving V1 were dismissed.

3. He followed the trial and received a report after the acquittal.

4. The Mayor then conferred with the City Attorney regarding the Mayor's duties, obligations, and authority in this situation.

5. The City Attorney advised the Mayor of the following:

  a. The Mayor is the Chief Executive Officer of the City.

---

[3] These statements are direct quotes from the notes taken during the meeting.

b.  The Charter establishes what is referred to as a "strong Mayor" system.

c.  The City Manager is the Chief Administrative Officer of the City.

d.  Normally, the City Manager would consider action against an employee based on the circumstances described above.

e.  In this case, calling for immediate action, *the Mayor was authorized to take action in order to avoid any allegations of conflict of interest involving the City Manager/Police Chief.*

f.  *Based on the facts obtained by the City, termination was appropriate.*

g.  *Based on the facts known to the City, potential liability could flow from a failure to terminate.*[4]

6.  Following discussions and a review of the information obtained by the City, Sgt. Misane's employment was terminated by the Mayor.[5]







*There is no viable claim of an adverse employment decision in this case. Manager Simpson did not terminate Sgt. Misane's employment. He had nothing to do with the decision.*