# EXHIBIT 1

MARKO LAW

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKOLAW.COM

**In The Matter Of:**

*Misane, et al v.*
*City of Bangor, et al*

---

*Hothman Misane*
*August 09, 2022*

---



Judy Jettke
& Associates
COURT REPORTING AND VIDEO

*Original File MISANE220808_1.txt*
*Min-U-Script® with Word Index*

1            UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DISTRICT

4

5  HOTHMAN MISANE, TYLER SLEEP

6  and JEROL WILLIAMS,

7                     Plaintiffs,

8        vs.                    Case No. 21-487

9                               Hon. Hala Jarbou

10  CITY OF BANGOR, TOMMY SIMPSON,

11  MAYOR DARREN WILLIAMS and

12  SCOTT GRAHAM,

13                     Defendants.

14  _____

15

16      The Deposition of HOTHMAN MISANE

17      Taken at 1300 Broadway Street, Fifth Floor

18      Detroit, Michigan

19      Commencing at 10:03 a.m.

20      Tuesday, August 9, 2022

21      Before Steve Brown, CER-999

22

23

24

25

APPEARANCES:

CAITLIN E. MALHIOT

Marko Law

1300 Broadway Street, Fifth Floor

Detroit, Michigan 48226

313.777.7529

    Appearing on behalf of the Plaintiffs.


KATHLEEN M. JOZWIAK

Garan Lucow Miller

1155 Brewery Park Boulevard, Suite 200

Detroit, Michigan 48207

313.446.5501

    Appearing on behalf of the Defendant, City of Bangor,

    Mayor Williams & Scott Graham


CHARLES L. BOGREN

MICHAEL S. BOGREN

Plunkett Cooney

333 Bridge Street, NW, Suite 530

Grand Rapids, Michigan 49504

269.226.8820

    Appearing on behalf of the Defendant, Simpson.

```
1                    INDEX

2   WITNESS:  HOTHMAN MISANE
```

```
3   EXAMINATION BY MR. BOGREN:                5

4   EXAMINATION BY MS. JOZWIAK:               107

5   RE-EXAMINATION BY MR. BOGREN:             142
```

```
6                   EXHIBITS

7   (Attached to Transcript).
```

```
8   DEPOSITION EXHIBIT 1 - INCIDENT REPORT          23

9   DEPOSITION EXHIBIT 2 - SCOTT GRAHAM MEMORANDUM  26

10  DEPOSITION EXHIBIT 3 - SEXUAL HARASSMENT POLICY 33

11  DEPOSITION EXHIBIT 4 - ANSWERS TO              35

12  INTERROGATORIES

13  DEPOSITION EXHIBIT 5 - TEXT MESSAGE            40

14  DEPOSITION EXHIBIT 6 - TEXT MESSAGE            91

15  DEPOSITION EXHIBIT 7 - TEXT MESSAGE            92

16  DEPOSITION EXHIBIT 8 - EMPLOYEE COMPLAINT FORM 110

17  DEPOSITION EXHIBIT 9 - CHARGE OF               111

18  DISCRIMINATION

19  DEPOSITION EXHIBIT 10 - E-MAIL (REQ. FOR       114

20  INTERVIEW)

21  DEPOSITION EXHIBIT 11 - TEXT MESSAGES          133
```

```
22

23

24

25
```

1    Tuesday, August 2, 2022

2    10:03 a.m.

3

4                    COURT REPORTER:  We are now on the record.

5          The time now is 10:03 a.m.  This is the videotaped

6          deposition of Mr. Hothman Misane, being taken on

7          Tuesday, August 9th, 2022.  This deposition is being

8          taken at Marko Law, 1300 Broadway Street, Fifth Floor,

9          Detroit, Michigan.  We are here in the matter of

10         Hothman Misane, et al, versus City of Bangor, et al.

11         This matter is being held in the United States

12         District Court, Western District of Michigan, Southern

13         Division.  This is case number 21-487.

14                    Sir, can you raise your right hand?

15                    HOTHMAN MISANE,

16         Was thereupon called as a witness herein, and after

17         having first been duly sworn to testify to the truth,

18         the whole truth and nothing but the truth, was

19         examined and testified as follows:

20                    COURT REPORTER:  Attorneys please identify

21         yourselves for the record.

22                    MR. C. BOGREN:  My name is Charles Bogren,

23         appearing on behalf of Tommy Simpson.

24                    MR. M. BOGREN:  Michael Bogren also

25         appearing on behalf of Tommy Simpson.

1      MS. JOZWIAK:  Kathleen Jozwiak on behalf of

2   Mayor Williams and Scott Graham.

3      MS. MALHIOT:  Caitlin Malhiot on behalf of

4   all three plaintiffs.

5                  EXAMINATION

6   BY MR. BOGREN:

7   Q.   Mr. Misane?

8   A.   Misane.

9   Q.   Misane.  Could you give your full name and address for

10   the record, please?

11   A.   Sure.  First name is Hothman, last Misane.  Address,

12   4843 Yellow Pine Lane, Kalamazoo, Michigan 49004.

13   Q.   Mr. Misane, have you ever been deposed before?

14   A.   I have not.

15   Q.   So just to give you a general ground rule, my name is

16   Charles Bogren.  I represent Tommy Simpson, one of the

17   defendants in this case.  I'm going to be asking you

18   some questions today.  Because this is being recorded,

19   because we're putting together a record, I will do my

20   best to make sure I let you finish any answer that you

21   have.  If enough any questions for me, you need me to

22   restate, please just let me know.  If you need to

23   answer affirmatively, please say yes; negatively,

24   please say no.  Uh-hum, nodding your head doesn't make

25   for a good record, so if you have to say yes or no,

1      please just say yes or no.

2              Mr. Misane, what's the highest level of

3      education you've reached?

4  A.  Associate's degree.

5  Q.  And where was that degree from?

6  A.  Kalamazoo Valley Community College.

7  Q.  And what was that degree in?

8  A.  Criminal justice.

9  Q.  And did you attend your police training in Kalamazoo

10     Community College?

11  A.  I did.

12  Q.  And when was that?

13  A.  It was, I completed it in May of 2011.

14  Q.  And when did you begin it then?

15  A.  In 2008.

16  Q.  And prior to that, where did you attend high school?

17  A.  St. Joseph High School.

18  Q.  In St. Joseph, Michigan?

19  A.  Correct.

20  Q.  And what was your first job after Kalamazoo Valley

21     Community College?

22  A.  Afterwards, I was working simultaneously.

23  Q.  Where were you working?

24  A.  At that time, I was working at an apartment complex

25     for a security company.

1  Q.  And after -- you said you were working simultaneously,
2      simultaneous with what?
3  A.  With attending school.
4  Q.  After you graduated from Kalamazoo Valley Community
5      College, where were you then working?
6  A.  After I graduated -- I'm sorry, can you repeat the
7      question?
8  Q.  Sure.  So after you completed your degree at Kalamazoo
9      Valley Community College, where were you working then?
10     Where was the next place you were employed?
11 A.  I was still employed with the same place.
12 Q.  After the apartment complex, where were you then
13     employed?
14 A.  Benton Harbor Department of Public Safety.
15 Q.  How long were you employed at Benton Harbor?
16 A.  Almost five years.
17 Q.  And what was the timeline?
18 A.  From October 2011 through November 2016 or 2015.
19 Q.  And what was your position while you were at Benton
20     Harbor?
21 A.  Public safety officer.
22 Q.  And what did being a public safety officer entail?
23     Were you on road patrol?  What exactly?
24 A.  It had multiple different levels of responsibility,
25     but generally it was road patrol.

1  Q.  And after Benton Harbor police, where did you leave

2      Benton Harbor for?

3  A.  I left and moved out of state.

4  Q.  Where did you go out of state?

5  A.  State of California.

6  Q.  And what were you doing in California?

7  A.  I worked for a tribal public safety company.

8  Q.  What was the name of that?

9  A.  29 Palm Department of Public Safety.

10  Q.  And so you were still a sworn law enforcement officer

11      there?

12  A.  It was not a sworn position there.

13  Q.  So what was that position?

14  A.  It was tribal public safety officer position.

15  Q.  And so you didn't have to have a law enforcement

16      officer license or certification?

17  A.  Correct.

18  Q.  Did you still have a license or certification while

19      you were there?

20  A.  With the State of Michigan.

21  Q.  With the State of Michigan, okay.  But not with the

22      State of California?

23  A.  Correct.

24  Q.  So how long were you with the tribal department?

25  A.  Nearly a year.

1   Q.   And when did you leave the department?

2   A.   In August of 2017.

3   Q.   And why did you leave the department?

4   A.   To move back to Michigan.

5   Q.   Why did you want to move back to Michigan?

6   A.   It's home.

7   Q.   So in August of 2017, did you take a new job or did

8       you just move back to Michigan?

9   A.   I accepted a new job.

10   Q.   And where did you accept that position?

11   A.   Hartford Police Department.

12   Q.   Was that a full-time position?

13   A.   It was a part-time position initially.

14   Q.   And when did you first start at Hartford?

15   A.   August 2017.

16   Q.   And what were your job duties there?

17   A.   Road patrol officer.

18   Q.   You said you were part-time at first, how frequently

19       were you working while you were part-time?

20   A.   It was two days a week with the Hartford Police

21       Department.

22   Q.   Were you working anywhere else while you were

23       part-time?

24   A.   I was.

25   Q.   Where was that?

1    A.    Bangor Police Department.

2    Q.    And when did you start working at the Bangor Police

3          Department?

4    A.    August 2017.

5    Q.    And so how often were you working at the Bangor Police

6          Department at that point?

7    A.    Three days a week.

8    Q.    What were your general responsibilities there?

9    A.    General road patrol.

10   Q.    And how long were you part-time at the Hartford Police

11         Department?

12   A.    I remained part-time all the way until summer of 2020.

13   Q.    Do you remember the month?

14   A.    I believe it was July.

15   Q.    And did you go full-time with Hartford Police

16         Department in July of 2020?

17   A.    No.

18   Q.    Did you terminate your employment with the Hartford

19         Police Department in 2020?

20   A.    Yes.

21   Q.    Why did you terminate your employment with the

22         Hartford Police Department in 2020?

23   A.    It was requested of me to terminate that employment

24         for an opportunity with Bangor.

25   Q.    And what was that opportunity with Bangor?

```
 1    A.    Acting chief position as the sergeant.
 2    Q.    Acting chief position as the sergeant?
 3    A.    Correct.
 4    Q.    What does acting chief position as the sergeant
 5          entail?
 6    A.    I assumed certain duties that a chief of police or an
 7          administrator would be responsible for, but while
 8          being only a sergeant instead of a chief of police.
 9    Q.    So how long were you the acting chief as a sergeant?
10    A.    Until approximately October of 2020.
11    Q.    So between August -- you said you began in August of
12          2020 as the acting chief?
13    A.    July.
14    Q.    July of 2020.  So from July of 2020 until October of
15          2020, what were the chief's roles that you said that
16          you were taking on?
17    A.    It varied.  There was no specific roles given to me.
18          I was just given tasks and handled them as it went.
19    Q.    So what would those tasks entail that a chief would do
20          but you wouldn't have done as a sergeant?
21    A.    Court work, scheduling, the hiring of new employees or
22          that process.
23    Q.    When you say court work, what does court work entail?
24    A.    When the officers effect arrests or any duties that
25          would have to go to court for review or to be tried,
```

1    things of that nature, I would have to compile that

2    together and then bring it over to the court, swear to

3    warrants, things like that.

4 Q.   So it was your position to oversee that but you didn't

5    necessarily go to court yourself?

6 A.   It varied.  Sometimes I did go to court myself,

7    sometimes no.

8 Q.   So what other chief's roles were you taking on?

9 A.   I took part in all the council meetings at that time

10    on behalf of the police department.

11 Q.   Who hired you at the City of Bangor in July of 2020?

12 A.   I was already working there.

13 Q.   So who gave you the position of sergeant in 2020?

14 A.   I was already a sergeant prior to that time.

15 Q.   So when you were part-time, you were a sergeant?

16 A.   No, sir.

17 Q.   So when did you become a sergeant with Bangor Police

18    Department?

19 A.   It was, I don't have an exact date, but it was April

20    of 2019.

21 Q.   April of 2019?

22 A.   Correct.

23 Q.   So when you were originally hired with the Bangor

24    Police Department, who was the supervisor at the time?

25 A.   Tommy Simpson.

1  Q.  And did you interview with anyone else when you were

2       hired at Bangor?

3  A.  Would you be more specific to the question?

4  Q.  When you were being considered for the position with

5       the City of Bangor, did you only interview with Tommy

6       Simpson?  Did you interview with others?

7  A.  Just with Tommy Simpson.

8  Q.  And when exactly -- if you don't know the exact date,

9       that's okay, do you know generally when you met with

10      Tommy Simpson to be interviewed for the City of Bangor

11      Police Department?

12  A.  Once I moved to Michigan.

13  Q.  So in --

14  A.  August 2020.  I'm sorry.  August 2017.

15  Q.  2017?

16  A.  Yes, sir.

17  Q.  So how long -- so from August 2017 until July 2020,

18      you were part-time with the City of Bangor?

19  A.  No.

20  Q.  When did you become full-time with City of Bangor?

21  A.  Within two weeks of being hired there.

22  Q.  So who made the decision to make you full-time with

23      the City of Bangor?

24  A.  Tommy Simpson, to the best of my knowledge.

25  Q.  And were you asked to -- once you were offered the

```
1          full-time position, is that when you were asked to
2          resign the position with the Hartford Police
3          Department?
4     A.   No.
5     Q.   When were you asked to resign the position with the
6          Hartford Police Department?
7     A.   In July of 2020.
8     Q.   So how many hours were you working at the Hartford
9          Police Department while you were full-time with City
10         of Bangor?
11    A.   It was combined hours between the City of Bangor and
12         the City of Hartford, that would equal to 40 hours a
13         week.
14    Q.   Okay.  So how long were you the acting chief as a
15         sergeant?
16    A.   From July 2020 until October of 2020.
17    Q.   And what did your position become after -- in October
18         of 2020?
19    A.   Deputy chief.
20    Q.   And what did your position as deputy chief entail?
21    A.   The same exact as it was as sergeant, acting chief.
22    Q.   Aside from court work, what else were you doing as the
23         deputy chief?
24    A.   The same duties I did as sergeant, from scheduling,
25         hiring and all of the duties that are essential for
```

1          Michigan Commission on Law Enforcement Standards.

2     Q.   So what are those duties that are essential under the

3          standard that you just referenced?

4     A.   There's a lot.  There is -- the employment records

5          must be updated with the State of Michigan to include

6          hours worked of each employee; training records

7          standards and the management of that which must be

8          updated regularly; all of the MICR, which are the

9          criminal codes of various cases that we handle that

10         has to be sent to the FBI for their UCR reports; the

11         registration of all the firearms which must be done

12         biannually to the best of my knowledge.  So those

13         things are additions to what I did.

14    Q.   While you were working -- let's go back to your first

15         position.  While you were working at Benton Harbor

16         Police Department, were you -- strike that.  Let me

17         rephrase that.  That was going to be confusing.

18              When you were working with the Benton

19         Harbor Police Department, were there any complaints

20         made against you by citizens?

21    A.   No.

22    Q.   While you were working for the tribal public safety in

23         29 Palms California, were there any complaints that

24         were made against you?

25    A.   No.

1  Q.  While you were at the Benton Harbor Police Department,
2      were you subject to any internal discipline?
3  A.  I'm sorry, which department?
4  Q.  While you were working at the Benton Harbor Police
5      Department, were you subject to any internal
6      discipline?
7  A.  Yes.
8  Q.  And what was that internal discipline?
9  A.  Tardiness, I believe there were two occurrences of
10     tardiness, and the other one was a misidentification
11     of an offender on a case.
12 Q.  Misidentification -- so does that mean you had the
13     wrong person for a particular crime?  Charged, alleged
14     crime.
15 A.  Correct.
16 Q.  While you were working at the tribal position in
17     California, were you subject to any internal
18     discipline there?
19 A.  No.
20 Q.  While you were working for the Hartford Police
21     Department, were you subject to any citizen
22     complaints?
23 A.  No.
24 Q.  Were you subject to any internal discipline while
25     working at Hartford?

1    A.    No.

2    Q.    So let's go back to working at the City of Bangor.

3          Were you subject to any citizen complaints while you

4          were working as a sergeant at the City of Bangor?

5    A.    Not that I recollect.

6    Q.    Were you subject to any internal discipline while you

7          were working as a sergeant?

8    A.    No.

9    Q.    Were you subject to any complaints while you were the

10         acting chief?

11   A.    No.

12   Q.    And any internal discipline while you were the acting

13         chief?

14   A.    Yes.

15   Q.    And what was the internal discipline that you were

16         subject to?

17   A.    My demotion and my termination.

18   Q.    So you were the acting chief at that time?

19   A.    I'm sorry, I was the chief at that point, so I was

20         acting chief --

21   Q.    I'll clarify.  So while you were the acting chief, so

22         from July 2020 to October 2020, were you subject to

23         any internal discipline?

24   A.    No.

25   Q.    So you were made deputy chief in October of 2020,

```
 1       correct?
 2  A.   Correct.
 3  Q.   And how long were you the deputy chief with the City
 4       of Bangor?
 5  A.   Approximately a month.
 6  Q.   Okay.  So in November of 2020, you received a
 7       different position?
 8  A.   I don't know the exact date, but around that time,
 9       yes.
10  Q.   And what position were you given at that point?
11  A.   Chief of police.
12  Q.   And who appointed you chief of police?
13  A.   The City of Bangor council.
14  Q.   So was that a vote that happened by the whole council?
15  A.   Yes.
16  Q.   And chief of police -- so how long did you have the
17       position of chief of police?
18  A.   Until my demotion in February of 2021.
19  Q.   So for about four months, you were chief of police?
20  A.   About three, three and-a-half months.
21  Q.   So from approximately November 2020 to February 2021,
22       you were chief of police?
23  A.   Correct.
24  Q.   What is your current position?
25  A.   I am a deputy.
```

1   Q.   Where are you a deputy?

2   A.   Calhoun County Sheriff's Department.

3   Q.   And what does your position as deputy entail?

4   A.   Road patrol, crime scene technician.

5   Q.   And how long have you had that position?

6   A.   Since April 30th of 2021.

7   Q.   And have you been a sheriff's deputy the entire time

8       you've been there?

9   A.   Would you specify, please?

10   Q.   The only title you've had while at Calhoun County is

11       sheriff's deputy?

12   A.   No.

13   Q.   What other titles have you had?

14   A.   Court officer of transport division.

15   Q.   And you're no longer that?

16   A.   Correct.

17   Q.   And any other titles that you've had while you've been

18       there?

19   A.   No.

20   Q.   So when you were originally hired at the City of

21       Bangor, who was the chief?

22   A.   Tommy Simpson.

23   Q.   And who was the sergeant when you were hired?

24   A.   There were none.

25   Q.   So when you were hired, did you say you were

```
 1        originally hired as a sergeant?
 2   A.   No.
 3   Q.   So what were you hired in as?
 4   A.   An officer.
 5   Q.   And when did you become a sergeant?
 6   A.   In April of 2019.
 7   Q.   And this was a full-time position at that point?
 8   A.   Yes, sir.
 9   Q.   And you said you became chief in November of 2020,
10        correct?
11   A.   Approximately around that time, correct.
12   Q.   And you said you were demoted as chief of police?
13   A.   Correct.
14   Q.   And what were you demoted to?
15   A.   To sergeant.
16   Q.   Were you given a choice to go back to sergeant or were
17        you given a choice for a different position?
18   A.   I was given a choice.
19   Q.   What were those choices?
20   A.   Deputy chief or sergeant.
21   Q.   So why did you choose to be a sergeant?
22   A.   There were multiple reasons.
23   Q.   What were those reasons?
24   A.   One of them was the incentive for the pay, the pay was
25        better as a sergeant than as a deputy chief due to
```

```
 1          hourly versus salary.  So overtime opportunities were
 2          present.  And the other reason was, as a sergeant, I
 3          would assume sergeant only responsibilities and not
 4          still be an acting chief while yet having been
 5          demoted.
 6    Q.    So as a sergeant, what were those roles that you'd be
 7          taking that you wouldn't have had otherwise as a
 8          deputy chief?
 9    A.    Direct line supervision.
10    Q.    Say that again for me.
11    A.    Direct line supervision.
12    Q.    What is direct line supervision?
13    A.    I'm immediate supervisor to the officers.
14    Q.    How many officers reported to you?
15    A.    Five approximately.
16    Q.    Was that number roughly the same or it fluctuated?
17    A.    It fluctuated.
18    Q.    What was the lowest it ever was while you were
19          sergeant?
20    A.    I couldn't give you an exact number.
21    Q.    Do you know what the highest would have been while you
22          were sergeant?
23    A.    I believe it was nine.
24    Q.    So somewhere between we'll say five to nine officers
25          that you would oversee?
```

1  A.   Correct.

2  Q.   So you said that you were demoted as the chief of

3       police; what was the reason that you were given that

4       you were demoted as chief of police?

5  A.   I wasn't given one.

6  Q.   So you were just informed that you were going to be

7       demoted?

8  A.   Correct.

9  Q.   And then you were offered the choice between deputy

10      chief and sergeant, correct?

11  A.   Correct.

12  Q.   Who informed you that you were being demoted?

13  A.   Tommy Simpson.

14  Q.   And when did he inform you?

15  A.   That night.

16  Q.   What is that night, when is that?

17  A.   I wasn't present when the decisions were made, but it

18      was the night of the council meeting.

19  Q.   Do you know the date?

20  A.   I do not.

21  Q.   But it would have been in February of 2021?

22  A.   I believe so.

23  Q.   Do you know if that was a decision that Tommy Simpson

24      made or it was a decision of the council?

25  A.   I don't know.

1   Q.   How long were you a sergeant with the City of Bangor

2       after you were demoted?

3   A.   Two weeks, approximately.

4   Q.   Bear with me for a second while I pull out our first

5       exhibit.

6               (Off the record).

7               (Deposition Exhibit #1 Marked).

8   Q.   Who is Antonio Lee Mendoza?

9   A.   An offender in a case I worked.

10  Q.   Were you assigned to investigate a criminal sexual

11      conduct case relating to Mr. Mendoza?

12  A.   I was.

13  Q.   Did you conduct an investigation into that case?

14  A.   I did.

15  Q.   And when was that investigation, approximately?

16  A.   2019.

17  Q.   Do you have a guess as far as the month?

18  A.   I believe it was around April of 2019.

19  Q.   Do you recognize what has been marked as Exhibit 1 and

20      placed in front of you?

21  A.   I do.

22  Q.   And what has been placed in front of you?

23  A.   The report for the case that you just referred to with

24      the offender being Antonio Lee Mendoza.

25  Q.   When you say offender, why do you say offender?

1   A.   He was being investigated as the offender in this

2        complaint.

3   Q.   Was he convicted a CSC?

4   A.   He was not.

5   Q.   So as part of the interview, did you interview --

6        excuse me.   Strike that.

7                   As part of the investigation, did you

8        interview the underage victims, the alleged victims?

9   A.   Not all.

10  Q.   How many did you interview?

11  A.   One.

12  Q.   And was that interview recorded?

13  A.   It was.

14  Q.   And again, roughly in April of 2019, you believe?

15  A.   I believe.

16  Q.   Were you given a personal journal or entries that she

17       had written?

18  A.   Yes.

19  Q.   And were those entries on loose-leaf paper?

20  A.   Can you elaborate on loose-leaf paper?

21  Q.   Were they part of a bound journal or were they just

22       written statements on loose pieces of paper?

23  A.   Loose pieces of paper.

24  Q.   What happened to those journals after they were given

25       to you?

1   A.   They were turned over to the prosecutor's office.

2   Q.   And how were they turned over to the prosecutor's

3       office?

4   A.   I attached them to the supplement reports and placed

5       them in the court box.

6   Q.   What's the court box?

7   A.   At the Bangor Police Department, we have a box that is

8       exclusively meant for documents that are to be

9       forwarded to the court.

10  Q.   And who takes the court box to the court then?

11  A.   At that time, Tommy Simpson.

12  Q.   So after you placed them in the court box, you

13      wouldn't know what would happen to the originals after

14      that?

15  A.   I wouldn't.

16  Q.   So Jay Boyer at the prosecuting attorney's office said

17      that he never received those original journals from

18      you, correct?

19  A.   I don't know what he said.

20  Q.   So you wouldn't know, again, after they were placed in

21      the box, what exactly happened to those afterwards?

22  A.   Correct, I wouldn't know.

23  Q.   Again bear with me for a second while I bring these

24      out.  Let's go off the record.

25               COURT REPORTER:  Off the record, the time

1     is 10:48.

2     (Off the record).

3     COURT REPORTER:  We're back on the record,

4     the time is 10:49.

5     (Deposition Exhibit #2 Marked).

6  Q.  Have you seen the document that has been marked as

7     Exhibit 2 placed in front of you?

8  A.  No.

9     COURT REPORTER:  Off the record, the time

10    is 10:30.

11    (Off the record).

12  Q.  So you have not seen the document that was placed in

13    front of you before?

14  A.  I believe not.

15  Q.  So it says Scott Graham, PLLC.  Do you know who Scott

16    Graham is?

17  A.  I believe I do.

18  Q.  Who is Scott Graham?

19  A.  The city attorney for the City of Bangor.

20  Q.  And this document says that this Opinion Memorandum

21    relates to issues, the employment termination of

22    Sergeant Misane and the employment complaints against

23    City Manager/Police Chief Simpson.  Did I read that

24    correct?

25  A.  Correct.

1  Q.   If you turn to page 4 for me, it says here in

2        paragraph 29 that on March 5th, 2021, Chief Simpson

3        and Sergeant Weber met with the Prosecutor and the APA

4        handling the case.  They learned the following.  A.

5        The prosecutors did not have the evidence they felt

6        they needed to proceed to trial.  B.  The case was

7        challenging because of the delay between the criminal

8        conduct and the investigation.  C.  The prosecutors

9        scheduled a trial preparation meeting with Sergeant

10       Misane for February 19th in order to discuss the

11       situation and the evidence.  D.  Sergeant Misane

12       cancelled meeting at the last minute.  E.  Another

13       meeting was scheduled for February 23rd and Sergeant

14       Misane again cancelled the meeting at the last minute.

15       F.  The prosecutor's office was very concerned about

16       the conduct of the BPD.  Did I read that correctly?

17  A.   Yes.

18  Q.   So February 19th, 2021 you were supposed to meet with

19       the prosecutor.  Is there a reason you had to cancel

20       that meeting?

21  A.   Yes.

22  Q.   What was that reason?

23  A.   I was ordered to cancel is by Tommy Simpson.

24  Q.   Why did he order you to cancel that meeting?

25  A.   He wanted me to address an issue at the Bangor schools

1     which he felt had precedence.

2 Q.   So it was unrelated to the case?

3 A.   Correct.

4 Q.   The Mendoza case, I should clarify.

5 A.   Correct.

6 Q.   How about on February 23rd, 2021, why was that meeting

7     cancelled?

8 A.   Tommy Simpson again ordered me to cancel that meeting.

9 Q.   And did he give you a reason why it should be

10     cancelled?

11 A.   The same reasons; that the city had precedence in

12     certain matters.

13 Q.   And what were those matters?

14 A.   I do not recall.

15 Q.   Do you recall discussing this case at any point with

16     the prosecuting attorneys?

17 A.   I do.

18 Q.   When did you discuss that with the prosecuting

19     attorneys?

20 A.   Various times throughout a year or more.

21 Q.   After February 23rd, 2021, do you recall when you met

22     with the prosecuting attorneys?

23 A.   I spoke on the phone.

24 Q.   You spoke with who on the phone?

25 A.   The assistant prosecuting attorney in charge.

1  Q.  Do you remember that person's name?

2  A.  I believe it's Rachel Keeley.

3  Q.  And did you communicate in any other way with the

4      prosecutor's office about this case?

5  A.  Yes.

6  Q.  In what way was that?

7  A.  Via e-mail.

8  Q.  And what were you discussing via e-mail?  The facts of

9      the case?  Were you sending documents?  What exactly

10     were you doing?

11 A.  All of the above.

12 Q.  So what documents were you sending the prosecuting

13     attorney's office related to this case?

14 A.  E-mails, such as the attachments of that journal entry

15     that belonged to the victim of this case regarding

16     Mendoza.

17 Q.  So if we go down to paragraph 30 in Exhibit 2, and you

18     go down to A, Sergeant Misane said that he provided

19     the original journal to V2 Jay Blair prosecutor's

20     office.  Who is Jay Blair?

21 A.  He was originally the APA assigned to this case until

22     he was switched.

23 Q.  And he was replaced by Rachel Keeley?

24 A.  Correct.

25 Q.  B.  Sergeant Misane said the body cam video was

1      uploaded and is now gone because the vendor did not
2      tell him that video was saved for only 30 days what
3      body cam video is that in reference to?
4                MS. MALHIOT:  I'm going to object as to
5      foundation.  You haven't established that he knows.
6      He didn't write this document and he hasn't seen it
7      before.  You can answer to the best of your knowledge.
8      BY MR. BOGREN:
9   Q.  We'll rephrase.  You said originally that there was
10      body cam video taken of your interview with underage
11      victim; is that correct?
12  A.  That is correct.
13  Q.  Did you upload that video to the Bangor internal
14      system?
15  A.  Yes.
16  Q.  And did the video delete after 30 days?
17  A.  I don't know.
18  Q.  So you did not tell anyone that the vendor did not
19      tell you that the video would only save for 30 days?
20  A.  I did not.
21  Q.  Did you make a hard copy of the video?
22  A.  I don't recall.
23  Q.  Do you recall if there's a policy regarding how body
24      cam videos related to or being used in police
25      investigations should be treated?

1  A.    I don't recall.

2  Q.    So would you agree -- well, strike that.

3            Go back to Exhibit 2, paragraph 30, go down

4        to E, it says:  Department policy is to copy all body

5        cam footage of evidentiary value to a disc.  Are you

6        aware of the department policy that states that all

7        bod cam footage of evidentiary value should be copied

8        to a disc?

9  A.    I am not aware.

10  Q.    So you were not aware at the time in 2021 that the

11        department policy was that body cam footage should be

12        saved to a disc?

13  A.    Correct.

14  Q.    If we go to paragraph 31, and it's bottom of page 4 on

15        to page 5, The prosecutor told Chief Simpson and

16        Sergeant Weber, A.  Misane has lost all credibility.

17        B.  Misane's report was full of holes.  C.  The

18        investigation was terrible.  D.  The investigation was

19        put together like he didn't give a shit -- and there's

20        a footnote there that says:  These statements are

21        direct quotes from the notes taken during the meeting.

22            Were you present at the Mendoza trial?

23  A.    Partly.

24  Q.    Did you testify at the trial?

25  A.    Yes.

1   Q.   When you were at the trial and not testifying, were

2        you sitting at the prosecution's table?

3   A.   No.

4   Q.   In the gallery then?

5   A.   No.

6   Q.   Where were you?

7   A.   In the witness room.

8   Q.   So at no point were you -- other than when you were

9        testifying in the courtroom?

10  A.   Correct.

11  Q.   What was the outcome of the Mendoza trial?

12  A.   I believe all charges were dropped against Mendoza.

13  Q.   Fair to say defendant was acquitted of all the

14       charges?

15  A.   Correct.

16  Q.   And paragraph 38 on Exhibit 2:  The jurors were

17       interviewed and said that the weakness in the

18       prosecution's case was the fact that the BPD lost all

19       the evidence.  Did I read that correctly?

20  A.   Yes, you did.

21  Q.   You were not present for the jurors to be interviewed,

22       correct?

23  A.   Correct.

24  Q.   Did any one tell you that that's what the jurors said

25       after the trial?

1   A.    No.

2   Q.    Did anyone tell you that the prosecuting attorney's

3          office was upset with your handling of the

4          investigation after the trial?

5   A.    Yes.

6   Q.    Who told you that?

7   A.    Tommy Simpson.

8   Q.    When did Tommy Simpson tell you that?

9   A.    I don't recall an exact date.

10  Q.    Was it right after the trial, was it later on?

11  A.    It was during the trial.

12  Q.    During the trial.  So I just want to clarify, and I

13         apologize if this seems redundant.  The body cam video

14         of your investigation was not saved to a disc or any

15         other backup?

16  A.    I don't recall.

17  Q.    So you can't state that it was or was not?

18  A.    Correct.

19              (Deposition Exhibit #3 Marked).

20  Q.    You've had a chance to look at what's been marked as

21         Exhibit 3 in front of you.  Do you recognize what that

22         document is?

23  A.    I do.

24  Q.    And what is that document?

25  A.    The acknowledgment and the updated sexual harassment

1       policy for the City of Bangor.

2  Q.   And on the last page, is that your signature?

3  A.   It is.

4  Q.   And that was dated on January 14th, 2021; is that

5       correct?

6  A.   That is correct.

7  Q.   Was this the first sexual harassment policy that you

8       were aware of while you were employed at the City of

9       Bangor?

10 A.   No.

11 Q.   So had there been previous ones that you had signed as

12      well?

13 A.   You would have to be more specific.

14 Q.   Prior to the 2021 signature on this sexual harassment

15      policy, had you signed any other sexual harassment

16      policies?

17 A.   I can't recall.

18 Q.   Were you aware of any other sexual harassment

19      policies?

20 A.   Yes.

21 Q.   Were you aware when you were hired there was a sexual

22      harassment policy?

23 A.   Yes.

24 Q.   What does the policy say on the third page under

25      Reporting Requirements?

1   A.    Did you wish for me to read that?

2   Q.    Yeah, just read that paragraph and the bullet points.

3   A.    If you feel that you are a victim of sexual

4        harassment, please report your complaint in writing to

5        either the following:  City manager, mayor, department

6        head.

7   Q.    If we go back to Exhibit 2, Mr. Graham's report --

8        strike that.  I'll give you the new document here.

9        I'm taking that off.  Off the record for a minute.

10           (Off the record).

11           (Deposition Exhibit #4 Marked).

12   Q.    You've been handed what's been marked as Exhibit 4.

13        Do you recognize this document?

14   A.    I do.

15   Q.    And what is this document?

16   A.    It is what I turned in in discovery.

17   Q.    So these are your Answers to Defendant Tommy Simpson's

18        First Interrogatories; is that correct?

19   A.    I believe so.

20   Q.    And we will talk about your answer to the very first

21        question, so if you flip to page 2 for me, you state

22        that Tommy Simpson asked you if you had ever

23        considered being with a man at some point during the

24        summer of 2018; is that correct?

25   A.    That is correct.

1  Q.   You go on to state that Tommy Simpson told you a story

2        relating to intercourse that he had with a boyfriend

3        of his several times, first in 2019 and then the same

4        story again in 2020 and January of 2021; is that

5        correct?

6  A.   Correct.

7  Q.   During a trip for a training event at the Michigan

8        State Police Headquarters in 2019, you claim that

9        Tommy Simpson told you about intercourse he had with a

10       hotel employee; is that correct?

11  A.   That is correct.

12  Q.   You further state that at one point in 2019, Tommy

13       Simpson told you about another incident where his

14       partner, a Berrien County law enforcement officer,

15       requested Tommy to urinate on him; is that correct?

16  A.   Correct.

17  Q.   This is a sampling of further stories that you allege

18       over the course of your time while employed with the

19       City of Bangor; is that correct?

20  A.   Correct.

21  Q.   You also state that manager Simpson has also mentioned

22       statements about Officer Tyler Sleep, making fun of

23       his physical size and call him fatso; is that correct?

24  A.   Correct.

25  Q.   Do you believe that those statements are also sexual

1     harassment?

2                MS. MALHIOT:  I'm going to object to the

3     extent that that calls for a legal conclusion.  You

4     can answer as to your own knowledge and understanding,

5     with the understanding that he's not a legal expert.

6  A.   It could be.

7  BY MR. BOGREN:

8  Q.   Were you superior to Officer Sleep?

9  A.   At some point.

10 Q.   When specifically?

11 A.   When I became sergeant.

12 Q.   And from when you became sergeant until when?

13 A.   Throughout the rest of my time with the Bangor Police

14     Department.

15 Q.   So do you know when Officer Sleep began working with

16     the City of Bangor?

17 A.   I do not.

18 Q.   But fair to say that from your time as a sergeant

19     starting July of 2020, until your termination with the

20     City of Bangor, you were Tyler Sleep's superior,

21     correct?

22 A.   Correct.

23 Q.   Did you ever raise concerns with Tommy Simpson or the

24     mayor or anyone on the city council about the

25     statements that were said about Officer Sleep, your

1    subordinate?

2    A.    No.

3    Q.    Why did you not -- strike that.

4          Did you not believe that those statements

5          were inappropriate?

6    A.    Would you repeat that question, please?

7    Q.    Did you believe that making mention -- statements of

8          Officer Sleep, making fun of his physical size and

9          doing things like calling him fatso was appropriate?

10   A.    No.

11   Q.    Did you believe that it was problematic?

12   A.    Depending on the context of certain statements.

13   Q.    So what context would you think that they are not

14         problematic statements?

15   A.    If everybody's involved.

16   Q.    So if everyone is joking around, if they're talking

17         with each other?  You say everyone's involved, what do

18         you mean by that?

19   A.    Mutually agreeing and accepting to be called certain

20         things or to be talked to about certain things.

21   Q.    Okay.  So when you say mutually agreeing, does that

22         mean that there's a statement saying it's okay for you

23         to call me something?

24   A.    Sure.

25   Q.    Are there other situations where it's more just

1      understood that it's okay?

2  A.    I believe there can be.

3  Q.    Situations where it's unspoken that these discussions

4      are acceptable, they're not harassing?

5  A.    Correct.

6  Q.    Who is Officer Dillon Schmidt?

7  A.    A former officer of the Bangor Police Department.

8  Q.    And you say former, do you know when he left the

9      Bangor Police Department?

10  A.    March 1st, 2021.

11  Q.    And prior to his leaving, was he a subordinate of

12      yours as well?

13  A.    Yes.

14  Q.    Now, you make reference in your responses that there

15      had been statements made by Tommy Simpson to Officer

16      Schmidt; is that correct?  Let me rephrase that.

17             You state here that there had been

18      concerning statements that were made by Tommy Simpson

19      to Officer Schmidt; is that correct?

20  A.    Correct.

21  Q.    And what were -- were those statements -- were you

22      present for them?  Were they relayed to you after the

23      fact?

24  A.    A statement was relayed to me.

25  Q.    What was that statement?

1   A.   It was discussing -- it was Tommy Simpson discussing

2        Dillon Schmidt's appearance, and that he was in a

3        sense attracted to that appearance.

4   Q.   And do you believe that that would constitute sexual

5        harassment?

6   A.   Yes.

7   Q.   Did you make a report to any supervisor, the city

8        mayor, anyone on the council about that harassment?

9   A.   I did not.

10          (Deposition Exhibit #5 Marked).

11   Q.   You have just been handed what's been marked Exhibit

12        5, which was produced to us from Jerol Williams, text

13        messages between yourself and co-defendant (sic) Jerol

14        Williams.  Do you recognize what's been put in front

15        of you?

16   A.   I do.

17   Q.   And can you describe what's been put in front of you?

18   A.   A screen shot of a Facebook post with a continued

19        conversation after that screen shot.

20   Q.   And what does the screen shot show?

21   A.   It shows Paige Galloway Schmidt tagging Dillon Schmidt

22        and making a statement with a photograph attached.

23   Q.   And then what's the statement that comes after that?

24   A.   LOL, quote, "best cop out there out there" closed

25        quote.

1  Q.  Was that sent to you from Jerol Williams?

2  A.  I don't recall.

3  Q.  Did you ever talk to Tommy Simpson about your

4      statements about Officer Schmidt?

5  A.  We have had discussions, correct.

6  Q.  When did you have those discussions?

7  A.  I can't give you an exact date and time.  It's been

8      throughout.

9  Q.  What were those discussions about?  Let's narrow this

10     down.  Did you ever talk to Tommy Simpson specifically

11     about Officer Schmidt, the sexual comments that Tommy

12     Simpson made to Officer Schmidt?

13 A.  I have not.

14 Q.  Why did you fail to bring those up with Tommy Simpson?

15 A.  Would you specify?

16 Q.  Why did you not bring up the comments that you believe

17     were sexually harassing Officer Schmidt, your

18     subordinate, to Tommy Simpson?

19 A.  Because they were directed towards me.  Those comments

20     involved myself as well.

21 Q.  So why did you not make a report to the mayor as per

22     the sexual harassment policy you signed?

23 A.  The signed sexual harassment policy came far after

24     these incidents.

25 Q.  Well, you said there was already a sexual harassment

```
 1          policy of which you were aware, so why did you not
 2          report the sexual harassment of one of your
 3          subordinates to someone in a position of power?
 4    A.    Retaliation, I was afraid of that.
 5    Q.    What kind of retaliation?
 6    A.    Being terminated or being looked down upon.
 7    Q.    Why did you believe that you would be looked down upon
 8          or terminated if you reported your subordinate sexual
 9          harassment?
10    A.    It's just in a sense the nature of the beast.
11    Q.    Be more specific.  Why did you specifically be you
12          would be retaliated against if you made a report that
13          your subordinate was being sexually harassed?
14    A.    I have learned prior to that time that Tommy Simpson
15          has specifically retaliated against former employees
16          for the same thing.
17    Q.    You've learned since that time, but at the time, why
18          did you not make a report?  Did you not believe that
19          your subordinate should be protected from sexual
20          harassment?
21    A.    I do believe that.
22    Q.    So why did you not report it?
23    A.    It involves myself not, just a subordinate.
24    Q.    So you felt protecting yourself from retaliation was
25          more important than protecting your subordinate?
```

```
 1   A.   No.

 2   Q.   So why did you fail to report the sexual harassment?

 3   A.   I wouldn't say I failed to report it.

 4   Q.   So you did report it?

 5   A.   No, I did not report it.

 6   Q.   So why did you not report the sexual harassment?

 7   A.   Out of fear of retaliation.

 8   Q.   So you said that retaliation generally, does that mean

 9        you believed you would lose your job?

10   A.   Correct, in part.

11   Q.   In part.  Expand on that.  What are the other parts

12        that you believed would occur?

13   A.   Demotion, not being liked any further at work and

14        therefore, things would turn against me.

15   Q.   Turn against you how?

16   A.   In scheduling, in promotional opportunities or in

17        working there period.

18   Q.   At this point in time, were you not the sergeant?

19   A.   I was.

20   Q.   Did you not testify you were in charge of scheduling?

21   A.   At one point I was in charge of scheduling.

22   Q.   So it changed?

23   A.   Correct.

24   Q.   So when were you no longer in charge of scheduling?

25   A.   When I was terminated.
```

1    Q.   So at the time when Officer Schmidt relayed that he

2         had these sexual harassment statements made to him,

3         sexually harassing statements, were you in charge of

4         scheduling?

5    A.   I'm sorry, you said at the time that Dillon Schmidt,

6         not Tommy Simpson?

7    Q.   At the time that Dillon Schmidt told you he had

8         received or been the victim of, had heard sexually

9         harassing statements from Tommy Simpson, were you in

10        charge of scheduling?

11   A.   I have to make a correction on the basis of the

12        question.  I was never told by Dillon Schmidt; I

13        thought we were discussing that I was told by Tommy

14        Simpson.

15   Q.   So if we go back to the Exhibit --

16                  MS. MALHIOT:  Exhibit 4?

17                  MR. BOGREN:  Yes.

18   Q.   You state here that:  Former Officer Dillon Schmidt

19        told me on March 11th, 2021 -- this is on page 4 --

20        that then Chief Simpson a few months after his hire

21        asked him a question while on duty and driving around

22        together.  Why did you relay this if this was not told

23        to you while you were actually his superior?

24   A.   I was fired the very next day.

25   Q.   But why exactly -- what does this have to do with your

1      claim that Officer Schmidt had been harassed?

2  A.   It was describing the facts of what Dillon Schmidt

3      told me about, and I was not even given an opportunity

4      to discuss it further, as I was terminated before that

5      even came up as an opportunity.

6  Q.   So if we go to page 5 --

7  A.   Same exhibit?

8  Q.   Yes, same exhibit.  And at the Blue Chip Casino Hotel.

9      So according to this, prior to -- you state -- strike

10     that.  Let me start again.

11           According to this exhibit, you state that

12     you took a personal trip to the Blue Chip Casino in

13     Michigan City, Indiana with Tommy Simpson on November

14     18th, 2020; is that correct?

15  A.   That is correct.

16  Q.   And this was not in any way work related?

17  A.   It was not.

18  Q.   And according to your statements, prior to your

19     personal trip to the Blue Chip Casino in November

20     2020, there were several instances of sexual

21     harassment that you experienced; is that correct?

22  A.   Correct.

23  Q.   So why did you go on a trip to Blue Chip Casino if you

24     had been harassed and made to feel uncomfortable prior

25     to this personal trip?

1   A.   It was an opportunity for me to mend certain issues

2        and discuss certain issues.

3   Q.   So you felt that this was going to be an opportunity

4        for you to discuss your previous harassment?

5   A.   A multitude of things.

6   Q.   Explain the multitude of things.  Break that down for

7        me.  What exactly were you going to discuss with him?

8   A.   We did discuss Justin Weber and his involvement at the

9        time.

10  Q.   What does Justin Weber have to do with your sexual

11       harassment claims?

12  A.   It has nothing to do with that.

13  Q.   So specifically, why did you go to the Blue -- what

14       did you plan on discussing about your sexual

15       harassment claim at the Blue Chip Casino?

16  A.   There was no direct plan to discuss the sexual

17       harassment.  It was to discuss everything overall and

18       see where the conversation goes.

19  Q.   So why were you comfortable going on a personal trip

20       with Tommy Simpson if you claim that he had sexually

21       harassed you at this point multiple times?

22  A.   I was not uncomfortable to go with him to Blue Chip

23       Casino on the basis of being sexually harassed in the

24       past.

25  Q.   So did you not believe that it was a problem that he

```
 1          had sexually harassed you in the past?
 2    A.    I did not believe it was a problem that would affect
 3          me conversing with him and going out on that date.
 4    Q.    When you say date, do you mean this was a personal
 5          nature or just the date in November?
 6    A.    The date in November.
 7    Q.    After your personal trip to the Blue Chip Casino with
 8          Tommy Simpson, did you make a complaint of his alleged
 9          harassment to the City of Bangor?
10    A.    I did not.
11    Q.    Had you previously made a complaint to the City of
12          Bangor?
13    A.    I did not.
14    Q.    You state in this exhibit that the work environment
15          after that personal trip became uncomfortable and that
16          the city department of public works director said you
17          seemed different; is that correct?
18    A.    That is correct.
19    Q.    You go on to say you wanted to say something to the
20          director but feared for your job; is that correct?
21    A.    Correct.
22    Q.    Why did you fear for your job?
23    A.    Because they are best friends.
24    Q.    Who are best friends?
25    A.    The public works director and Tommy Simpson.
```

1  Q.   Whose name is?

2  A.   John Saylor.

3  Q.   And you believe that they're best friends; is that

4       correct?

5  A.   Correct.

6  Q.   And so why did you fear for your job that they were

7       best friends?

8  A.   I feared that he would tell him about it instead of

9       handling it appropriately through the appropriate

10      chain.

11 Q.   So was the department of public works director your

12      direct supervisor?

13 A.   No.

14 Q.   So why would it be incumbent on him to deal with the

15      sexual harassment?

16 A.   I had no one else.

17 Q.   So the policy that was in place that you signed, and

18      you've testified that you're aware of other policies,

19      states that you could have gone to the mayor or

20      department head; why did you not go to the mayor?

21 A.   I went to the department head.  The mayor was also

22      involved by that time.

23 Q.   What department head did you go to?

24 A.   The public works director.

25 Q.   But you just said that you feared for your job, so you

```
 1        didn't say anything to him?
 2   A.   Correct.
 3   Q.   So you didn't go to the department head?
 4   A.   I just didn't say anything, as I feared there would be
 5        some issue with telling him and therefore did not
 6        proceed with telling him.
 7   Q.   So fair to say you did not make a sexual harassment
 8        complaint to the department of public works director?
 9   A.   Correct.
10   Q.   So what exactly was your fear for your job simply
11        because they were friends?  What is that fear based
12        on?
13   A.   Their friendship.
14   Q.   So they're friends, why does that mean that your job
15        would be in danger?
16   A.   I believe they're friends that would look out for each
17        other instead of perhaps doing the right thing.
18   Q.   Why do you believe that?
19   A.   Watched them as they've worked and I have witnessed
20        several occurrences where they've done that.
21   Q.   Let's walk through those occurrences then.  Give me
22        specifics, people, time, places.  What occurrences are
23        you referring to that led you to this belief?
24   A.   One occurrence is the prior public works director,
25        Mike Sullins, he was terminated from his employment,
```

        1           and I was there when I watched -- I listened to them
        2           as they were in the office, and that would be John
        3           Saylor and Tommy Simpson, as they planned and
        4           calculated how to get rid of him.
        5   Q.      How did they plan and calculate to get rid of him?
        6   A.      Saying that he's incompetent, are you ready to take
        7           over, would you take over, and then he was suddenly
        8           fired.
        9   Q.      Was he incompetent?  Do you know one way or the other?
       10   A.      I have no idea.
       11   Q.      What are the other examples that led you to believe
       12           you would be fired if you brought up your sexual
       13           harassment claim?
       14   A.      Those would be inclusive, the fact that in the first
       15           place --
       16   Q.      You say those, implies more than one, I've heard one;
       17           what's the next one?
       18   A.      At that time I have already heard about a former
       19           employee.
       20   Q.      Who?
       21   A.      I recall his name as Taylor at this time.
       22   Q.      First name, last name?
       23   A.      I believe that is his last name.
       24   Q.      What department did he work in?
       25   A.      Bangor Police Department.

1    Q.   And what did he do that made you believe that you

2         would be terminated if you raised your sexual

3         harassment concerns with the department of public

4         works director?

5    A.   I was told that he was sexually harassed and that he

6         was pushed out after it occurred.

7    Q.   Who told you that?

8    A.   The sheriff of Van Buren County.

9    Q.   And when did he tell you that?

10   A.   A little bit prior to my termination.

11   Q.   So when?

12   A.   I wouldn't recall an exact date.

13   Q.   How did he tell you that?

14   A.   On the phone.

15   Q.   Why were you talking to him about that?

16   A.   Because I did disclose to him these things.

17   Q.   But you didn't disclose it to anyone within the city?

18   A.   Correct.

19   Q.   So what other instances, or are those the only two

20        that you can think of?

21   A.   I want to go back on the last question if I may.

22   Q.   Go ahead.

23   A.   You said I didn't disclose it to anyone in the city,

24        that would be incorrect.  I did disclose it to someone

25        in the city.

1    Q.    Who did you disclose it and when?

2    A.    Amanda Karr, in approximately February of 2021.

3    Q.    And is Amanda Karr the department head for you?

4    A.    She is not.

5    Q.    Is she department head for anybody?

6    A.    She was the acting clerk.

7    Q.    So she was not a department head, though?

8    A.    I believe not.

9    Q.    And you told her this in February of 2021; is that

10         correct?

11   A.    Correct.

12   Q.    And what did you tell her?

13   A.    I told her about the Blue Chip Casino event and

14         several of the other events that I've documented in

15         this exhibit.

16   Q.    You say several, which ones specifically?

17   A.    I wouldn't be able to recall the specifics.

18   Q.    So why did you wait until February of 2021 to talk

19         with anyone at the city about this, let alone someone

20         who would be in a position to do something under the

21         sexual harassment policy you signed?

22   A.    I was trying to find a person that was trustworthy and

23         put my complaint together.  It was just very difficult

24         to talk about it.

25   Q.    Do you have any other specific examples that would

```
1              cause you to fear for your job if you had brought up
2              your sexual harassment claims to someone at the city?
3    A.   The fact that I was terminated when I brought it up.
4    Q.   Prior to that, do you have any other examples as to
5              why between your hiring, the first claim in your
6              responses here in Exhibit 3, and let's say February of
7              2021 when you spoke with Amanda Karr, what happened
8              that made you believe you would be terminated if you
9              brought up your sexual harassment complaints?
10   A.   Terminated or retaliated against, just to specify.
11   Q.   Sure.
12   A.   Just the conversations that I witnessed Tommy Simpson
13             having with John Saylor, as I said earlier;
14             conversations that I've heard with him and other
15             employees, which -- not for the same matters but for
16             other matters that are non-sexual harassment.
17   Q.   Such as what?  Give me examples that make you fear for
18             retaliation.
19   A.   Taylor Freelove is one of them.  Different Taylor than
20             previously mentioned.  Taylor Freelove was an employee
21             of the Bangor Police Department.
22   Q.   Do you know when?
23   A.   He started prior to me and left prior to me.
24   Q.   Continue.
25   A.   So Taylor Freelove, Tommy Simpson would discuss with
```

1     me his strategies to get rid of him.

2  Q.  So he was there before you, but he discussed his prior

3      strategies to get rid of him; is that what you're

4      testifying to?

5  A.  No.

6  Q.  What exactly was he telling about if Taylor Freelove

7      was no longer working there?

8  A.  He was working there at the time these discussions

9      took place.

10 Q.  You said that he -- so I'm clear, Taylor Freelove did

11     not work at Bangor when you worked there?

12 A.  That is not correct.

13 Q.  So when did Taylor Freelove work there?

14 A.  He started prior to my employment there and he left

15     Bangor Police Department prior to me leaving.

16 Q.  So there was overlap while you were there?

17 A.  Correct.

18 Q.  I'm with you now.  So what exactly did those

19     conversations entail that made you believe that you

20     would be retaliated against?

21 A.  Tommy Simpson described a strategy to getting rid of

22     Taylor Freelove simply because he sent an e-mail to

23     the sheriff for employment opportunity.

24 Q.  And what did the strategy -- what did he talk about,

25     what exactly made you believe that you would be a

1     victim of retaliation?

2  A.   I believed that if he can do that for someone, an

3     employee of his that I witnessed he was good with or

4     had a good relationship with, that he was going to

5     fire him for simply sending an e-mail asking for

6     another job, that my complaint which was directed

7     towards him would certainly be met with worse

8     retaliation if not equal.

9  Q.   So are you testifying you didn't have a good

10    relationship with Tommy Simpson then?

11  A.  I did at some point.

12  Q.  When would you say that your relationship turned with

13    Tommy Simpson?

14  A.  The Blue Chip Casino event.

15  Q.  So once you returned from Blue Chip Casino, you would

16    say that that's when your relationship was no longer

17    positive with Tommy Simpson?

18  A.  Correct.

19  Q.  In your complaint, you state that the unwelcome

20    conduct affected a term or condition of employment

21    and/or had the purpose or effect of unreasonably

22    interfering with your work performance and/or creating

23    intimidating, hostile or offensive work environment.

24    What exactly was -- let's take this in part -- what

25    was the hostile work environment that you were

1    alleging?

2            MS. MALHIOT:  I'm going to object to the

3        extent that you're calling for a legal conclusion,

4        particularly as to the definition of a hostile work

5        environment.  He's not a legal expert.  You can answer

6        as to the best of your knowledge.

7    BY MR. BOGREN:

8    Q.  I'll restate it for you.  You said that the position

9        had become -- it was unreasonably interfering with

10       your work performance.  How was it unreasonably

11       interfering with your work performance?

12   A.  That's a multifaceted question.  There's a lot to it.

13   Q.  Let's start wherever you like.  Just how exactly was

14       it interfering with your work performance?

15   A.  One example is the schedule that was given to me for

16       my schedule by Tommy Simpson was erratic.  I was asked

17       to come in on one day at six a.m., the next eight, the

18       next nine and I was asked to stay longer than eight

19       hours.  There was no official schedule that was

20       provided to me, yet I asked for it regularly.  So I

21       would show up one day, say from seven to three, an

22       eight hour shift, and then four or five p.m. would

23       roll around and he would call me, where are you at?

24       Tommy Simpson would call me and state, where are you

25       at?  Questions of that nature.  I would tell him I've

1    already completed my shift, and then he'd ask me that

2    you need to stay here longer.  So then I would adjust

3    my shift so that it would be eight to four or nine to

4    five.  Then it would be the same thing the following

5    day as soon as I adjusted it, which would be seven

6    a.m., hey, we have this going on, why aren't you here?

7    So I could never, in a sense, please him with my

8    schedule or when I'm there, but yet, upon asking, they

9    refused to provide me and Tommy Simpson specifically

10   refused to provide me with an actual schedule and

11   would tell me just make up your own schedule.  That's

12   one example as to how he made it a hostile work

13   environment.  It affected my performance, definitely,

14   because I had no peace in the sense of schedule.

15   That's one example.

16 Q.  Essentially you're saying, correct me if I'm wrong, if

17   someone is changing your schedule, that can be

18   hostile, that can be a problem?

19 A.  As a part of a bigger picture.

20 Q.  So what was the bigger picture then?

21 A.  All of the other examples that I could provide.

22 Q.  Provide those examples, please.

23 A.  Another one was, I was not allowed to discuss matters

24   with other agencies that would otherwise be a norm to

25   discuss.  I will give specific example.

1  Q.    Sure.

2  A.    I was not allowed to talk to the South Haven chief of

3        police simply because Tommy Simpson and her had a poor

4        relationship.

5  Q.    What do you base that claim that they had a poor

6        relationship on?

7  A.    He would complain about her regular -- Tommy Simpson

8        would complain about her regularly.

9  Q.    So does that mean that they therefore had a bad

10       working relationship?

11  A.    If I could describe or elaborate on what those

12       conversations were.

13  Q.    Sure.

14  A.    He believed that the South Haven chief was coming

15       after him and trying to get his job or trying to get

16       him terminated.  He would avoid her if she was at the

17       courthouse and not go to the courthouse and adjusted

18       his time to go there, and he would verbalize these

19       things, Tommy Simpson would verbalize these things to

20       me.  He directly expressed that he can't stand her.

21  Q.    So you don't have any specifics as far as the actual

22       professional relationship, just his personal

23       animosity?

24  A.    Correct.

25  Q.    So you testified about the scheduling, talking with

1      other departments, what else interfered with your work

2      performance?

3  A.   I was not allowed to attend council meetings. Yet, my

4      duties as the chief of police, and this is during the

5      time I was chief of police, is to talk to the council

6      members. I was prohibited at one point from

7      discussing anything with the council members, whether

8      it would be positive things or negative things. Any

9      at all.

10  Q.   And had you previously been able to talk with the city

11      council?

12  A.   Yes.

13  Q.   And why were you no longer allowed to talk to city

14      council?

15  A.   At sometime approximately in December 2020, I believe.

16  Q.   Any other examples you said that made your job harder

17      or work performance more difficult?

18  A.   Sure. Another example is I wasn't allowed to hire

19      anyone; yet, I was allowed to conduct interviews, but

20      he would reject every choice that I brought to the

21      table unless it was his specific friends.

22  Q.   So what specific friends did he hire?

23  A.   He tried to get me to hire Taylor Freelove back, who

24      he terminated, or attempted to terminate, once Taylor

25      Freelove left the department for the issue I discussed

1       earlier about the e-mail.  So he wanted me to hire him

2       back.  He also wanted me to hire one of his friends

3       from the Mattawan Police Department, who was a

4       sergeant there, bring him on part-time, and he

5       discussed hiring Justin Weber into a full-time

6       position and, in fact, went behind my back and

7       assigned him as an officer in charge, a supervisor.

8       Also in charge is another word for a supervisor that

9       is not officially a supervisor like a sergeant.

10  Q.   Is Justin Weber the only one you're alleging was a

11      friend that was hired by Tommy Simpson?

12  A.   The only one that he was able to get hired in, yes.

13  Q.   When you say able to get hired in, does that mean he's

14      not ultimately the one who makes that decision?

15  A.   He is the one that ultimately makes the decision.

16  Q.   So if he was only hiring his friends, why didn't he

17      hire the other two?

18  A.   He tried to get me to do it.

19  Q.   So if he was only trying to hire his friends, did he

20      tell you that he was going to just hire them himself?

21  A.   Yes.

22  Q.   And he followed through on that?

23  A.   No.

24  Q.   So any other examples how it interfered with your work

25      performance?

1    A.    Sure.  Another example is, there was criticism

2          regarding -- I asked for my now wife, then just

3          started talking, I asked for permission to have her

4          conduct a ride-along with me at that time, which is

5          completely permissible by law and policy and procedure

6          at the Bangor police department.  Upon doing so, I

7          learned that Tommy Simpson said he would not allow me

8          to have a girl ride with me.  So to me, at that time,

9          I felt harassment on that as I'm being judged and I've

10         yet had no conduct whatsoever in my entire life in

11         that regard that would be inappropriate.

12                   I did confront Tommy Simpson about that,

13         and he told me that I was more welcome to have her, he

14         never said anything like that to Taylor Freelove.

15         Taylor Freelove is the one who told me, and which was

16         countered with actual text messages that I was shown.

17         So I was lied to.  From that moment on, right away, it

18         established to me it's not going to work.  There's

19         some issue here.

20    Q.   So first, did you produce those text messages?

21    A.   I do not have them.

22    Q.   Who sent you those text messages?

23    A.   Taylor Freelove.

24    Q.   And they were between Taylor Freelove and Tommy

25         Simpson?

1   A.    Correct.

2   Q.    And whose determination is it ultimately whether

3         someone is allowed to ride along?

4   A.    Tommy Simpson's at the time.

5   Q.    So prior to your trip to Blue Chip Casino, would you

6         say that it was not a hostile work environment then?

7   A.    I would say that it was on and off.

8   Q.    When it was on, what was it on over?  What made it

9         hostile to you?

10  A.    The example is that Taylor Freelove example that I

11        just used with the ride-along situation.  I just moved

12        on in a sense.  Didn't want to make a big deal out of

13        certain things.

14  Q.    And how did he retaliate against you for that

15        situation?

16  A.    He did not for that situation.  It was corrected.

17  Q.    So prior to -- strike that, actually.

18            In paragraph 71 of your complaint, you

19        state that plaintiff's made complaints to defendant,

20        City of Bangor, recording defendant Simpson's sex

21        and/or gender based discriminatory practices and

22        nothing was ever done to remedy the situation and, in

23        fact, discrimination and disparate treatment worsened.

24        What complaints did you make that you're referring to

25        here?

1  A.    That was a lot of words.  I would have to --

2  Q.    No problem.  In your complaint you state that you had

3       made complaints to the City of Bangor -- sorry, I

4       apologize, I thought you had one.  You state that you

5       made complaints to the City of Bangor about defendant

6       Simpson's sex or gender-based discriminatory practices

7       and nothing was ever done to remedy the situation.

8       What complaints did you make to the City of Bangor

9       about the defendant Simpson?

10  A.    At the time those events were occurring, I did not

11      make a complaint.

12  Q.    So when you said nothing was ever done to remedy the

13      situation and, in fact, discrimination and disparate

14      treatment worsened, what is that in reference to if

15      you had not made a complaint?

16  A.    That when I made the complaint and actually turned it

17      in, upon my termination.

18  Q.    So you're testifying that the only complaint you made

19      was on March 11th, the same day you were terminated?

20             MS. MALHIOT:  I'm going to object to the

21      extent that it calls for a legal conclusion as to

22      what's a complaint.  You can answer as to the best of

23      your knowledge or understanding.

24             MS. JOZWIAK:  I just want to clarify, are

25      you referring to March 11th or March 12th when he was

1    terminated?

2            BY MR. BOGREN:  I apologize, March 12,

3    2021.

4  Q.  Was that the only complaint, or was that the only

5    time, again, as you state here, that you complained to

6    the City of Bangor regarding defendant Simpson's sex

7    and/or gender-based discriminatory practices?

8  A.  For that specific, yes.

9  Q.  What do you mean for that specific?

10  A.  For the gender discrimination as worded in what you

11    just read.

12  Q.  What about sex discrimination then?

13  A.  As well, gender, sex.

14  Q.  So when you say, in fact, the discrimination and

15    disparate treatment worsened, when did it worsen?

16  A.  After I was terminated.

17  Q.  So to whom were those complaints made?

18  A.  To Mayor Williams.

19  Q.  And you had not made any prior complaints to them?

20  A.  That I recall, none that were in writing.

21  Q.  So what discrimination did you personally experience?

22  A.  Personally, I would say Justin Weber is an example.

23  Q.  How is Justin Weber an example of discrimination you

24    personally experienced?

25  A.  I'm going to go back to last question if I may.

1   Q.   You may.

2   A.   I actually do have a recollection.  I apologize.

3        Justin Weber was actually a complaint that I did make

4        in writing directly to Tommy Simpson.

5   Q.   Justin Weber is a person, what do you mean that you

6        made Justin Weber to Tommy Simpson?

7   A.   I filed a complaint to Tommy Simpson, who was then the

8        city manager, I was the chief of police, in reference

9        to Justin Weber, and I complained to him that the

10       treatment was unfair of how they regarded Justin Weber

11       and how they brought him in as the supervisor without

12       my consent or permission, and the consideration of my

13       word as the chief of police wasn't considered at all.

14       They just did it behind my back.

15  Q.   So you're testifying that the complaint you made prior

16       to the date of your termination had to do with

17       discrimination related to Justin Weber, not to Tommy

18       Simpson?

19  A.   No.  I gave that to Tommy Simpson and it wasn't dealt

20       with.

21  Q.   I will restate that.  You were complaining of Justin

22       Weber's actions or the actions relating to Justin

23       Weber, you were not making any claim regarding

24       defendant Tommy Simpson's sex or gender-based

25       discriminatory practices?

1  A.  Correct.

2  Q.  What other discrimination did you personally

3      experience?

4  A.  When I was conducting interviews in approximately

5      October through November of 2020, any of the African

6      American candidates that I interviewed, he would

7      specifically call me and ask me to bring them over to

8      his office so he can look at them in a suit, and has

9      explicitly expressed that he likes black guys.

10 Q.  So how many instances of this were there?

11 A.  Two regarding the interviews.

12 Q.  Regarding anything other than the interviews, then,

13     how many instances were there?

14 A.  Just him telling us the stories of his explicit sexual

15     encounters or personal stories, and I also -- Taylor

16     Freelove and him kissing Tommy on the forehead.  We

17     actually expressed that complaint but it wasn't in

18     writing.

19 Q.  Who did you express that complaint to?

20 A.  Tommy Simpson.

21 Q.  Who is we expressed that complaint?

22 A.  It was, that I recall, it was Tyler Sleep, and it was

23     another officer who is no longer there.

24 Q.  And do you remember who that other officer is?

25 A.  Anthony, I can't say his last name, but it's Lindahl

1   or Lendahl.

2 Q. A good Nordic name. So when did that complaint, the

3   verbal complaint that you just talked about, occur?

4 A. The same day, after that meeting.

5 Q. Same day, what meeting, what's the date?

6 A. I don't have a date, but it was a department meeting,

7   a mandatory department meeting, and in that meeting,

8   Taylor Freelove kissed Tommy Simpson on the forehead,

9   and then that's when we brought that up right after

10   the meeting concluded of the actual police affairs, we

11   brought up that, he's just going to kiss you on the

12   forehead like that? These are not the exact words,

13   they're the sense of the conversation. It was more of

14   a positive conversation in how we discussed it with

15   him.

16 Q. What does that mean, a positive conversation?

17 A. Well, we're not going to go to Tommy Simpson and tell

18   him, how dare you. We told him, in a sense -- I don't

19   recall the exact words, so I couldn't elaborate on the

20   wording, but we did discuss it with him.

21 Q. And you don't remember when this occurred?

22 A. I do not.

23 Q. Fair to say it was when Freelove was employed at the

24   City of Bangor then?

25 A. Correct.

1  Q.    What other discrimination did you personally

2         experience?

3  A.    In what I've said, the discrimination comes from the

4         fact that people that acted in that manner, the

5         kissing on the forehead, hanging out off duty all the

6         time, and it ended up Tommy Simpson expressing sexual

7         interest or any jokes of such in regards to them or

8         their appearances, those people were promoted.  Those

9         people never faced disciplinary action, even though

10        there's plenty of subject matter for reasonable

11        disciplinary action, unlawful things beyond just

12        policy.  There was never an issue.  So that's what I

13        meant by there was no -- it wasn't taken care of.

14        When these complaints were made or these complaints

15        occurred or issues occurred, nothing was done about

16        it.  They were all swept under the rug.  But only for

17        specific individuals.  Individuals who he had explicit

18        sexual interests in or who kisses him on the forehead;

19        i.e., Taylor Freelove.

20  Q.    Did you not hang out outside of work with Tommy

21         Simpson?

22  A.    One time.

23  Q.    One time when?

24  A.    The Blue Chip Casino event.

25  Q.    So you never spent any time with him outside of the

1     office?

2  A.  We went to department dinners together as a group.

3  Q.  That's it?  Never any other times?

4  A.  Correct.

5  Q.  Did you talk with him outside of work?

6  A.  Yes.

7  Q.  And was that a discussion of a personal nature?

8  A.  Sometimes.

9  Q.  So what disparate treatment did you receive?  In that,

10     who was treated more favorably than yourself?

11  A.  Taylor Freelove and Justin Weber.

12  Q.  So Taylor Freelove, how was he treated more favorably

13     than yourself?

14  A.  He would conduct -- he would actually violate the law,

15     commit crimes and violate policy; yet, would not be

16     subject to certain disciplinary actions and would be

17     promoted, in fact, at one point, as equal, that I was

18     promoted, he was promoted, yet I have a clean record

19     and he had these issues.  To elaborate further, all

20     the things he did, it wasn't an issue until Taylor

21     Freelove made it personal by e-mailing to apply

22     elsewhere, which was expressed to me directly that

23     Tommy Simpson felt betrayed by Taylor Freelove's

24     seeking employment elsewhere, and therefore, now felt

25     a need to let him go; yet, there was, I can name you

1      four events just specifically attributed to him.

2  Q.   So when you say that it was personally relayed to you,

3      were you talking with Tommy Simpson in the office that

4      he felt betrayed?

5  A.   Yes.

6  Q.   And what ultimately happened with Officer Freelove?

7  A.   Can you be more specific?

8  Q.   Was Officer Freelove terminated from the City of

9      Bangor?

10 A.   He was not.

11 Q.   Where did he go after the City of Bangor?

12 A.   He was allowed to resign and went to the Mattawan

13      Police Department.

14 Q.   You say he was allowed to resign, were they going to

15      fire him as far as you know?

16 A.   Correct, as far as I know.

17 Q.   So you also referenced Justin Weber, how was he

18      treated more favorably than yourself?

19 A.   Justin Weber also, like Taylor Freelove, caused

20      several issues at the department with several other

21      employees, to include Tommy Simpson himself directly.

22 Q.   So you say that he was treated more favorably than

23      you, does that mean that you also caused several

24      issues within the department that you were not

25      favorably treated for?

1   A.   I caused zero issues, and yet, those individuals I'm

2        discussing have had a better outcome.

3   Q.   So they were promoted over you?

4   A.   Correct.

5   Q.   And what position were they promoted over to you?

6   A.   Justin Weber is currently chief of police.

7   Q.   Did he become chief of police while you were employed

8        there?

9   A.   Right after.

10  Q.   So he did not become chief of police while you were

11       employed there?

12  A.   Correct, he did not.

13  Q.   And was Tyler Freelove promoted over you?

14  A.   Not over me.

15  Q.   So in what other way -- strike that.  Let me go back.

16            To your knowledge, is Officer Freelove

17       heterosexual or homosexual?

18  A.   I don't know.

19  Q.   How about Sergeant Weber or Chief Weber now?

20  A.   I don't know.

21  Q.   You make a Whistle Blowers Protection Act claim in

22       your complaint at paragraph 75, you state that you

23       reported or were about to report violations of law by

24       defendant Simpson to the City of Bangor.  What had you

25       reported at the time you were terminated?  So prior to

1      being terminated, what had you reported to the City of

2      Bangor?

3  A.   The sexual harassment and hostile work environment to

4       the mayor of the city.

5  Q.   And when did you make that report?

6  A.   I believe it was on the 9th of March, 2021, the 9th or

7       10th.

8  Q.   How was that report made?

9  A.   It was made over the phone.

10  Q.   So it was not in writing?

11  A.   Not yet.  I had it in writing.

12  Q.   At the time you made the report on the 9th, it was not

13       in writing?

14  A.   I had it in writing, but the complaint to the mayor

15       was not in writing yet.

16  Q.   So what were you about to report specifically?

17  A.   The information that was actually reported on March

18       12th.

19  Q.   So fair to say the information you gave in response to

20       Interrogatory number 1, in the exhibit in front of

21       you?

22  A.   Which exhibit, sir?

23  Q.   This one, it's the --

24               MS. MALHIOT:  Exhibit 4.

25  BY MR. BOGREN:

1  Q.    Exhibit 4, the Interrogatory answer.

2  A.    Which specific area?

3  Q.    If you go to first question, your answer to that, it's

4        several pages.

5  A.    Gotcha.

6  Q.    And I believe it's a copy of your complaint that you

7        pasted in as an answer.

8  A.    Yes, in part it was pasted, but yes.

9  Q.    So you go on in paragraph 77 to state that the

10      termination of and suspension of your employment were

11      retaliatory.  How was the termination of your

12      employment retaliatory by Tommy Simpson?

13  A.    I filed the complaint with the mayor several days

14      prior to my termination, approximately the 9th or the

15      10th, and the mayor had the knowledge that I was going

16      to meet with him since he's the one that set up the

17      meeting date and time to file my complaint in writing

18      to him directly.  At that time, which was about five

19      p.m. on March 12th, 2021, I went -- I was called by

20      him, by the mayor.  Mayor Williams asked me to come to

21      the office and to bring my complaint.  I was on the

22      way, as soon as I entered the room, I was fired right

23      before I could turn in my complaint, which was in hand

24      in a red folder.  I wasn't even allowed to sit yet.  I

25      was terminated right before I could even sit down.

1  Q.   So how did Tommy Simpson particularly retaliate

2       against you?

3  A.   Because the Mayor Williams the day of my termination

4       told me, it wasn't me, it was him, and pointed towards

5       Tommy Simpson.

6  Q.   So if we go back to Exhibit 2, Mr. Graham's report, on

7       page 10, can you read what it says there in the

8       italics and bold?

9  A.   There is no viable claim of an adverse employment

10      decision in this case.  Manager Simpson did not

11      terminate Sergeant Misane's employment.  He had

12      nothing to do with the decision.

13  Q.   So you believe that Scott Graham is lying when he

14      states that in this report?

15  A.   I don't know.

16  Q.   So do you disagree when he states that manager Simpson

17      did not terminate your employment?

18  A.   I disagree.

19  Q.   So Tommy Simpson was the one who signed the documents

20      that fired you?

21  A.   Could you be more specific to the documents?

22  Q.   Sure.  Who is the person who told you you were

23      terminated?

24  A.   Mayor Williams.

25  Q.   And if we go back to 4, just so you have it in front

1    of you -- actually, I take that back.  Go to your
2    complaint, again in paragraph 77 you state:  The
3    termination of and suspension of your employment were
4    an order of retaliatory.  So what exactly was he
5    retaliating against you for, Mr. Simpson?
6  A.   Filing a complaint against him.
7  Q.   So even though you hadn't filed a complaint at that
8    point?
9  A.   I did file it at that point.
10 Q.   So you had made a written complaint at that point?
11          MS. MALHIOT:  I'm going to object.  That
12    mischaracterizes his testimony.  He didn't say he made
13    a written complaint, he said he made a complaint.
14 BY MR. BOGREN:
15 Q.   Had you made a written complaint at that point?
16 A.   I did not turn in my written complaint at that point
17    to the mayor two to three days prior to my
18    termination.
19 Q.   So let's go down to paragraph 107, you claim that
20    these adverse employment actions against you were
21    motivated by your protected conduct.  Give the factual
22    basis for your claim there that you engaged in that
23    protected conduct.
24          MS. MALHIOT:  I'm going to object to the
25    extent that that calls for a legal conclusion as to

1          the definition of protected conduct.  You can answer
2          to the best of your knowledge and understanding.
3    A.    With the words protected conduct, I don't even know
4          the context of the question.
5    BY MR. BOGREN:
6    Q.    So you said he retaliated against you because you had
7          talked with the mayor; is that correct?  On March 9th,
8          you had talked to the mayor about your report, though
9          you had not made a written complaint; is that
10         accurate.
11   A.    That is accurate.
12   Q.    So you believe that Tommy Simpson directed the mayor
13         to fire you because you had told the mayor on the
14         previous date that you were going to make a complaint?
15   A.    I believe they were both in it together.
16   Q.    What is the factual basis upon which you make that
17         claim?
18   A.    The fact that the mayor told me that it wasn't me, it
19         was him, and pointed at Tommy Simpson.
20   Q.    So what exactly do you believe was the motivating
21         factor for the mayor to go along with that?
22   A.    I don't know.
23   Q.    Had you had any interactions with the mayor prior to
24         this date?
25   A.    I had.

1   Q.   And did you have any issues, problems with the mayor

2        prior to this day?

3   A.   I had one issue.

4   Q.   What's that issue?

5   A.   The Mayor Williams ordered me to -- well, asked me to

6        dismiss the citation for his cousin that was written

7        by Dillon Schmidt, Officer Dillon Schmidt.

8   Q.   And so it was just -- when you say citation, what do

9        you mean by citation?

10  A.   The mayor's cousin received a ticket for going through

11       a stop sign, and I was asked a couple days afterwards

12       to dismiss the citation, to take care of it.

13  Q.   Did you dismiss the citation?

14  A.   I did not.

15  Q.   Do you know what the outcome of that citation

16       ultimately was?

17  A.   I allowed for Dillon Schmidt to make that decision.

18  Q.   And do you know what Dillon Schmidt decided?

19  A.   He was okay with dismissing it.

20  Q.   So it was ultimately dismissed?

21  A.   Correct.

22            MR. BOGREN:  Why don't we take a five

23       minute break?  I could use some water.

24            (Off the record).

25  Q.   We were just discussing your calling the mayor prior

```
 1        to your termination on March the 8th or 9th?
 2   A.   I believe it's the 9th, 10th, something -- I believe
 3        it's the 9th.
 4   Q.   Prior to the date you were terminated?
 5   A.   Correct.
 6   Q.   You called the mayor on the phone.  Okay.  Just wanted
 7        to get the time down.
 8                  So in paragraph 111 of your complaint, I
 9        won't obviously need you to go into the legal details
10        of it, but you allege that you were treated
11        differently because of your sexual orientation, sex
12        and/or race.  Who specifically were you treated
13        differently than and in what way were you treated
14        differently?
15   A.   I was treated differently in comparison to two other
16        employees, but specifically Taylor Freelove, who
17        conducted himself in a sexual manner I would say that
18        would be more on the side of being homosexual, that I
19        knew that Tommy was as he told me he was.
20   Q.   Did you not testify that you're not aware of Taylor
21        Freelove is or is not a homosexual?
22   A.   Right, I did.
23   Q.   So in what way were you treated differently than
24        Taylor Freelove?
25   A.   In the ways that I was describing his actions, that
```

1     were in a way that would be more homosexual in that

2     regard of those specific actions, such as kissing.  So

3     there was acceptance of that orientation between Tommy

4     and Freelove and the fact that both of these other

5     individuals who were further empowered yet while there

6     was issues with Tommy Simpson on and them are also

7     both white males.

8  Q.  So you say that Taylor Freelove, I believe you said

9     was excused from violations of various policies if not

10    laws; is that correct?

11  A.  Correct.

12  Q.  And you allege that's because of his relationship with

13    Tommy Simpson, correct?

14  A.  Correct.

15  Q.  So what laws or ordinances did you violate that you

16    were not excused of?

17  A.  I did not violate any.

18  Q.  And you said that there was another individual, who

19    was the other individual?

20  A.  That would be Justin Weber.

21  Q.  And you testified that you don't know that Sergeant

22    Weber is or is not homosexual; is that correct?

23  A.  Correct.

24  Q.  So do you believe that you were treated differently

25    because you were heterosexual?

1  A.  In part, yes.

2  Q.  But as compared with whom?

3  A.  Taylor Freelove, as I said for that specific example

4      of the homosexuality context, that would be Taylor

5      Freelove.

6  Q.  And for Justin Weber, because it seemed unclear, what

7      specifically -- how was he treated differently from

8      you?  What did you both do that you received a

9      different outcome than he did?

10 A.  The question would have to be more specific.  I'm not

11     clear on the what would he do.

12 Q.  Give me any example where Sergeant Weber was treated

13     differently than you were because of an action that

14     you had both taken.

15 A.  It's that I did not do any actions, and yet was

16     treated unfairly; yet Justin Weber conducted negative

17     actions towards Tommy Simpson and at the department,

18     yet was promoted.

19 Q.  So what negative actions did he perform toward Tommy

20     Simpson?

21 A.  He called him, Justin Weber called Tommy Simpson a

22     knee jerker to the council members.  About how he has

23     a relationship with the council members.

24 Q.  About how Justin Weber has a relationship with council

25     members?

1   A.   No, about how Tommy has his relationship with the

2        council members.

3   Q.   So Sergeant Weber made that statement to the council

4        members and Tommy Simpson was aware of it?

5   A.   Correct.

6   Q.   And yet, Justin Weber received no negative action

7        because of that, correct?

8   A.   He did receive negative action but it was retracted

9        later.

10   Q.   What negative action was taken against Justin Weber

11        because of that?

12   A.   I don't know.

13   Q.   But you said it was retracted later, so what was

14        retracted?

15   A.   The fact that he was still employed.

16   Q.   So he was fired?

17   A.   I don't know.

18   Q.   So you say in paragraph 28, because of your sexual

19        orientation and/or sex, you have been subjected to

20        treatment disparate from that of nonheterosexual

21        employees of defendant who have been treated more

22        favorably than plaintiff.  Who are you specifically

23        referring to that is a nonheterosexual?

24   A.   I couldn't describe who is or who isn't non-

25        heterosexual, as I don't know what they're thinking.

1    However, the actions that were not heterosexual, that

2    would be Taylor Freelove.

3 Q. So when you say that you were subjected to disparate

4    treatment (inaudible) to a nonheterosexual employee,

5    you can't point to anyone you know as a

6    nonheterosexual?

7 A. I don't know how the person identifies in that regard.

8 Q. How did -- strike that.  We don't need to retread that

9    ground.

10     You reference employees plural, so who are

11    the other nonheterosexual employees you reference in

12    this paragraph?

13 A. It would be the actions -- Justin Weber.

14 Q. What leads you to believe that Justin Weber is not a

15    heterosexual such that you would put it in your

16    complaint?

17 A. The actions that would be considered over friendly in

18    the workplace or homosexual in nature.

19 Q. Oh.  Well, explain to me what exactly would be

20    considered homosexual in nature.

21 A. Rubbing shoulders, kissing one on the forehead.

22 Q. I believe you testified it was Taylor Freelove who

23    kissed him on the forehead.  Did Sergeant Weber kiss

24    Tommy Simpson on the forehead as well?

25 A. Not that I know.

1  Q.  So what specifically were actions that you believe

2       were identified as homosexual that would make you

3       believe that he received disparate treatment from you?

4  A.  None.

5  Q.  So if we go back to your Interrogatories, we go down

6       to number 10, your response to number 10, I'll tell

7       you the page number here in a second. Number 10 is on

8       page 21, so second to last. You were asked to

9       identify each employee of the Defendant, City of

10      Bangor, who you allege was similarly situated to you

11      but was treated more favorably than you. And can you

12      read that first paragraph and the answer?

13  A.  Inquiry to question 11 cannot exist as posed --

14  Q.  Tell you what, I'll read it for you here. In number

15      10, your answer to number 10, you state: Ultimately,

16      no one was in a position similar to me as none were an

17      upcoming chief of police at 33 years old who was/is a

18      heterosexual married male, Muslin, non-white and

19      foreign born. None experienced the abuse, hostile

20      work environment, lack of comfortability, hardship and

21      misery while in the aforementioned circumstances,

22      therefore is incomparable. And then you go on to

23      state: However, Taylor Freelove would be a close

24      example at one time in some regard, Justin Weber to

25      some extent as well. Is that accurate?

1  A.  That is accurate.

2  Q.  So when you say that there was someone who was

3      similarly situated, you can't point to someone who was

4      similarly situated, correct?

5  A.  Correct.

6  Q.  So here again, you state that Justin Weber to some

7      extent as well was treated more favorably than you,

8      and we sort of talked about why.  But given the

9      factually basis for the claim that he was treated more

10     favorably than you, as far as you said that he was

11     made the officer in charge or whatever it is, what's

12     the factual basis that he received a more favorable

13     outcome than you did?

14 A.  He was causing problems while simultaneously being

15     promoted.

16 Q.  So what problems was he causing?

17 A.  He was creating dissension among other employees at

18     the department.

19 Q.  And who were those other employees?

20 A.  Justin Blankenship, Jerol Williams and Tyler Sleep,

21     Dillon Schmidt.

22 Q.  And in what way was he causing dissension?

23 A.  He would have -- it was reported to me that he would

24     have discussions with him and then such discussions

25     then were brought -- that Justin Weber would have

1       discussions with those employees, and that those

2       discussions would then be brought to Tommy Simpson

3       directly.

4 Q.   Discussions of what nature?

5 A.   Future of the department or Tommy Simpson's

6       involvement.

7 Q.   And how is this a problem such that it was sowing

8       dissension?

9 A.   Because instead of keeping it confidential as a

10      conversation they were all involved in, it was brought

11      to superiors, which evidently caused issues.

12 Q.   Well, you say evidently caused issues, clearly you

13      believe they caused issues, correct?

14 A.   I know it caused issues.

15 Q.   So what issues did it cause?

16 A.   The officers would no longer talking to Justin Weber

17      and refused to work with him at all, and he had to be

18      placed on his own special rotation in order to prevent

19      further issues, a rotation that was set by Tommy

20      Simpson.

21 Q.   What does that mean, a special rotation?

22 A.   A shift rotation to where he would not work directly

23      with those other individuals at the department.

24 Q.   And you know that Tommy did this because of this

25      dissension?

```
 1   A.   He told me.

 2   Q.   And when did he tell you that?

 3   A.   Within the weeks that this was occurring which would

 4        be approximately December -- November to December of

 5        2020.

 6   Q.   So is it not possible that Tommy Simpson believed that

 7        Sergeant Weber was just doing a better job than you

 8        were at the time?

 9   A.   He wasn't a sergeant.

10   Q.   So it's not possible that he believed he was doing a

11        better job than you were at the time?

12   A.   It is not possible at all.

13   Q.   Do you ever discuss your personal life with your

14        fellow officers?

15   A.   Sometimes, yes.

16   Q.   How about with Tommy Simpson?

17   A.   Yep.

18   Q.   Did you discuss your sex life with any other

19        employees?

20   A.   Sometimes.

21   Q.   With Tommy Simpson?

22   A.   No.

23   Q.   Never?

24   A.   Never.

25   Q.   Did you discuss other employees' sex lives?
```

```
1   A.   In what context?
2   Q.   Did you have conversations about your other
3        subordinates, fellow sergeants, whatever it may be,
4        about their personal sex lives?
5   A.   No.
6   Q.   So you only talked about your sex life with others?
7   A.   But I didn't talk about my sex life, but about my
8        personal relationships, sure.
9   Q.   So your personal relationships.  Gotcha.  Did you make
10       any comments of a sexual nature to any of your
11       colleagues at the city?
12  A.   You would have to be specific as to sexual nature.
13       How are you defining sexual nature?
14  Q.   Did you ever make any reference to say having sex with
15       someone, did you make any reference to any kind of
16       crude language that's sexual in nature?
17  A.   Sure, yes.
18  Q.   How about to Tommy Simpson?
19  A.   Yes.
20  Q.   But not specifically about anyone's personal sex lives
21       specifically?
22  A.   Correct.  Certainly not mine.
23  Q.   So I believe you testified before, but do you believe
24       there's circumstances where it's acceptable to makes
25       these kind of crude jokes, sexual nature statements?
```

1  A.   Yes.

2  Q.   So was this kind of crude language and these

3       discussions normal among police officers at Bangor

4       Police Department?

5  A.   No.

6  Q.   So they were not common?

7  A.   Not common.

8  Q.   Did they typically occur while you were working or

9       were they off duty?

10 A.   Both.

11 Q.   Did you take part in these conversations with any of

12      your subordinates?

13 A.   What type of conversations?

14 Q.   Anything sexual in nature, crude language,

15      pornographic.

16 A.   Sure, yes.

17 Q.   And you felt that that was appropriate?

18 A.   At those times, yes.

19 Q.   So what are times where it would not be an appropriate

20      situation?

21 A.   Explicit stories told by someone who is my boss about

22      his personal life that I don't need to know.

23 Q.   And is it acceptable when a subordinate tells a

24      superior about their personal life?

25 A.   I don't think so.

1  Q.   So you didn't discuss any sexual encounters or

2       otherwise discuss matters of a sexual nature with

3       Tommy Simpson?

4  A.   There was no explicit discussion of anything of a

5       sexual nature with Tommy Simpson about myself.

6  Q.   Are you familiar with Deputy Andrea Walker of the Van

7       Buren County Sheriff's Office?

8  A.   Yes.

9  Q.   How would you characterize your relationship with Miss

10      Walker?

11  A.   A friend of hers, we get along.

12  Q.   Would you characterize it differently in any previous

13      years?

14  A.   Yeah, I would.

15  Q.   How would you characterize it then?

16  A.   I have slept with her.

17  Q.   And when was the last sexual encounter you had with

18      Deputy Walker?

19  A.   It would have to be 2018.  I have no idea when.

20  Q.   And did you discuss your relationship with Deputy

21      Walker with Tommy Simpson?

22  A.   I have.

23  Q.   And did you describe any of your encounters with

24      Deputy Walker?

25  A.   Just that we have hooked up.

1  Q.   Are you familiar with a Britney Geary of Bangor,

2       Michigan?

3  A.   Yes.

4  Q.   How would you characterize your relationship with Ms.

5       Geary?

6  A.   She is a citizen of the city and an often complainer.

7  Q.   Would you characterize that any differently in

8       previous years?

9  A.   No.

10  Q.   Have you ever had a sexual encounter with Miss Geary?

11  A.   No.

12  Q.   Did you ever discuss having a sexual encounter with

13      Miss Geary with Tommy Simpson?

14  A.   No.

15  Q.   Do you discuss any other sexual encounters or

16      otherwise discuss matters of a sexual nature with your

17      coworkers?

18  A.   Yes.

19  Q.   Including Ms. Geary or with Deputy Walker?

20  A.   I'm sorry, can you repeat that?

21  Q.   Did you discuss your experiences, your encounters with

22      Deputy Walker with any of your coworkers or

23      subordinates?

24  A.   Yes, with Andrea Walker, yes.

25  Q.   How about any other individuals?

1 A. Sexual nature, is that the question?

2 Q. That is correct.

3 A. Just that I am seeing my now wife, in that sense.

4 Q. When did you first start dating your wife?

5 A. It would be late 2018.

6 Q. And when did you get married?

7 A. July 25th, 2020.

8 Q. So during COVID?

9 A. Right, COVID wedding.

10    (Deposition Exhibit #6 Marked).

11 Q. You have just been handed what's been marked as

12   Exhibit 6.  It's a text message.  Do you recognize

13   this text message?

14 A. I do.

15 Q. And who is it between?

16 A. Jerol Williams and I.

17 Q. And can you describe the text message?

18 A. It is a picture of a woman's genitals and she's

19   playing with herself with a toy.

20 Q. And then what's the comment after that?

21 A. Comment, by Jerol Williams saying, "man that looks

22   delicious LOL."

23 Q. So you believe that these kinds of discussions are not

24   inappropriate, correct?

25 A. It depends with whom.

1   Q.   So this was not an inappropriate text message,

2        correct?

3   A.   Correct.  It wasn't at work.

4   Q.   So there was no complaint, you didn't feel the need to

5        bring this to anyone's attention that such a

6        discussion had happened?

7   A.   Correct.

8                  (Deposition Exhibit #7 Marked).

9   Q.   That's been marked Exhibit 7.  And do you recognize

10       what has been marked as Exhibit 7?

11  A.   I do.

12  Q.   And what exactly is shown in Exhibit 7?

13  A.   A printed piece of paper with a picture of a local

14       trooper and a picture of a swine underneath.

15  Q.   And was that sent from you to Jerol Williams?

16  A.   I don't recall if it was between us two.

17  Q.   Do you know who made the picture that's shown in that

18       text message?

19  A.   Yes, I do.

20  Q.   Who is that?

21  A.   I did.

22  Q.   And was this made in jest?  Was it an attack against

23       the trooper?

24  A.   It was in jest due to events that were occurring at

25       the time that involved her.

1   Q.   So again, not meant to be malicious in any way?

2   A.   No.

3   Q.   So you allege that you suffered injuries and damages

4       obviously, not limited to potential loss of earnings

5       and earning capacity, loss of career opportunities,

6       reputation and esteem in the community, mental and

7       emotional distress and loss of ordinary pleasures of

8       life.  Let's take those one by one.  What loss of

9       earnings and earning capacity have you suffered and on

10      what factual basis do you make that allegation?

11  A.   Well, I was terminated and didn't get another job

12      until my starting date of April 30th, 2021.

13  Q.   So how long after you were terminated was that?

14  A.   I'm not sure of exact days, but about two months.  So

15      it was losses in that regard because I had no job.

16      And that financially also put me behind, as I had to

17      take funding from other places in order to still

18      survive and to ensure that my house wouldn't be

19      foreclosed.

20  Q.   So where did you get that funding then?

21  A.   I just didn't pay for certain things so I could pay

22      other things.

23  Q.   So what loss of career opportunities have you

24      suffered?

25  A.   I was the chief of police at Bangor, and to my

1   knowledge, and we were going places in a positive

2   direction in that regard, and then I was no longer the

3   chief.

4 Q.   So when were you no longer the chief?

5 A.   I believe it was end of April, March 1st, 2021.

6 Q.   So before you were terminated, you were forced to --

7   or you were demoted; is that correct?

8 A.   Correct.

9 Q.   So between March 1st or whenever the date you were

10   demoted, were you acting as a sergeant until the time

11   of your termination?

12 A.   Correct.

13 Q.   So what exactly makes you believe that your demotion

14   has to do with the complaint you made to the mayor on

15   March 9th or 10th?

16 A.   I don't believe it has anything to do with a future

17   date.

18 Q.   So in what way was the demotion a result of your

19   activities here alleged?

20 A.   It was of different activities.

21 Q.   So what activities were those?

22 A.   It was in general after the casino event at the Blue

23   Chip Casino, as soon as that occurred and our

24   professional relationship essentially went downhill,

25   and from there, it was brought to my attention by

```
 1         several other individuals that Tommy is coming after
 2         me.
 3    Q.   So the Blue Chip Casino, that was in November of 2020;
 4         is that correct?
 5    A.   I believe so, yes.
 6    Q.   So there was a lag time of three or four months before
 7         you were demoted; is that correct?
 8    A.   Correct.
 9    Q.   So again, what exactly makes you believe that this
10         demotion was the result of anything to do with that
11         event or other future complained of sexual harassment?
12    A.   The manner in which the demotion occurred.
13    Q.   What's the manner in which it occurred that made you
14         believe that?
15    A.   Suddenly I wasn't allowed to attend council meetings.
16    Q.   So when you say suddenly, is that at the discretion of
17         the chief of police?
18    A.   No, I was the chief of police.
19    Q.   So why did you believe that it was up to you to decide
20         whether you attended those meetings or not?
21    A.   It's always been the case and standard practice to my
22         knowledge, at least in the entirety of my time there,
23         that the chief of police attends them.
24    Q.   So again, what other loss of career of opportunities
25         you suffered then?
```

```
 1   A.   I had to restart from essentially scratch from a
 2        deputy position at another agency.
 3   Q.   How many positions did you apply for before you ended
 4        up with Calhoun County?
 5   A.   I wouldn't be all to recall, but it was definitely
 6        over 15.
 7   Q.   And how did you end up at Calhoun County specifically?
 8   A.   They're the first ones who called.
 9   Q.   Did you know anyone that was working there?
10   A.   I did.
11   Q.   Who was that?
12   A.   Robert Cody.
13   Q.   And what is Robert Cody's position there?
14   A.   He's a jail corrections deputy.
15   Q.   And did you talk to him about the position that was
16        open?
17   A.   Yes.
18   Q.   While you were working at the City of Bangor, prior to
19        your termination, had you applied to any other
20        positions?
21   A.   Could you be more specific as to applied to other
22        positions?
23   Q.   Did you apply to any other jobs while you were working
24        either as acting chief of police, a sergeant or any
25        other position with the City of Bangor?
```

```
 1   A.   Yes.

 2   Q.   And where and when did you make those applications?

 3   A.   Prior to my demotion, I began some of the

 4        applications.

 5   Q.   And when is prior to your demotion?

 6   A.   About two weeks prior to that happening.

 7   Q.   And that was the first time you applied for any other

 8        job while working at the City of Bangor?

 9   A.   Correct.

10   Q.   Do you remember where you applied?

11   A.   I didn't apply fully, I was in the process of

12        completing applications.  I was in the process with

13        Florida, with the state, and I have to transfer my

14        certification first before I could ever apply.

15   Q.   So was it like Florida state trooper or just a

16        position in Florida?

17   A.   Just in Florida.  There's no specifics.

18   Q.   But you never finished an application?

19   A.   Correct.  The initial process, not even through.

20   Q.   And that was the only position you applied for or

21        started the application process while working for City

22        of Bangor?

23   A.   No.

24   Q.   Where else did you apply?

25   A.   Calhoun County Sheriff's Office.
```

```
1   Q.   And when did that application start?
2   A.   It started about three days after my demotion.
3   Q.   So March 3rd or 4th?
4   A.   Approximately.
5   Q.   And any other places or was that it while you were
6        still employed at the City of Bangor?
7   A.   That was it.
8   Q.   And then you said it was ten or 15 that you believe
9        you applied to after termination?
10  A.   Correct.
11  Q.   So you also allege loss of reputation and esteem in
12       the community.  What factual basis do you make that
13       allegation?
14  A.   People, as in citizens of the City of Bangor and the
15       surrounding communities all contacted me when they
16       discovered that this happened, I would receive phone
17       calls, Facebook messages, things of that nature or
18       some in person when I cross them, and I was told by
19       several of those individuals that Tommy is going
20       around, Tommy Simpson is telling everyone that I lost
21       my credibility and that I was messing up and just
22       essentially things like that.  They were negative in
23       nature.
24  Q.   Do you have specific examples of these individuals
25       that contacted you or just general citizens?
```

1   A.   It was, I have Mike Sullins, he contacted me and told

2        me that he knew this was going to happen as it

3        happened to him.  And that's all he told me.  I didn't

4        get information from him.  Van Buren County Sheriff

5        Daniel Abbott stated that we knew this was coming as

6        well, that's what Tommy does to everyone and that he

7        wanted to keep both positions, and that I fell on his

8        sword and they actually made a bet as to how long it

9        would take for me to fall on his sword, and that was

10       from the Van Buren County Sheriffs.

11  Q.   When you say both positions, do you mean chief of

12       police and city manager?

13  A.   Yes.

14  Q.   So who else?

15  A.   Otherwise, just various citizens and local business

16       owners.

17  Q.   Did you produce those Facebook messages or anything

18       along, the phone calls?

19  A.   I produced what I have.

20  Q.   Anyone else that talked to you about this from the

21       community?

22  A.   In person when I crossed them in certain areas, yes.

23  Q.   Do you know their names?

24  A.   I provided those that I did know and did have.

25  Q.   Did any of those people specifically state that they

1      think less of you because of what happened?

2  A.   They did not specifically state that.

3  Q.   Did they indicate that they believed that?

4  A.   No.

5  Q.   So what mental and emotional distress have you

6      suffered, and on what factual basis do you make that

7      allegation?

8  A.   Well, I have -- I can't trust anyone at work right

9      now.  I feel like sometimes if I even have a

10     discussion with anybody in any regard, that it's going

11     to backfire.  Even though there's nothing negative, it

12     can be as simple as going to get a coffee at a gas

13     station as an example or go get a soda at the gas

14     station.  So I watch my back, I think I overdo it, to

15     the extent I watch my back now.  I feel like I just

16     can't trust anyone even in my workplace or on the

17     outside.

18           I don't drive through Bangor at all.  I

19     wanted to go to South Haven for the fireworks, took me

20     hour and-a-half to get there because I had to go way

21     around the countryside, because I just feel like I'm

22     going to get pulled over by someone and it's going to

23     be a disaster.  So I just avoid that in the general.

24     In the very community, in the area I'm at, I can't be

25     the same.

```
 1                    I was at Buffalo Wild Wings, this
 2          approximately happened three months after my
 3          termination, approximately, and a Kalamazoo officer
 4          came up to me who knew who I was, just an acquaintance
 5          position, and told me the same thing; I heard you got
 6          shit canned.  So it's constantly, I can't go anywhere
 7          for a period of time where I was at peace with it.  It
 8          was a constant reminder of how I felt and how I was
 9          set up for all this and leading to my termination.
10     Q.   Who was that acquaintance?
11     A.   Fidel Morales.
12     Q.   Is he with KDPS?  Is he with the county?  Who does he
13          work for?
14     A.   Kalamazoo Department of Public Safety.
15     Q.   What was the name again for me?
16     A.   Fidel Morales.
17     Q.   Any other factual basis that you want to give that
18          states that you had mental and emotional stress that
19          you suffered?
20     A.   Well, outside of that, the countless nights where I'm
21          trying to figure out what to do and how I'm going to
22          take care of my wife, who wasn't working at the time,
23          and having to get a foreclosure letter from my
24          company, it was definitely a stressful outcome and
25          ordeal.  I didn't know if I was going to end up -- I
```

1     didn't know about Calhoun County, didn't have any

2     awareness if I was going to get a job after that

3     because of the manner in which it was conducted, my

4     termination.

5  Q.   When did you interview with Calhoun County?

6  A.   I interviewed prior to my termination.  I don't have

7     an exact date, though.

8  Q.   When did they make the offer to you?

9  A.   It was maybe a week prior to my starting date.

10  Q.   So mid April?

11  A.   Correct, about.

12  Q.   What treatment have you undertaken as a result of your

13     employment termination with the City of Bangor?

14  A.   Can you repeat that?

15  Q.   I was probably fast.  I apologize.  What treatment

16     have you undertaken as a result of your employment and

17     termination with the City of Bangor?

18  A.   Could you specify treatment by who?

19  Q.   So any kind of medical treatment, whether that's

20     mental health, physical, whatever it may be.

21  A.   I'm seeing a therapist in regards to this and we've

22     discussed those things.  I otherwise talk to close

23     friends and relatives and vent with them quite a lot.

24  Q.   And when did the treatment with the therapist begin?

25  A.   It began I believe in May or June of this year.  2022.

1   Q.   And what diagnosis have you received?

2   A.   PTSD.

3   Q.   Anything else or just that?

4   A.   In the sense of a medical treatment.

5   Q.   Have you been prescribed any kind of drugs or any

6        other further treatments?

7   A.   No.

8   Q.   Who is the therapist that you've been treating with?

9   A.   Eric, I apologize, he has a very lengthy last name.

10  Q.   Is he the one you identified in your Interrogatories?

11  A.   Yes.

12  Q.   And what emotional distress have you suffered and in

13       what way has that manifested itself aside from the

14       trust issues of which you spoke?

15  A.   Well, for a while, I was on overdrive mode just trying

16       to get back on my feet in general in life with paying

17       bills and such and dealing with the mortgage company.

18       Once I got settled and everything, then everything hit

19       me at once, and I think I preoccupied myself too much.

20       But I got hit all at once with it.  It was difficult

21       at times to go out.  It was difficult to -- I don't

22       know who's going to be where or who's going to ask me

23       the next question, because that did occur several

24       times.  So I never looked forward to going to a

25       restaurant if there was anybody else there.

1                    Also, for example, I saw Justin Weber at a

2         restaurant downtown Kalamazoo, and obviously they saw

3         me, they talked to each other, but I don't know in

4         what regard.

5    Q.   When you say they saw me, who's they?

6    A.   Justin Weber and his wife.

7    Q.   Do you know when that was, approximately?

8    A.   May 2022.  Maybe April.

9    Q.   You also say that ordinary measures of life that

10        you've lost, so what are those specifically that you

11        lost?

12   A.   Well, I don't feel safe at work.  The biggest -- the

13        pleasure of going to work and just earning a living

14        and doing my job, now I'm looking at administrators as

15        being the pad guys and not the actual guy with the gun

16        running around.  So my work has completely changed in

17        that regard.  And it's just in general, I can't go to

18        South Haven to go see the fireworks without having to

19        have an extensive plan to not get screwed over.

20   Q.   So what wage loss have you suffered and how is that

21        calculated?

22   A.   I calculated what I made and I provided all that, I

23        calculated what I made leaving, my final wage at

24        Bangor Police Department, and from the date of my

25        termination until I got my first check, until I

1    started working at my new place of employment for the

2    wages.

3  Q.  You say when you got your first check or first started

4    working?

5  A.  First started working.  I calculated it to Apri 30th,

6    2021.

7  Q.  So you started the next day at Calhoun County?

8  A.  April 30th is when I started.

9  Q.  You say in your response to the co-defense

10    Interrogatories that, asking for all financial losses

11    that you incurred, that your wife had to find a job

12    and began working at West Michigan Family Dental as a

13    dental assistant at full-time making 16 dollars an

14    hour.  Is that accurate?

15 A.  That is accurate.

16 Q.  How is your wife being gainfully employed a financial

17    loss?

18 A.  She had to going to work so we didn't lose everything

19    while I worked on -- and she wasn't even supposed to

20    go back to work.  She had a medical issue.

21 Q.  So how is it a financial loss that she was working?

22 A.  Because the loss was my loss.

23 Q.  What does that mean?

24 A.  The wages that I lost, your question was, what wages

25    did I lose.  Those are the wages that I lost.  She

1      went back to work and made her wages.

2  Q.  You say you had continue forbearance on your house

3      payments in response to that same Interrogatory.  When

4      did you begin forbearance?

5  A.  I began that in, it was earlier, it was actually in

6      March 2020.

7  Q.  While you were employed at the City of Bangor?

8  A.  Correct.

9  Q.  And that negatively affected your credit score when

10     you began that forbearance?

11  A.  No.

12  Q.  So when you testified your credit score when from 700

13     down to 550, how did that occur?

14  A.  So there was two instances of forbearance.  The first

15     one you asked when did it start, then we stopped it

16     because we didn't need it.  It was due to COVID-19, my

17     wife got laid off.  So then because of my termination,

18     I reactivated the forbearance because that's the only

19     way I could get out of foreclosure per my mortgage

20     company.  And so that's what I did.  Because it was

21     not due to COVID-19, my credit suffered.

22          MR. BOGREN:  I understand.  I think that is

23     what I have right now.  Do you want to take a five

24     minute break before we hand it over?

25          MS. JOZWIAK:  Yeah, why don't we do that?

1           (Off the record).

2           MS. JOZWIAK:  My name is Kathleen Jozwiak.

3       I represent the City of Bangor as well Scott Graham

4       and Mayor Williams.  I apologize if I repeat some

5       questions, I may have some -- I know Mr. Bogren pretty

6       much got all of it during his direct, so if I repeat

7       something, I apologize.

8                   EXAMINATION

9   BY MS. JOZWIAK:

10  Q.   I first want to clarify that all the allegations

11       you're making against Mr. Graham and Mayor Williams

12       stem from their conduct after you turned in your

13       complaint on March 12th, 2021; is that correct?

14  A.   That is incorrect.

15  Q.   Can you please lay out all of your specific

16       allegations of wrongdoing against Mayor Williams and

17       Scott Graham?

18  A.   One incident against Mayor Williams which is in regard

19       to the text message that he sent me to ask me for the

20       dismissal of a citation with his cousin.  And that's

21       the only event.

22  Q.   Okay.  And that's with regard to Mayor Williams,

23       correct?

24  A.   Correct.

25  Q.   Have you ever dismissed a traffic citation for your

```
 1        family member or friend while you were employed with
 2        Bangor?
 3   A.   No.
 4   Q.   Have you dismissed -- has anyone else asked you to
 5        dismiss a traffic citation for anyone else while you
 6        were employed with Bangor?
 7   A.   Yes.
 8   Q.   And have you dismissed the citation?
 9   A.   Yes.
10   Q.   So you feel that's inappropriate even though you were
11        doing the same thing?
12   A.   The manner in which it was conducted was inappropriate
13        and actually unlawful under Michigan law.
14   Q.   How was it unlawful under Michigan law?
15   A.   I can't be ordered by anyone to dismiss or charge
16        anyone with anything.
17   Q.   And you felt that he ordered you to dismiss the
18        traffic citation as opposed to requesting or looking
19        into it?
20   A.   Correct.
21   Q.   And that's your only allegation of wrongdoing against
22        Mayor Williams, correct?
23   A.   Until the date of my termination, correct.
24   Q.   And what about the termination are you alleging
25        against Mayor Williams?
```

1  A.   The manner of the termination in general and the

2       Whistle Blower part of it, which the Mayor Williams

3       reached out to me actually to sit with him to provide

4       my complaint about Tommy Simpson.  And then when we

5       organized that and scheduled that meeting, I showed up

6       to get terminated.  And that's the issue with Mayor

7       Williams.

8  Q.   So let's go over it again.  You said that he called

9       you on March 9th, I believe?

10 A.   Correct.

11 Q.   And what was the content of your discussions on March

12      9th, 2021, just to clarify?

13 A.   Mayor Williams asked me -- or told me that he was

14      calling around as a complaint was filed against Tommy

15      Simpson by other employees.  Didn't specify who were

16      the other employees.  Told me he was calling around

17      the whole department as he was told that someone else

18      had a complaint against Tommy Simpson or against

19      another member of the city.  I told him that I did

20      have a complaint.  So he asked me about the complaint

21      and I did elaborate a little bit to that complaint,

22      and he said, do you have anything?  And I said I did.

23      And then I said, when are you back to work?  And I

24      told him that Friday was my next scheduled day, which

25      would be March 12th, 2021.  Then he told me that he

1  would call me that morning and organize an actual time

2  once he got off work.  And that day came along and he

3  did contact me and scheduled that time for

4  approximately 5:00 on March 12th, 2021.

5 Q. And what specifics did you get into during that call,

6  exactly, about your complaint against Mr. Simpson?

7 A. Just that I did have a sexual harassment and hostile

8  work environment complaint about Tommy Simpson and

9  that I wanted to discuss it with him.

10 Q. So no details was discussed, you just said that there

11  was a sexual harassment/hostile work environment

12  claim?

13 A. Just the nature of the incident, not the specifics.

14 Q. And you never came to find out who had filed the

15  complaint which initiated Mayor Williams' phone call

16  to you on March 9th, 2021?

17 A. I found out.

18 Q. And who filed the complaint?

19 A. Amanda Karr.

20 Q. And I apologize, I haven't made copies of these

21  exhibits, but I will mark this as, I believe we're on

22  7?

23    COURT REPORTER:  8.

24    MS. JOZWIAK:  8, okay.

25    (Deposition Exhibit #8 Marked).

1   Q.   Is this the complaint that you're referring to?

2   A.   I believe so.  I did not at the time see this

3       complaint, so I didn't know that this physical paper

4       existed at that time.

5   Q.   Okay.  But you came to find out that it was Amanda

6       Karr who had filed the complaint?

7   A.   Correct.

8   Q.   And on that piece of paper it says she filed the

9       complaint on March 10th, 2021, but you say that Mayor

10      Williams called you the day before on March 9th?

11  A.   Either March 9th or 10th.

12  Q.   So you don't know if it was March 9th or 10th when

13      Mayor Williams called you?

14  A.   Correct.  I believe it was two to three days prior to,

15      is what I testified to.

16  Q.   And do you know whether Mayor Williams reached out to

17      any other employee from the Bangor Police Department?

18  A.   I do.

19  Q.   Who else did he reach out to?

20  A.   Justin Blankenship, prior to me.

21  Q.   Any other employees?

22  A.   Not that I know of.  I don't know.

23            MS. JOZWIAK:  I'll mark this as Exhibit 9.

24            (Deposition Exhibit #9 Marked).

25  Q.   Is this a complaint that you filed with the EEOC?

1   A.    Looks like it, yes.

2   Q.    Do you know what date you filed it on?

3   A.    I don't recall the exact date.  I just know that it's

4        after my termination.

5   Q.    It was after your termination?

6   A.    Correct.

7   Q.    And in that complaint, it states that the city clerk

8        submitted the complaint on your behalf on March 10th,

9        2021.  Is that accurate?  I'm sorry, the second page

10       of Exhibit 9.

11  A.    What you have highlighted?

12  Q.    Yes.

13  A.    Correct.

14  Q.    Is there anything Exhibit 8, Amanda Karr's complaint,

15       that mentions a complaint with regards to you against

16       Mr. Simpson?

17  A.    No.

18  Q.    So it would be inaccurate, then, what's included in

19       your EEOC complaint in Exhibit 9?

20  A.    No, it is accurate.

21  Q.    So what complaint did she submit, Amanda Karr, on

22       behalf of yourself in regards to the allegations

23       against Mr. Simpson?

24  A.    She told me, Amanda Karr directly told me that she

25       told the mayor verbally that there was also several

1     officers on the police side who have complaints

2     against Tommy similar to mine.

3  Q.  But she didn't mention your name specifically?

4  A.  She did not.

5  Q.  Is there anything else, any other allegations that

6     you're making against Mayor Williams besides the text

7     message that he sent you with regards to dismissing

8     his cousin's citation and the manner of the

9     termination after you were terminated?

10  A.  As in total or prior to my termination any complaints

11     about Williams?

12  Q.  In total.

13  A.  My termination itself, and then how it was handled

14     afterwards.

15  Q.  And what are your allegations with regards to how it

16     was handled afterwards?

17  A.  Mayor Williams refused to provide me with the alleged

18     investigation that Scott Graham did on me.

19  Q.  Was there ever a point in time where Mr. Graham

20     reached out to you and asked you to discuss the case

21     with him?

22  A.  Yes.

23  Q.  And did you contact him back?

24  A.  No.

25  Q.  Why not?

1  A.  I was fired.  I had no connection with the city

2      anymore.

3  Q.  Part of your allegations are that they didn't discuss

4      the complaint with you after your termination,

5      correct?

6  A.  Correct.

7  Q.  But you didn't respond to their request to talk to you

8      about the investigation after you were terminated?

9  A.  Correct.

10 Q.  In effect, Mr. Graham reached out to you twice through

11     e-mail as well as a text message after you were

12     terminated to discuss the investigation, correct?

13 A.  I recall the text message, I don't recall an e-mail.

14          MS. JOZWIAK:  I'll mark this as Exhibit 10.

15          (Deposition Exhibit #10 Marked).

16 Q.  Included in this is an e-mail from March 19th, 2021 as

17     well as a text message from Scott Graham on March

18     14th, 2021.  Do you recall that e-mail now?

19 A.  I do.

20 Q.  And was there any other allegations with regards to

21     Mayor Williams that you're bringing in your complaint?

22 A.  No.

23 Q.  And moving on to Mr. Graham, what's your specific

24     allegations against Mr. Graham?

25 A.  Yes, it is.

1  Q.    I'm sorry, what are your specific allegations against

2         Mr. Graham?

3  A.    The investigation that was conducted against me in

4         reference to that CSC trial that I supposedly got

5         terminated for, I was not contacted whatsoever as a

6         part of the investigation or interviewed or even had

7         the knowledge that it was taking place.  Had that not

8         taken place, I would have been able to elaborate on

9         specifics of the case that would have had a completely

10       different outcome and determination, which would have

11       alleviated me entirely of everything in regards to

12       that CSC case.

13  Q.   But you did testify earlier that Mr. Simpson did

14       discuss your performance of deficiencies prior to your

15       termination, correct?

16  A.   I testified that it was discussed with me but not that

17       he discussed -- that he did discuss it with me, but

18       not his position on it; that it was told to him by the

19       court.

20  Q.   Who discussed his position with you?  Who are you

21       referring to?

22  A.   Tommy Simpson discussed it with me but about what the

23       court told him, not his position or take on my

24       involvement with that case of mine.

25  Q.   Did you reach out to Mr. Graham at all to talk to him

1      about the investigation regarding the CSC charge that

2      you were investigated on?

3  A.   I was never informed it even existed.

4  Q.   What other allegations do you have against Mr. Graham

5      in your complaint?

6  A.   The outcome of the investigation I believe was biased.

7      There was no effort at all, information was provided

8      as well, no effort was brought into our allegations,

9      what I said that Tommy Simpson was involved in or did

10     with the case.  So if any actual effort was made, it

11     would have been brought up that it was incorrect, the

12     entirety of it.

13  Q.  So you again never responded to his request to discuss

14     the investigation with you, correct?

15  A.  Right.  That's not the charter, though.

16  Q.  I'm sorry?

17  A.  That's not the charter of the city, though.  That's

18     not the policy of the procedures of the city with

19     respect of discussing employment termination issues.

20  Q.  Did you ever appeal your termination?

21  A.  I did.

22  Q.  When was that?

23  A.  I believe on the 13th or 14th of March, 2021, I sent

24     all council members, to include Scott Graham and the

25     mayor, an appeal and a request for my job back.

1   Q.   And you did want your job back at that point, correct?

2   A.   Correct.

3   Q.   So you weren't that uncomfortable in the workplace

4        that you wanted to go somewhere else?

5   A.   No.  My hope was that I would get my job back and that

6        the issues that I complained about would be handled

7        appropriately.

8   Q.   You're not bringing -- I'm sorry -- was that the last

9        allegation you had against Mr. Graham specifically?

10  A.   Yes.

11  Q.   There's no sexual harassment or gender discrimination

12       claims against Mr. Graham or Mayor Williams, correct?

13  A.   Correct.

14  Q.   They never discussed their sexual encounters or

15       experiences with you?

16  A.   Not with me directly.

17  Q.   And the first time that you made a specific allegation

18       against Mr. Simpson was when you turned in your

19       written complaint after you were terminated on March

20       12, 2021; is that right?

21  A.   That is incorrect.

22  Q.   When was the first time you made the written complaint

23       about Mr. Simpson's conduct during your employment?

24  A.   Prior to being terminated.

25  Q.   Prior to being terminated, when?

1  A.   Right before being terminated.

2  Q.   You made a written complaint prior to your written

3       complaint that you turned in after you were

4       terminated?

5  A.   The written complaint I turned in was made prior to my

6       termination.  The meeting where I was terminated was

7       about my complaints, not about a termination.

8  Q.   When did you submit your written complaint to Mayor

9       Williams or Scott Graham?

10 A.   On March 12th, 2021 at about five p.m.

11 Q.   And that was after you were terminated, correct?

12 A.   Incorrect.  Prior to my termination.

13 Q.   Let me get this straight.  So Mayor Williams called

14      you on March 9th or March 10th asking you to meet.

15      You said yes.  The next work day, which was March 12,

16      2021, tell me what occurred that day specifically.

17 A.   Which day, March 12th?

18 Q.   March 12th, 2021.

19 A.   The mayor called me at approximately one p.m. and

20      asked me if I was at work.  I told him that I was, I

21      started at one p.m. that day, and he told me he was

22      still at work and would call me when he's back home

23      from Kalamazoo and that we could meet about my

24      complaint.  About 5:00 p.m., the mayor called me and

25      told me, are you close to town?  And I said I'm in the

```
 1      city.  And he goes, go ahead and come with your
 2      complaint.
 3                So I parked the police vehicle, grabbed my
 4      red folder which contained the complaint out of my
 5      personal vehicle and then walked over to the city hall
 6      where I was, I believed I was there to turn in a
 7      complaint about Tommy Simpson.  Instead I, was stopped
 8      from turning it in and told you're fired instead
 9      before I could even sit down.  Provided with a
10      termination letter.
11   Q. So you didn't turn in your written complaint until
12      after you were terminated, correct?
13   A. I turned it in.
14   Q. After you were terminated?
15   A. No, before.
16   Q. So when you first went to go meet with them, the first
17      thing you did was hand them your manila folder and
18      said, here's my complaint?
19   A. Correct.
20   Q. First thing before you guys even discussed anything?
21   A. Correct.  If I can elaborate.  I didn't use those
22      exact words, here, I'm turning in my complaint.  I
23      came in with my complaint in hand to turn it in, and
24      he's like, I have something for you first, along those
25      lines, and those are not exact quotes because I don't
```

1    recall the exact words he used, but I did provide a

2    recording of the entire meeting that will show just as

3    such.

4  Q.  So Mayor Williams did not read the complaint until

5      after you were terminated, correct?

6  A.  Correct.

7  Q.  And the first and only time that you allegedly

8      complained to Mayor Williams about Mr. Simpson's

9      conduct was during the March 9th, 2021 phone call, and

10     you didn't get into specifics about your allegations,

11     correct?

12 A.  Correct.

13 Q.  And when was the first time that you complained to

14     Scott Graham about Mr. Simpson's conduct?  Alleged

15     conduct, I should say.

16 A.  I never complained to him.

17 Q.  Did you ever file a complaint with regards to Mayor

18     Williams or Scott Graham's conduct during your

19     employment before you were terminated?

20 A.  Yes.

21 Q.  And when was that?

22 A.  I would say approximately November or December, around

23     the new year, going from 2020 to '21, about Mayor

24     Williams, Mayor Williams only, in regards to that

25     speeding or that stop sign violation ticket for his

1     cousin.

2  Q.   And who did you complain to?

3  A.   Tommy Simpson.

4  Q.   Any other complaints about Mayor Williams or Scott

5     Graham prior to your termination?

6  A.   No.

7  Q.   And was the complaint to Tommy Simpson in writing?

8  A.   Of Tommy's incident, you asked?

9  Q.   I'm sorry.  Was your complaint about the traffic

10    citation that Mayor Williams asked you to get

11    dismissed, was that, when you complained to Tommy

12    Simpson about that, was that in writing, or how did

13    you communicate that to Mr. Simpson?

14  A.   I met with him in person and we discussed it.

15  Q.   Which jobs did you apply for after you were

16    terminated?  You said ten to 15, I would like the

17    names of those departments, please.

18  A.   There's so many.  I applied to Township of Kalamazoo

19    Police Department, I applied to Kalamazoo County

20    Sheriff's Office, Calhoun County Sheriff's Office,

21    Allegan County Sheriff's Office.  Trying to think

22    where else.  Several little departments around that

23    area.  I started my -- I had my application for

24    Schoolcraft Police Department, which I did work there

25    before.  Vicksburg Police Department.

```
 1   Q.   Where is the Schoolcraft Police Department?

 2   A.   In Kalamazoo County.

 3   Q.   I'm sorry, what was the next one after that?

 4   A.   Vicksburg Police Department, and I wouldn't recall at

 5        this time other ones, but I believe there was

 6        additional sheriff's offices.  I think Kent County

 7        Sheriff's Office was one of them.

 8   Q.   Did you get call backs for interviews from any of

 9        these facilities or departments?

10   A.   I got testing dates.

11   Q.   From how many?

12   A.   I believe two, but I'm not sure.

13   Q.   Had you already been offered the job at Calhoun County

14        at that point?

15   A.   Yes.

16   Q.   So you didn't show up for those testing dates?

17   A.   Correct.  I withdrew.

18   Q.   Why did you hand your complaint to Amanda Karr in the

19        parking lot after you were terminated on March 12th,

20        2021?

21   A.   I had a discussion with her on the phone that today is

22        the day I'm turning in my complaint.  Let's see if I

23        get fired or not.  That was literally the joke in the

24        conversation.  She was getting off of work and there

25        was no actual plan between us to see each other at
```

1          that time, I just saw her walking across the parking

2          lot, so I parked and showed her the complaint and told

3          her that the mayor was going to meet with me later.

4          She never knew the actual specifics of the complaint,

5          so I gave it to her to start reading it, and she read

6          about the quarter through the first page if that and

7          then she handed it back to me after she saw the

8          content.

9     Q.   And this was before your meeting on March 12th, 2021

10         or after?

11    A.   Before.

12    Q.   I apologize, I just don't want to repeat any questions

13         that have already been asked.

14              And Mayor Williams discussed with you your

15         performance deficiencies during this March 12th, 2021

16         meeting correct?

17    A.   He did not discuss them with me.

18    Q.   In your responses to, I believe we marked this as

19         Exhibit 4, page 9 you say that this allegation was

20         also mentioned in my termination determination by city

21         attorney Scott Graham and Mayor Williams on March 12,

22         2021.  So he did not bring it up at your meeting at

23         all?  That's your testimony?

24    A.   He mentioned to me the reason of the termination, but

25         he did not discuss the issues that led to the

```
 1        termination.
 2   Q.   What's the difference between mentioning them and
 3        discussing them?
 4   A.   Mentioning them as in you're being terminated for
 5        events that happened at the court, versus, here's what
 6        you did at the court and that's why you're being
 7        terminated.  Instead of elaborating on the reasons
 8        that led to my termination and this investigation by
 9        Scott Graham, instead of elaborating on those, I was
10        just told that an investigation was conducted and I'm
11        being terminated because of it.
12   Q.   But he did list the reasons as to why you were being
13        terminated, correct?
14   A.   That it was regarding -- correct, regarding the case.
15   Q.   When did you go to Cancun with your wife for your
16        honeymoon?
17   A.   Approximately two weeks after my termination.
18   Q.   When did you book that trip?
19   A.   It was -- we did the booking, started the booking and
20        money planning for it back in October of 2020, and I
21        actually bought the flight, I think it was like three
22        or four days after my termination.
23   Q.   So it wasn't completely booked until after you were
24        terminated, correct?
25   A.   Correct.
```

1  Q.  Even though you were financially so distressed that

2      you had to worry about losing your house at that

3      point?

4  A.  It was already paid for.

5  Q.  You said you didn't book the flight tickets until

6      three days after your termination, right?

7  A.  Right, just the flights.  But everything else, all the

8      funding for everything else was already part of our

9      wedding gift from July of 2020.

10 Q.  I want to clarify your forbearance on your house.  You

11     purchased your house at 4843 Yellow Pine March of

12     2020, correct?

13 A.  Yes.

14 Q.  And you immediately -- you were in the forbearance

15     program when you bought it?

16 A.  In May 2020.

17 Q.  And you had testified earlier that you utilized it

18     because your wife was laid off, but you also said she

19     wasn't supposed to be working because of medical

20     issues?

21 A.  Correct.

22 Q.  Can you explain that?

23 A.  Sure.  She was fine at that time.  The medical issues

24     developed after she was already laid off from COVID

25     where they became a serious matter where she could no

1     longer work for a while.

2  Q.  And what was that medical issue?

3  A.  She had tumors on her uterus.

4  Q.  When did she go back to work?

5  A.  After my termination.  I don't have an exact date.

6  Q.  When did she stop working prior to going back to work?

7  A.  I believe around September 2020.

8  Q.  Was she working at the same dental office?

9  A.  No.

10  Q.  So you utilized the forbearance program in May of

11     2020.  How long did you utilize the forbearance

12     program for.

13  A.  Nine months, which is the maximum you can use.  It's

14     automatically, they give you nine months.

15  Q.  So that's until about February 2021?

16  A.  Correct, about, approximately.  Around the change of

17     the new year.

18  Q.  So you didn't make any mortgage payments from May 2020

19     till February 2021?

20  A.  Incorrect.

21  Q.  What was your payments every month on your mortgage

22     during that time?

23  A.  Approximately 1,300.

24  Q.  We received some documents of your Notice of Intent to

25     Foreclose, we got one page out of four.  Do you know

1      where these other pages are?

2   A.  The other pages are just your rights for HUD.  So

3      several mandatory documents that they have to provide

4      with every single letter they sent.

5   Q.  And you had to refinance, you said?

6   A.  We were working on refinancing, but it was -- it

7      wasn't a refinance; our account was sold to Kent from

8      Amerifirst to Kent.

9   Q.  You were making mortgage payments the whole year 2020,

10     right?

11  A.  Right.

12  Q.  Then how were you -- so you were almost 20,000 dollars

13     behind by April 2022?

14  A.  I did not make mortgage payments the whole time

15     consistently.  I made some mortgage payments.

16  Q.  But even while you were working for Bangor, you

17     weren't making all of your mortgage payments for 2020,

18     right?

19  A.  Correct.

20  Q.  Before you were terminated?

21  A.  Correct.

22  Q.  So how far are you behind when you were terminated in

23     March of 2021?

24  A.  A maximum about two months.  So the period of the

25     forbearance, there was no such thing as being behind

1    while you're on forbearance.  It continues from that

2    point.  So we paid as soon as the forbearance was

3    over.  I couldn't pay (inaudible) once I got

4    terminated and we went back into forbearance, and that

5    lasted until just this past February or January 2022.

6    And ever since then, but we've been making payments as

7    well when we could.  So it's not like I just didn't

8    pay.  We were making payments when we could.

9 Q.  In 2020?

10 A.  And 2021.

11 Q.  And that seven weeks that you were out of work put you

12    behind 20 grand?

13 A.  Nope.  During the forbearance period, whatever you owe

14    is still being saved until it resumes.  So when it

15    resumes, that whole 20 grand would carryover, and

16    that's how --

17 Q.  So you only made -- how many payments did you make

18    from 2020 until you were terminated in March 2021?

19 A.  I don't have that in front of me to know, but I would

20    say approximately a third of the year's payments.

21 Q.  Have you read Dr. Shiener's report after your

22    examination, I believe it was in April of this year,

23    2022?

24 A.  I have not.

25 Q.  You told several of your former coworkers to call you

1  instead of messaging you because your texts were

2  requested by counsel in this suit.  Why did you do

3  that?

4 A. We told them to stop talking on our phones and just

5  talk in person because it was unnecessary to just add

6  more fuel to the fire in a sense.  So just it was

7  unnecessary to communicate by text, it was obviously

8  being subpoenaed or pulled for discovery, so then we

9  would just have to re-pull everything again and again

10  if there was new things.  So we provided obviously

11  what we had, there was no issue with that, but instead

12  of having to provide more work --

13 Q. It wasn't because you were going to say something that

14  you didn't want disclosed?

15 A. There was nothing of worry of them disclosing

16  anything.  We're an open book in that regard.

17 Q. There's a text from Dillon where he was concerned

18  about a previous group chat after you told him that

19  your texts were being pulled for discovery purposes.

20  What was that group chat about?

21 A. I don't recall.  I recall that text, but I don't

22  recall the content of the group chat.

23 Q. Well, you responded:  That's okay.  It shows how

24  miserable he made us.  So you obviously knew about it

25  then.

1   A.   I don't recall the specifics as to the group chat.

2   Q.   Do you have any issues with gay people?

3   A.   None.

4   Q.   There's some derogatory terms that you included in

5       your group chat such as fag centipede. Do you know

6       what that's about?

7   A.   They're not from me.

8   Q.   You didn't report that -- you would you consider that

9       harassment?

10   A.   I don't know at the time when those were sent. I

11       don't believe I was there at that time as to my

12       recollection.

13   Q.   In response to Jerol Williams stating fag centipede,

14       you respond: D, as in the millions of dollars that

15       they (inaudible). Do you remember that?

16   A.   It's helping recollecting as you say, but I don't

17       remember that. I don't remember the specifics.

18   Q.   So you were a part of that conversation, correct?

19   A.   I was in several group chats, but a lot of times I

20       didn't converse about the specific terms that you

21       stated were mentioned.

22   Q.   Do you think fag is a derogatory term?

23   A.   I do.

24   Q.   But you didn't report that, correct?

25   A.   Again, I would ask when is the timeline of that text

1     message.

2    Q.    I believe this was in February of 2021, but we have

3           the text messages.  And there was also a text about

4           switch plates for Tommy's new office with a picture of

5           a switch plate depicting homosexual acts; is that

6           correct?

7    A.    Switch -- what do you mean?

8    Q.    The outlet covers.

9    A.    Oh, like a like switch?

10    Q.    Yeah.

11    A.    Someone did send a text message of that.  Again, I did

12           not send that at all.

13    Q.    So again, what's the difference -- we see in the text

14           messages of you and your former coworker sending

15           pictures of vaginas and naked women.  What's the

16           difference between that and Mr. Simpson allegedly

17           talking about his sexual encounters with other men?

18    A.    Mr. Simpson can fire me, and these are my friends, and

19           I have been friends with them far before I ever

20           started at Bangor Police Department, especially with

21           Jerol Williams.  I've known him since 2011.  A lot of

22           the context is prior to any these issues even being

23           brought up.  And the other part of it is, at sometimes

24           we were equal.  Once I was their chief of police, we

25           didn't have those exchanges in that nature.  So as

1       soon as I took that role, a lot of that stuff stopped,

2       because I understood that that is just a no-no.

3  Q.   (Inaudible) for a while too, correct?

4  A.   Correct.

5  Q.   And you were their supervisor then too, correct?

6  A.   Correct.

7  Q.   So what's the difference between -- you're their

8       superior, correct?

9  A.   Correct.

10  Q.   You say it's wrong because Mr. Simpson was your

11       superior, what's the difference?

12  A.   I was their superior in the duties of what I was doing

13       at work.  I had no control over their job, their

14       outcome, their write-ups, nothing in that regard where

15       I had a final decision.  Tommy Simpson did.  And

16       again, the content that was shared, Tommy Simpson and

17       I hung out one time outside of work.  I've hung out

18       with Tyler dozens of times, I've hung out with Jerol

19       probably a thousand times.  So it was different in our

20       relationship, we understand what was acceptable and

21       what was not.  What was a joke -- I never discussed

22       anything about Jerol's wife, I have no idea what she

23       looks like, outside of her face, nor do they of mine.

24       But I have explicit stories that were told to me by

25       Tommy Simpson that I don't need to know.

1   Q.   So it depends on your personal relationship --

2         depending on what you can talk about is based on your

3         personal relationship with your coworkers, correct?

4   A.   In part, with coworkers and non-coworkers.

5   Q.   And at one point you talked to Mr. Williams about

6         hitting Governor Whitmer from behind and choking her

7         during sex?

8   A.   I don't recall mentioning that.

9   Q.   These are really small, this is how I got them, but

10        we'll mark this as 11.

11              (Deposition Exhibit #11 Marked).

12   Q.   Towards the bottom.

13   A.   I do recall this.

14   Q.   And that's your text that you said, right, about

15        hitting Governor Whitmer from behind and choking her

16        during sex?

17   A.   Yes.

18   Q.   And you feel that's appropriate?

19   A.   In the context that it was.

20   Q.   And what's the context that it's in?

21   A.   It was a complete joke, and the basis of a

22        conversation that we had about that that's probably

23        all she's just missing is a good sexual relationship.

24   Q.   What's the name of the Bangor firefighter that Mr.

25        Simpson allegedly told you he had sex with?

1   A.    I never got that name.

2   Q.    Did you keep secret personnel files in your office

3         while employed with Bangor Police Department?

4   A.    No.

5   Q.    So if there's pictures of secret personnel files that

6         you had in your office, that would be inaccurate?

7   A.    Correct.  There were none.

8   Q.    Were you responsible for reviewing and/or approving

9         police reports of sergeants?

10  A.    In part.

11  Q.    Was there several police reports that weren't reviewed

12        or approved prior to your termination in your Interact

13        Report Management System?

14  A.    I don't know.

15  Q.    Is it true that you had evidence unsecured in your

16        office while employed with Bangor?

17  A.    No.

18  Q.    So if there's pictures of evidence scattered

19        throughout your office after your termination, that

20        would be inaccurate?

21  A.    That would be inaccurate.

22  Q.    How often did you go to court when you were chief of

23        police?

24  A.    Court for any reason or for trial?

25  Q.    You said that was part of your duties, correct?

1    A.    Correct.

2    Q.    So how often on a normal?

3    A.    Biweekly, approximately.

4    Q.    Twice a week?

5    A.    Correct.

6    Q.    For how long each time?

7    A.    It varied based on the amount of work that was to be

8          brought over.

9    Q.    Why weren't you involved or why didn't you watch them

10         at the Mendoza trial?  Why did you sit in the witness

11         room when that was going on?

12   A.    I wasn't part of the trial in that respect, so they

13         called me when they needed me.  So I came there when I

14         was called.

15   Q.    Does the OIC typically watch the trial they're in

16         charge of?

17   A.    Yes.

18   Q.    So why didn't you sit during the trial of that --

19   A.    I was told by Tommy that they would call me when they

20         need me, by Tommy Simpson.

21   Q.    Why did you ask assistant prosecuting attorney

22         Hoekstra to communicate with you via Snapchat after

23         your termination?

24   A.    Because I didn't have her phone number and I didn't

25         have her e-mail.  We always communicated by e-mail

1     otherwise.

2  Q.  You said that you suffered a panic attack and chest

3     pains in October 2020 as a result of this incident.

4     Is that true that you were diagnosed with an enlarged

5     valve in your left ventricle approximately 15 years

6     ago?

7  A.  That is correct.

8  Q.  And you suffered several complications since then,

9     since you were diagnosed?

10  A.  Zero complications.

11  Q.  You had several abnormal EKG tests before this

12     incident, correct?

13  A.  Correct.

14  Q.  You wouldn't consider that complications of your

15     diagnosis?

16  A.  No.

17  Q.  What were the abnormal EKG tests for?

18  A.  Any time I would go to the hospital for anything or

19     any standard check-up, since that is a historical

20     medical issue, they do an EKG just to make sure

21     everything is fine.  My abnormal EKG will be for the

22     rest of my life.

23  Q.  And you were diagnosed with this before this incident

24     occurred, correct, or before you were terminated?

25  A.  Correct.

1   Q.   On October 10th, 2020, you also told the doctors that

2         you had stressors at home.  What were the stressors at

3         home?

4   A.   It was regarding everything that was going on and then

5         COVID-19 happening and my wife losing her job.

6   Q.   Your wife losing her job?

7   A.   To COVID-19.  And then her personal medical issues

8         with her.

9   Q.   You also claim that you suffer from abdominal pain and

10        gastrointestinal issues as a result of this incident;

11        is that correct?

12   A.   Correct.

13   Q.   Was there only one instance in January 2022?

14   A.   Correct.

15   Q.   And you haven't had any issues since then or prior to

16        that?

17   A.   Correct.

18   Q.   And the doctors found nothing medically wrong with

19        you, correct?

20   A.   Correct.

21   Q.   Did you suffer from gastrointestinal issues prior to

22        your termination?

23   A.   No.

24   Q.   How did you sprain a ligament in your right thumb in

25        June of 2022?

1  A.   I was helping a citizen push a car out of an

2        intersection, and in doing, so he slammed on his

3        brakes and my thumb jammed into his trunk.

4  Q.   Your personnel file states that you were disqualified

5        from interviewing with the Grand Rapids Police

6        Department because you did not pass the psychology

7        test.  Why didn't you pass the psychology test?

8  A.   From what I was told by my background investigator, I

9        answered the questions one off, so therefore, all of

10       the questions were off.

11  Q.   Did they let you retake it?

12  A.   They told me I was more than welcome to come back and

13       they would fast track me in the next round.

14  Q.   But you didn't?

15  A.   I didn't.

16  Q.   Do you have a history of any mental health conditions?

17  A.   I do not.

18  Q.   You don't have any trauma stemming from your

19       stepfather sexually molesting you when you were twelve

20       years old?

21  A.   I don't know how to define trauma in that extent, but

22       there was about incidents.

23  Q.   Did you suffer from anxiety or depression as a result

24       of your stepfather sexually molesting you?

25  A.   No, I wouldn't know.  I can't diagnose that.  I

1      wouldn't know.

2  Q.  Did you see a counselor in high school after this

3      happened?

4  A.  I did but not for that reason.

5  Q.  What did you see a counselor for in high school?

6  A.  My mom got me a counselor because she believed

7      something was wrong and they believed -- they

8      attributed it to thinking it was my girlfriend at the

9      time, which was my first girlfriend ever, and it was

10     causing issues, and that's it.

11  Q.  What did she think was wrong with you?

12  A.  Just that I would skip school a lot.

13  Q.  So you never saw a counselor as a result of your

14     stepfather molesting you when you were a child?

15  A.  Never.

16  Q.  Were you ever prescribed medications prior to 2017,

17     let's say?

18  A.  I have, yes.

19  Q.  And what kind of medications?

20  A.  For various work-related injuries.  Ibuprofen, I think

21     I had Hydrocodone once.  That's all I can recall.

22  Q.  You never had anxiety medications or

23     antidepressants --

24  A.  Never.

25  Q.  -- prescribed to you?  Why did you wait until June

1      23rd, 2022 to start treating with a psychologist?

2  A.  Like I said, everything caught up to me at once.  I

3      had other things that I believed were a far bigger

4      priority than myself, which was the recovery of my

5      wife.

6  Q.  When was your wife fully recovered?

7  A.  She still isn't.

8  Q.  But she's still working?

9  A.  She was able to go back to work.

10  Q.  And I believe you said it's Eric Stezowski that you're

11      treating with?

12  A.  Yes.

13  Q.  And the first was in June of 2022.  How many visits

14      have you been since June 2020 two?

15  A.  Five or six.  I've been going weekly about.

16  Q.  And when is your next appointment?

17  A.  Next week.

18  Q.  And you go once a week?

19  A.  Correct.  I skipped a couple weeks due to my phone.

20      I've been doing physical therapy instead.

21  Q.  On October 29th, 2020 you sent an e-mail to the

22      officers in your department advising them that all

23      grievances filed with the department, against the

24      department and personnel must go to you.  Did you

25      receive any grievances from October 2020 to March

1    2021?

2  A.    I believe I did not.  Let me correct.  In writing.

3        But I had verbal grievances, several of them from

4        several officers.

5  Q.    Have you received any raises or bonuses since you've

6        been employed with Calhoun County?

7  A.    Yes.

8  Q.    And what's that?

9  A.    We had our annual 5 percent raise that was at the turn

10      of the year just this past year, '21 to '22.  And when

11      I got off of my one-year probationary period, I

12      received a raise as well.

13  Q.   And what kind of raise was that?

14  A.   I believe it was a dollar.  Dollar raise.

15  Q.   So now how much are you making per hour at Calhoun

16      County?

17  A.   I believe I'm making 25.45.

18  Q.   And you haven't received any bonuses, signing bonuses

19      or anything like that?

20  A.   No sign-on bonus.  We just got a retention bonus that

21      was given to the whole department and that's done

22      monthly, once a month of 500 dollars if you don't call

23      off.  I've been on work injury, so I've received none.

24             MS. JOZWIAK:  That's all I have.  Just give

25      me one second.

1  Q.   In your complaint, your March 12, 2021 complaint that

2       you handed to Mayor Williams after the meeting,

3       there's no allegations of wrongdoing against Mayor

4       Williams or Scott Graham, correct?  And you can review

5       it if you need to review it.

6  A.   I don't need to review it.  There was none.

7                 MS. JOZWIAK:  That's all I have.

8                 MS. MALHIOT:  I have no questions.

9                 MR. BOGREN:  Quick follow-up.

10                RE-EXAMINATION

11 BY MR. BOGREN:

12 Q.   Who was at the meeting on March 13th or March 12th,

13      2021 when you were terminated?

14 A.   Mayor Williams and Justin Weber.

15 Q.   So Tommy Simpson was not present?

16 A.   Not in the meeting.

17                MR. BOGREN:  That's all I have.

18                (Deposition concluded at 1:23 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF MACOMB  )

5

6

7              I, STEVE BROWN, certify that this

8         deposition was taken before me on the date

9         hereinbefore set forth; that the foregoing questions

10        and answers were recorded by me digitally and reduced

11        to computer transcription; that this is a true, full

12        and correct transcript of my digital recording so

13        taken; and that I am not related to, nor of counsel

14        to, either party nor interested in the event of this

15        cause.

16

17

18

19                                _Steven Brown_

20                         _____

21

22                         STEVE BROWN, CER-999

23                         Notary Public,

24                         Macomb County, Michigan

25        My Commission expires: March 18, 2023

**#**

**#1 (1)**
23:7
**#10 (1)**
114:15
**#11 (1)**
133:11
**#2 (1)**
26:5
**#3 (1)**
33:19
**#4 (1)**
35:11
**#5 (1)**
40:10
**#6 (1)**
91:10
**#7 (1)**
92:8
**#8 (1)**
110:25
**#9 (1)**
111:24

**A**

**Abbott (1)**
99:5
**abdominal (1)**
137:9
**able (6)**
52:17;59:10;60:12,
13;115:8;140:9
**abnormal (3)**
136:11,17,21
**above (1)**
29:11
**abuse (1)**
83:19
**accept (1)**
9:10
**acceptable (4)**
39:4;87:24;88:23;
132:20
**acceptance (1)**
79:3
**accepted (1)**
9:9
**accepting (1)**
38:19
**according (3)**
45:9,11,18
**account (1)**
127:7
**accurate (8)**
76:10,11;83:25;
84:1;105:14,15;
112:9,20
**acknowledgment (1)**
33:25
**acquaintance (2)**

101:4,10
**acquitted (1)**
32:13
**across (1)**
123:1
**Act (1)**
71:21
**acted (1)**
68:4
**Acting (16)**
11:1,2,4,9,12;14:14,
21;17:10,12,18,20,21;
21:4;52:6;94:10;
96:24
**action (6)**
68:9,11;80:13;81:6,
8,10
**actions (13)**
65:22,22;69:16;
75:20;78:25;79:2;
80:15,17,19;82:1,13,
17;83:1
**activities (3)**
94:19,20,21
**acts (1)**
131:5
**actual (9)**
57:10;58:21;61:16;
67:10;104:15;110:1;
116:10;122:25;123:4
**actually (14)**
44:23;62:17;63:16;
65:2,3;66:17;69:14;
72:17;75:1;99:8;
106:5;108:13;109:3;
124:21
**add (1)**
129:5
**additional (1)**
122:6
**additions (1)**
15:13
**address (3)**
5:9,11;27:25
**adjust (1)**
57:2
**adjusted (2)**
57:5;58:17
**administrator (1)**
11:7
**administrators (1)**
104:14
**adverse (2)**
74:9;75:20
**advising (1)**
140:22
**affairs (1)**
67:10
**affect (1)**
47:2
**affected (3)**
55:20;57:13;106:9
**affirmatively (1)**

5:23
**aforementioned (1)**
83:21
**afraid (1)**
42:4
**African (1)**
66:5
**Afterwards (5)**
6:22;25:21;77:11;
113:14,16
**again (23)**
21:10;24:14;25:20,
23;27:14;28:8;36:4;
45:10;64:5;75:2;84:6;
93:1;95:9,24;101:15;
109:8;116:13;129:9,
9;130:25;131:11,13;
132:16
**against (40)**
15:20,24;26:22;
32:12;42:12,15;
43:14,15;53:10;
54:20;62:14;74:2;
75:5,6,20;76:6;81:10;
92:22;107:11,16,18;
108:21,25;109:14,18,
18;110:6;112:15,23;
113:2,6;114:24;
115:1,3;116:4;117:9,
12,18;140:23;142:3
**agencies (1)**
57:24
**agency (1)**
96:2
**ago (1)**
136:6
**agree (1)**
31:2
**agreeing (2)**
38:19,21
**ahead (2)**
51:22;119:1
**al (2)**
4:10,10
**Allegan (1)**
121:21
**allegation (7)**
93:10;98:13;100:7;
108:21;117:9,17;
123:19
**allegations (13)**
107:10,16;112:22;
113:5,15;114:3,20,24;
115:1;116:4,8;
120:10;142:3
**allege (6)**
36:17;78:10;79:12;
83:10;93:3;98:11
**alleged (6)**
16:13;24:8;47:8;
94:19;113:17;120:14
**allegedly (3)**
120:7;131:16;

133:25
**alleging (3)**
56:1;60:10;108:24
**alleviated (1)**
115:11
**allow (1)**
61:7
**allowed (12)**
57:23;58:2;59:3,13,
18,19;62:3;70:12,14;
73:24;77:17;95:15
**Almost (2)**
7:16;127:12
**alone (1)**
52:19
**along (6)**
62:3;76:21;89:11;
99:18;110:2;119:24
**always (2)**
95:21;135:25
**Amanda (9)**
52:2,3;53:7;110:19;
111:5;112:14,21,24;
122:18
**American (1)**
66:6
**Amerifirst (1)**
127:8
**among (2)**
84:17;88:3
**amount (1)**
135:7
**and/or (7)**
55:21,22;62:21;
64:7;78:12;81:19;
134:8
**and-a-half (2)**
18:20;100:20
**Andrea (2)**
89:6;90:24
**animosity (1)**
58:23
**annual (1)**
141:9
**answered (1)**
138:9
**Anthony (1)**
66:25
**antidepressants (1)**
139:23
**Antonio (2)**
23:8,24
**anxiety (2)**
138:23;139:22
**anymore (1)**
114:2
**APA (2)**
27:3;29:21
**apartment (2)**
6:24;7:12
**apologize (10)**
33:13;63:4;64:2;
65:2;102:15;103:9;

107:4,7;110:20;
123:12
**appeal (2)**
116:20,25
**appearance (2)**
40:2,3
**appearances (1)**
68:8
**appearing (2)**
4:23,25
**application (4)**
97:18,21;98:1;
121:23
**applications (3)**
97:2,4,12
**applied (8)**
96:19,21;97:7,10,
20;98:9;121:18,19
**apply (7)**
69:21;96:3,23;
97:11,14,24;121:15
**appointed (1)**
18:12
**appointment (1)**
140:16
**appropriate (5)**
38:9;48:9;88:17,19;
133:18
**appropriately (2)**
48:9;117:7
**approved (1)**
134:12
**approving (1)**
134:8
**approximately (25)**
11:10;18:5,21;
20:11;21:15;23:3,15;
52:2;59:15;66:4;
73:14;86:4;98:4;
101:2,3;104:7;110:4;
118:19;120:22;
124:17;126:16,23;
128:20;135:3;136:5
**Apri (1)**
105:5
**April (13)**
12:19,21;19:6;20:6;
23:18;24:14;93:12;
94:5;102:10;104:8;
105:8;127:13;128:22
**area (3)**
73:2;100:24;121:23
**areas (1)**
99:22
**around (15)**
18:8;20:11;23:18;
38:16;44:21;56:23;
98:20;100:21;104:16;
109:14,16;120:22;
121:22;126:7,16
**arrests (1)**
11:24
**Aside (2)**

14:22;103:13

**assigned (3)**
23:10;29:21;60:7

**assistant (3)**
28:25;105:13;
135:21

**Associate's (1)**
6:4

**assume (1)**
21:3

**assumed (1)**
11:6

**attached (1)**
25:4;40:22

**attachments (1)**
29:14

**attack (2)**
92:22;136:2

**attempted (1)**
59:24

**attend (4)**
6:9,16;59:3;95:15

**attended (1)**
95:20

**attending (1)**
7:3

**attends (1)**
95:23

**attention (2)**
92:5;94:25

**attorney (4)**
26:19;28:25;
123:21;135:21

**Attorneys (4)**
4:20;28:16,19,22

**attorney's (3)**
25:16;29:13;33:2

**attracted (1)**
40:3

**attributed (2)**
70:1;139:8

**August (11)**
4:1,7;9:2,7,15;10:4;
11:11,11;13:14,14,17

**automatically (1)**
126:14

**avoid (2)**
58:16;100:23

**aware (10)**
31:6,9,10;34:8,18,
21;42:1;48:18;78:20;
81:4

**awareness (1)**
102:2

**away (1)**
61:17

**B**

**back (39)**
9:4,5,8;15:14;17:2;
20:16;26:3;31:3;35:7;
44:15;51:21;59:23;

60:2,6;64:25;65:14;
71:15;74:6,25;75:1;
83:5;100:14,15;
103:16;105:20;106:1;
109:23;113:23;
116:25;117:1,5;
118:22;123:7;124:20;
126:4,6;128:4;
138:12;140:9

**backfire (1)**
100:11

**background (1)**
138:8

**backs (1)**
122:8

**backup (1)**
33:15

**bad (1)**
58:9

**Bangor (76)**
4:10;10:1,2,5,24,
25;12:11,17,23;13:2,
5,10,18,20,23;14:10,
11;17:2,4;18:4,13;
19:21;23:1;25:7;
26:19;27:25;30:13;
34:1,9;36:19;37:13,
16,20;39:7,9;47:9,12;
50:25;53:21;54:11,
15;61:6;62:20;63:3,5,
8;64:6;67:24;70:9,11;
71:24;72:2;83:10;
88:3;90:1;93:25;
96:18,25;97:8,22;
98:6,14;100:18;
102:13,17;104:24;
106:7;107:3;108:2,6;
111:17;127:16;
131:20;133:24;134:3,
16

**base (1)**
58:5

**based (4)**
49:11;62:21;133:2;
135:7

**basis (11)**
44:11;46:23;75:22;
76:16;84:9,12;93:10;
98:12;100:6;101:17;
133:21

**Bear (2)**
23:4;25:23

**beast (1)**
42:10

**became (5)**
20:9;37:11,12;
47:15;125:25

**become (7)**
12:17;13:20;14:17;
20:5;56:9;71:7,10

**began (7)**
11:11;37:15;97:3;
102:25;105:12;106:5,

10

**begin (3)**
6:14;102:24;106:4

**behalf (7)**
4:23,25;5:1,3;
12:10;112:8,22

**behind (9)**
60:6;65:14;93:16;
127:13,22,25;128:12;
133:6,15

**belief (1)**
49:23

**belonged (1)**
29:15

**Benton (9)**
7:14,15,19;8:1,2;
15:15,18;16:1,4

**Berrien (1)**
36:14

**besides (1)**
113:6

**best (12)**
5:20;13:24;15:12;
30:7;40:24;47:23,24;
48:3,7;56:6;63:22;
76:2

**bet (1)**
99:8

**betrayed (2)**
69:23;70:4

**better (4)**
20:25;71:2;86:7,11

**beyond (1)**
68:11

**biannually (1)**
15:12

**biased (1)**
116:6

**big (1)**
62:12

**bigger (3)**
57:19,20;140:3

**biggest (1)**
104:12

**bills (1)**
103:17

**bit (2)**
51:10;109:21

**Biweekly (1)**
135:3

**black (1)**
66:9

**Blair (2)**
29:19,20

**Blankenship (2)**
84:20;111:20

**Blower (1)**
109:2

**Blowers (1)**
71:21

**Blue (15)**
45:8,12,19,23;
46:13,15,22;47:7;

52:13;55:14,15;62:5;
68:24;94:22;95:3

**bod (1)**
31:7

**body (7)**
29:25;30:3,10,23;
31:4,11;33:13

**BOGREN (20)**
4:22,22,24,24;5:6,
16;30:8;37:7;44:17;
56:7;64:2;72:25;
75:14;76:5;77:22;
106:22;107:5;142:9,
11,17

**bold (1)**
74:8

**bonus (2)**
141:20,20

**bonuses (3)**
141:5,18,18

**book (3)**
124:18;125:5;
129:16

**booked (1)**
124:23

**booking (2)**
124:19,19

**born (1)**
83:19

**boss (1)**
88:21

**both (8)**
76:15;79:4,7;80:8,
14;88:10;99:7,11

**bottom (2)**
31:14;133:12

**bought (2)**
124:21;125:15

**bound (1)**
24:21

**box (6)**
25:5,6,7,10,12,21

**Boyer (1)**
25:16

**boyfriend (1)**
36:2

**BPD (2)**
27:16;32:18

**brakes (1)**
138:3

**Break (3)**
46:6;77:23;106:24

**bring (9)**
12:2;25:23;41:14,
16;60:4;66:7;73:21;
92:5;123:22

**bringing (2)**
114:21;117:8

**Britney (1)**
90:1

**Broadway (1)**
4:8

**brought (16)**

50:12;53:1,3,9;
59:20;65:11;67:9,11;
84:25;85:2,10;94:25;
116:8,11;131:23;
135:8

**Buffalo (1)**
101:1

**bullet (1)**
35:2

**Buren (4)**
51:8;89:7;99:4,10

**business (1)**
99:15

**C**

**Caitlin (1)**
5:3

**calculate (1)**
50:5

**calculated (5)**
50:4;104:21,22,23;
105:5

**Calhoun (12)**
19:2,10;96:4,7;
97:25;102:1,5;105:7;
121:20;122:13;141:6,
15

**California (5)**
8:5,6,22;15:23;
16:17

**call (14)**
36:23;38:23;56:23,
24;66:7;110:1,5,15;
118:22;120:9;122:8;
128:25;135:19;
141:22

**called (15)**
4:16;38:19;73:19;
78:6;80:21,21;96:8;
109:8;111:10,13;
118:13,19,24;135:13,
14

**calling (5)**
38:9;56:3;77:25;
109:14,16

**calls (5)**
37:3;63:21;75:25;
98:17;99:18

**cam (8)**
29:25;30:3,10,24;
31:5,7,11,13;33:13

**came (8)**
41:23;45:5;101:4;
110:2,14;111:5;
119:23;135:13

**can (31)**
4:14;7:6;24:20;
30:7;37:4;39:2;40:17;
51:20;55:2;56:5;
57:17,18;63:22;66:8;
69:25;70:7;74:7;76:1;
83:11;90:20;91:17;

100:12;102:14;
107:15;119:21;
125:22;126:13;
131:18;133:2;139:21;
142:4
**cancel (4)**
27:19,23,24;28:8
**cancelled (4)**
27:12,14;28:7,10
**Cancun (1)**
124:15
**candidates (1)**
66:6
**canned (1)**
101:6
**capacity (2)**
93:5,9
**car (1)**
138:1
**care (3)**
68:13;77:12;101:22
**career (3)**
93:5,23;95:24
**carryover (1)**
128:15
**case (26)**
4:13;5:17;16:11;
23:9,11,13,23;27:4,6;
28:2,4,15;29:4,9,13,
15,21;32:18;74:10;
95:21;113:20;115:9,
12,24;116:10;124:14
**cases (1)**
15:9
**Casino (15)**
45:8,12,19,23;
46:15,23;47:7;52:13;
55:14,15;62:5;68:24;
94:22,23;95:3
**caught (1)**
140:2
**cause (2)**
53:1;85:15
**caused (7)**
70:19,23;71:1;
85:11,12,13,14
**causing (4)**
84:14,16,22;139:10
**centipede (2)**
130:5,13
**certain (11)**
11:6;28:12;38:12,
19,20;46:1,2;62:13;
69:16;93:21;99:22
**certainly (2)**
55:7;87:22
**certification (3)**
8:16,18;97:14
**chain (1)**
48:10
**challenging (1)**
27:7
**chance (1)**

33:20
**change (1)**
126:16
**changed (2)**
43:22;104:16
**changing (1)**
57:17
**characterize (5)**
89:9,12,15;90:4,7
**charge (12)**
28:25;43:20,21,24;
44:3,10;60:7,8;84:11;
108:15;116:1;135:16
**Charged (1)**
16:13
**charges (2)**
32:12,14
**Charles (2)**
4:22;5:16
**charter (2)**
116:15,17
**chat (5)**
129:18,20,22;
130:1,5
**chats (1)**
130:19
**check (2)**
104:25;105:3
**check-up (1)**
136:19
**chest (1)**
136:2
**chief (62)**
11:1,2,4,6,8,9,12,
19;14:14,19,20,21,23;
17:10,13,18,19,20,21,
25;18:3,11,12,16,17,
19,22;19:21;20:9,12,
20,25;21:4,8;22:2,4,
10;26:23;27:2;31:15;
44:20;58:2,14;59:4,5;
65:8,13;71:6,7,10,19;
83:17;93:25;94:3,4;
95:17,18,23;96:24;
99:11;131:24;134:22
**chief's (2)**
11:15;12:8
**child (1)**
139:14
**Chip (14)**
45:8,12,19,23;
46:15,22;47:7;52:13;
55:14,15;62:5;68:24;
94:23;95:3
**choice (5)**
20:16,17,18;22:9;
59:20
**choices (1)**
20:19
**choking (2)**
133:6,15
**choose (1)**
20:21

**circumstances (2)**
83:21;87:24
**citation (13)**
77:6,8,9,12,13,15;
107:20,25;108:5,8,18;
113:8;121:10
**citizen (4)**
16:21;17:3;90:6;
138:1
**citizens (4)**
15:20;98:14,25;
99:15
**City (73)**
4:10;12:11;13:5,10,
18,20,23;14:9,11,12;
17:2,4;18:3,13;19:20;
23:1;26:19,19,23;
28:11;34:1,8;35:5;
36:19;37:16,20,24;
40:7;45:13;47:9,11,
16;51:17,23,25;
52:19;53:2;59:10,13;
62:20;63:3,5,8;64:6;
65:8;67:24;70:8,11;
71:24;72:1,4;83:9;
87:11;90:6;96:18,25;
97:8,21;98:6,14;
99:12;102:13,17;
106:7;107:3;109:19;
112:7;114:1;116:17,
18;119:1,5;123:20
**claim (16)**
36:8;45:1;46:15,20;
50:13;53:5;58:5;
65:23;71:21;74:9;
75:19,22;76:17;84:9;
110:12;137:9
**claims (3)**
46:1;53:2;117:12
**clarify (7)**
17:21;28:4;33:12;
63:24;107:10;109:12;
125:10
**clean (1)**
69:18
**clear (2)**
54:10;80:11
**clearly (1)**
85:12
**clerk (2)**
52:6;112:7
**close (3)**
83:23;102:22;
118:25
**closed (1)**
40:24
**co-defendant (1)**
40:13
**co-defense (1)**
105:9
**codes (1)**
15:9
**Cody (1)**

96:12
**Cody's (1)**
96:13
**coffee (1)**
100:12
**colleagues (1)**
87:11
**College (5)**
6:6,10,21;7:5,9
**combined (1)**
14:11
**comfortability (1)**
83:20
**comfortable (1)**
46:19
**coming (3)**
58:14;95:1;99:5
**comment (2)**
91:20,21
**comments (4)**
41:11,16,19;87:10
**Commission (1)**
15:1
**commit (1)**
69:15
**common (2)**
88:6,7
**communicate (4)**
29:3;121:13;129:7;
135:22
**communicated (1)**
135:25
**communities (1)**
98:15
**Community (9)**
6:6,10,21;7:4,9;
93:6;98:12;99:21;
100:24
**company (5)**
6:25;8:7;101:24;
103:17;106:20
**compared (1)**
80:2
**comparison (1)**
78:15
**compile (1)**
12:1
**complain (3)**
58:7,8;121:2
**complained (8)**
64:5;65:9;95:11;
117:6;120:8,13,16;
121:11
**complainer (1)**
90:6
**complaining (1)**
65:21
**complaint (94)**
24:2;35:4;47:8,11;
49:8;52:23;55:6,19;
62:18;63:2,11,15,16,
18,22;64:4;65:3,7,15;
66:17,19,21;67:2,3;

71:22;72:14;73:6,13,
17,21,23;75:2,6,7,10,
13,13,15,16;76:9,14;
78:8;82:16;92:4;
94:14;107:13;109:4,
14,18,20,20,21;110:6,
8,15,18;111:1,3,6,9,
25;112:7,8,14,15,19,
21;114:4,21;116:5;
117:19,22;118:2,3,5,
8,24;119:2,4,7,11,18,
22,23;120:4,17;121:7,
9;122:18,22;123:2,4;
142:1,1
**complaints (20)**
15:19,23;16:22;
17:3,9;26:22;53:9;
62:19,24;63:3,5,8;
64:17,19;68:14,14;
113:1,10;118:7;121:4
**complete (1)**
133:21
**completed (3)**
6:13;7:8;57:1
**completely (4)**
61:5;104:16;115:9;
124:23
**completing (1)**
97:12
**complex (2)**
6:24;7:12
**complications (3)**
136:8,10,14
**concerned (2)**
27:15;129:17
**concerning (1)**
39:18
**concerns (2)**
37:23;51:3
**concluded (2)**
67:10;142:18
**conclusion (4)**
37:3;56:3;63:21;
75:25
**condition (1)**
55:20
**conditions (1)**
138:16
**conduct (19)**
23:11,13;27:8,16;
55:20;59:19;61:4,10;
69:14;75:21,23;76:1,
3;107:12;117:23;
120:9,14,15,18
**conducted (6)**
78:17;80:16;102:3;
108:12;115:3;124:10
**conducting (1)**
66:4
**confidential (1)**
85:9
**confront (1)**
61:12

**confusing (1)**
15:17
**connection (1)**
114:1
**consent (1)**
65:12
**consider (2)**
130:8;136:14
**consideration (1)**
65:12
**considered (5)**
13:4;35:23;65:13;
82:17,20
**consistently (1)**
127:15
**constant (1)**
101:8
**constantly (1)**
101:6
**constitute (1)**
40:4
**contact (2)**
110:3;113:23
**contacted (4)**
98:15,25;99:1;
115:5
**contained (1)**
119:4
**content (4)**
109:11;123:8;
129:22;132:16
**context (8)**
38:12,13;76:4;80:4;
87:1;131:22;133:19,
20
**Continue (2)**
53:24;106:2
**continued (1)**
40:18
**continues (1)**
128:1
**control (1)**
132:13
**conversation (9)**
40:19;46:18;67:13,
14,16;85:10;122:24;
130:18;133:22
**conversations (7)**
53:12,14;54:19;
58:12;87:2;88:11,13
**converse (2)**
130:20
**conversing (1)**
47:3
**convicted (1)**
24:3
**cop (1)**
40:24
**copied (1)**
31:7
**copies (1)**
110:20
**copy (3)**

**30:21;31:4;73:6**
**corrected (1)**
62:16
**correction (1)**
44:11
**corrections (1)**
96:14
**correctly (2)**
27:16;32:19
**council (19)**
12:9;18:13,14;
22:18,24;37:24;40:8;
59:3,5,7,11,14;80:22,
23,24;81:2,3;95:15;
116:24
**counsel (1)**
129:2
**counselor (4)**
139:2,5,6,13
**countered (1)**
61:16
**countless (1)**
101:20
**countryside (1)**
100:21
**County (22)**
19:2,10;36:14;51:8;
89:7;96:4,7;97:25;
99:4,10;101:12;
102:1,5;105:7;
121:19,20,21;122:2,6,
13;141:6,16
**couple (2)**
77:11;140:19
**course (1)**
36:18
**COURT (28)**
4:4,12,20;11:21,23,
23,25;12:2,5,6;14:22;
19:14;25:5,6,9,10,10,
12,25;26:3,9;110:23;
115:19,23;124:5,6;
134:22,24
**courthouse (2)**
58:17,17
**courtroom (1)**
32:9
**cousin (4)**
77:6,10;107:20;
121:1
**cousin's (1)**
113:8
**covers (1)**
131:8
**COVID (3)**
91:8,9;125:24
**COVID-19 (4)**
106:16,21;137:5,7
**coworker (1)**
131:14
**coworkers (5)**
90:17,22;128:25;
133:3,4

**creating (2)**
55:22;84:17
**credibility (2)**
31:16;98:21
**credit (3)**
106:9,12,21
**crime (3)**
16:13,14;19:4
**crimes (1)**
69:15
**Criminal (4)**
6:8;15:9;23:10;
27:7
**criticism (1)**
61:1
**cross (1)**
98:18
**crossed (1)**
99:22
**crude (4)**
87:16,25;88:2,14
**CSC (4)**
24:3;115:4,12;
116:1
**current (1)**
18:24
**currently (1)**
71:6

**D**

**damages (1)**
93:3
**danger (1)**
49:15
**Daniel (1)**
99:5
**dare (1)**
67:18
**date (28)**
12:19;13:8;18:8;
22:19;33:9;41:7;47:3,
4,5,6;51:12;65:16;
67:5,6;73:17;76:14,
24;78:4;93:12;94:9,
17;102:7,9;104:24;
108:23;112:2,3;126:5
**dated (1)**
34:4
**dates (2)**
122:10,16
**dating (1)**
91:4
**day (18)**
44:24;56:17,21;
57:5;63:19;67:4,5;
74:3;77:2;105:7;
109:24;110:2;111:10;
118:15,16,17,21;
122:22
**days (13)**
9:20;10:7;30:2,16,
19;73:13;75:17;

77:11;93:14;98:2;
111:14;124:22;125:6
**deal (2)**
48:14;62:12
**dealing (1)**
103:17
**dealt (1)**
65:19
**December (4)**
59:15;86:4,4;
120:22
**decide (1)**
95:19
**decided (1)**
77:18
**decision (9)**
13:22;22:23,24;
60:14,15;74:10,12;
77:17;132:15
**decisions (1)**
22:17
**defendant (11)**
32:13;35:17;62:19,
20;63:5,9;64:6;65:24;
71:24;81:21;83:9
**defendants (1)**
5:17
**deficiencies (2)**
115:14;123:15
**define (1)**
138:21
**defining (1)**
87:13
**definitely (3)**
57:13;96:5;101:24
**definition (2)**
56:4;76:1
**degree (4)**
6:4,5,7;7:8
**delay (1)**
27:7
**delete (1)**
30:16
**delicious (1)**
91:22
**demoted (11)**
20:12,14;21:5;22:2,
4,7,12;23:2;94:7,10;
95:7
**demotion (10)**
17:17;18:18;43:13;
94:13,18;95:10,12;
97:3,5;98:2
**Dental (3)**
105:12,13;126:8
**Department (81)**
7:14;8:9,24;9:1,3,
11,21;10:1,3,6,11,16,
19,22;12:10,18,24;
13:11;14:3,6,9;15:16,
19;16:1,3,5,21;19:2;
25:7;31:4,6,11;35:5;
37:14;39:7,9;47:16;

48:11,20,21,23;49:3,
8;50:24,25;51:3;52:3,
5,7;53:21;54:15;
59:25;60:3;61:6;67:6,
7;69:2;70:13,20,24;
80:17;84:18;85:5,23;
88:4;101:14;104:24;
109:17;111:17;
121:19,24,25;122:1,4;
131:20;134:3;138:6;
140:22,23,24;141:21
**departments (4)**
59:1;121:17,22;
122:9
**Depending (2)**
38:12;133:2
**depends (2)**
91:25;133:1
**depicting (1)**
131:5
**deposed (1)**
5:13
**deposition (14)**
4:6,7;23:7;26:5;
33:19;35:11;40:10;
91:10;92:8;110:25;
111:24;114:15;
133:11;142:18
**depression (1)**
138:23
**Deputy (23)**
14:19,20,23;17:25;
18:3,25;19:1,3,7,11;
20:20,25;21:8;22:9;
89:6,18,20,24;90:19,
22;96:2,14
**derogatory (2)**
130:4,22
**describe (5)**
40:17;58:11;81:24;
89:23;91:17
**described (1)**
54:21
**describing (2)**
45:2;78:25
**details (2)**
78:9;110:10
**determination (3)**
62:2;115:10;123:20
**Detroit (1)**
4:9
**developed (1)**
125:24
**diagnose (1)**
138:25
**diagnosed (3)**
136:4,9,23
**diagnosis (2)**
103:1;136:15
**difference (5)**
124:2;131:13,16;
132:7,11
**different (9)**

7:24;18:7;20:17;
47:17;53:19;80:9;
94:20;115:10;132:19
**differently (10)**
78:11,13,14,15,23;
79:24;80:7,13;89:12;
90:7
**difficult (4)**
52:23;59:17;
103:20,21
**Dillon (14)**
39:6;40:2,21;44:5,
7,12,18;45:2;77:7,7,
17,18;84:21;129:17
**dinners (1)**
69:2
**Direct (7)**
21:9,11,12;31:21;
46:16;48:12;107:6
**directed (3)**
41:19;55:6;76:12
**direction (1)**
94:2
**directly (9)**
58:20;65:4;69:22;
70:21;73:18;85:3,22;
112:24;117:16
**director (8)**
47:16,20,25;48:11,
24;49:8,24;51:4
**disagree (2)**
74:16,18
**disaster (1)**
100:23
**disc (4)**
31:5,8,12;33:14
**disciplinary (3)**
68:9,11;69:16
**discipline (9)**
16:2,6,8,18,24;17:6,
12,15,23
**disclose (5)**
51:16,17,23,24;
52:1
**disclosed (1)**
129:14
**disclosing (1)**
129:15
**discovered (1)**
98:16
**discovery (3)**
35:16;129:3,8,19
**discretion (1)**
95:16
**discrimination (12)**
62:23;63:13;64:10,
12,14,21,23;65:17;
66:2;68:1,3;117:11
**discriminatory (4)**
62:21;63:6;64:7;
65:25
**discuss (32)**
27:10;28:18;45:4;

46:2,4,7,8,16,17;
53:25;57:23,25;
67:20;86:13,18,25;
89:1,2,20;90:12,15,
16,21;110:9;113:20;
114:3,12;115:14,17;
116:13;123:17,25
**discussed (15)**
54:2;59:25;60:5;
67:14;102:22;110:10;
115:16,17,20,22;
117:14;119:20;
121:14;123:14;
132:21
**discussing (11)**
28:15;29:8;40:1,1;
44:13;46:14;59:7;
71:2;77:25;116:19;
124:3
**discussion (5)**
69:7;89:4;92:6;
100:10;122:21
**discussions (13)**
39:3;41:5,6,9;54:8;
84:24,24;85:1,2,4;
88:3;91:23;109:11
**dismiss (6)**
77:6,12,13;108:5,
15,17
**dismissal (1)**
107:20
**dismissed (5)**
77:20;107:25;
108:4,8;121:11
**dismissing (2)**
77:19;113:7
**disparate (7)**
62:23;63:13;64:15;
69:9;81:20;82:3;83:3
**disqualified (1)**
138:4
**dissension (1)**
84:17,22;85:8,25
**distress (3)**
93:7;100:5;103:12
**distressed (1)**
125:1
**District (2)**
4:12,12
**Division (2)**
4:13;19:14
**doctors (2)**
137:1,18
**document (9)**
26:6,12,20;30:6;
33:22,24;35:8,13,15
**documented (1)**
52:14
**documents (7)**
25:8;29:9,12;74:19,
21;126:24;127:3
**dollar (2)**
141:14,14

dollars (4)
105:13;127:12;
130:14;141:22
**done (8)**
11:20;15:11;49:20;
62:22;63:7,12;68:15;
141:21
**down (13)**
29:17,18;31:3;
41:10;42:6,7;46:6;
73:25;75:19;78:7;
83:5;106:13;119:9
**downhill (1)**
94:24
**downtown (1)**
104:2
**dozens (1)**
132:18
**Dr (1)**
128:21
**drive (1)**
100:18
**driving (1)**
44:21
**dropped (1)**
32:12
**drugs (1)**
103:5
**due (5)**
20:25;92:24;
106:16,21;140:19
**duly (1)**
4:17
**during (18)**
31:21;33:11,12;
35:23;36:7;59:4;91:8;
107:6;110:5;117:23;
120:9,18;123:15;
126:22;128:13;133:7,
16;135:18
**duties (9)**
9:16;11:6,24;14:24,
25;15:2;59:4;132:12;
134:25
**duty (3)**
44:21;68:5;88:9

## E

earlier (5)
53:13;60:1;106:5;
115:13;125:17
**earning (3)**
93:5,9;104:13
**earnings (2)**
93:4,9
**education (1)**
6:3
**EEOC (2)**
111:25;112:19
**effect (3)**
11:24;55:21;114:10
**effort (3)**

116:7,8,10
**eight (4)**
56:17,18,22;57:3
**either (3)**
35:5;96:24;111:11
**EKG (4)**
136:11,17,20,21
**elaborate (7)**
24:20;58:11;67:19;
69:19;109:21;115:8;
119:21
**elaborating (2)**
124:7,9
**else (19)**
9:22;13:1;14:22;
48:16;59:1;97:24;
99:14,20;103:3,25;
108:4,5;109:17;
111:19;113:5;117:4;
121:22;125:7,8
**elsewhere (2)**
69:22,24
**e-mail (12)**
29:7,8;54:22;55:5;
60:1;114:11,13,16,18;
135:25,25;140:21
**e-mailing (1)**
69:21
**E-mails (1)**
29:14
**emotional (4)**
93:7;100:5;101:18;
103:12
**employed (18)**
7:10,11,13,15;34:8;
36:18;67:23;71:7,11;
81:15;98:6;105:16;
106:7;108:1,6;134:3,
16;141:6
**employee (8)**
15:6;36:10;50:19;
53:20;55:3;82:4;83:9;
111:17
**employees (15)**
11:21;42:15;53:15;
70:21;78:16;81:21;
82:10,11;84:17,19;
85:1;86:19;109:15,
16;111:21
**employees' (1)**
86:25
**employment (24)**
10:18,21,23;15:4;
26:21,22;49:25;
54:14,23;55:20;
69:24;73:10,12;74:9,
11,17;75:3,20;102:13,
16;105:1;116:19;
117:23;120:19
**empowered (1)**
79:5
**encounter (3)**
89:17;90:10,12

encounters (7)
66:15;89:1,23;
90:15,21;117:14;
131:17
**end (3)**
94:5;96:7;101:25
**ended (2)**
68:6;96:3
**enforcement (4)**
8:10,15;15:1;36:14
**engaged (1)**
75:22
**enlarged (1)**
136:4
**enough (1)**
5:21
**ensure (1)**
93:18
**entail (7)**
7:22;11:5,19,23;
14:20;19:3;54:19
**entered (1)**
73:22
**entire (3)**
19:7;61:10;120:2
**entirely (1)**
115:11
**entirety (2)**
95:22;116:12
**entries (2)**
24:16,19
**entry (1)**
29:14
**environment (10)**
47:14;55:23,25;
56:5;57:13;62:6;72:3;
83:20;110:8,11
**equal (4)**
14:12;55:8;69:17;
131:24
**Eric (2)**
103:9;140:10
**erratic (1)**
56:16
**especially (1)**
131:20
**essential (2)**
14:25;15:2
**Essentially (4)**
57:16;94:24;96:1;
98:22
**established (2)**
30:5;61:18
**esteem (2)**
93:6;98:11
**et (2)**
4:10,10
**even (20)**
45:3,5;68:9;73:24,
25;75:7;76:3;97:19;
100:9,11,16;105:19;
108:10;115:6;116:3;
119:9,20;125:1;

127:16;131:22

**event (7)**
36:7;52:13;55:14;
68:24;94:22;95:11;
107:21

**events (5)**
52:14;63:10;70:1;
92:24;124:5

**everybody's (1)**
38:15

**everyone (3)**
38:16;98:20;99:6

**everyone's (1)**
38:17

**evidence (5)**
27:5,11;32:19;
134:15,18

**evidentiary (2)**
31:5,7

**evidently (2)**
85:11,12

**exact (17)**
12:19;13:8;14:21;
18:8;21:20;33:9;41:7;
51:12;67:12,19;
93:14;102:7;112:3;
119:22,25;120:1;
126:5

**exactly (19)**
7:23;13:8;25:21;
29:9;44:25;46:7;
49:10;54:6,18,25;
55:24;56:13;75:4;
76:20;82:19;92:12;
94:13;95:9;110:6

**EXAMINATION (3)**
5:5;107:8;128:22

**examined (1)**
4:19

**example (15)**
56:15;57:12,15,25;
59:18;61:1;62:10,10;
64:22,23;80:3,12;
83:24;100:13;104:1

**examples (9)**
50:11;52:25;53:4,
17;57:21,22;59:16;
60:24;98:24

**exchanges (1)**
131:25

**exclusively (1)**
25:8

**excuse (1)**
24:6

**excused (2)**
79:9,16

**exhibit (44)**
23:5,7,19;26:5,7;
29:17;31:3;32:16;
33:19,21;35:7,11,12;
40:10,11;44:15,16;
45:7,8,11;47:14;
52:15;53:6;72:20,22,

24;73:1;74:6;91:10,
12;92:8,9,10,12;
110:25;111:23,24;
112:10,14,19;114:14,
15;123:19;133:11

**exhibits (1)**
110:21

**exist (1)**
83:13

**existed (2)**
111:4;116:3

**Expand (1)**
43:11

**experience (3)**
64:21;66:3;68:2

**experienced (3)**
45:21;64:24;83:19

**experiences (2)**
90:21;117:15

**expert (2)**
37:5;56:5

**Explain (3)**
46:6;82:19;125:22

**explicit (5)**
66:14;68:17;88:21;
89:4;132:24

**explicitly (1)**
66:9

**express (1)**
66:19

**expressed (5)**
58:20;66:9,17,21;
69:22

**expressing (1)**
68:6

**extensive (1)**
104:19

**extent (8)**
37:3;56:3;63:21;
75:25;83:25;84:7;
100:15;138:21

**F**

**face (1)**
132:23

**Facebook (3)**
40:18;98:17;99:17

**faced (1)**
68:9

**facilities (1)**
122:9

**fact (13)**
32:18;39:23;50:14;
53:3;60:6;62:23;
63:13;64:14;68:4;
69:17;76:18;79:4;
81:15

**factor (1)**
76:21

**facts (2)**
29:8;45:2

**factual (7)**

75:21;76:16;84:12;
93:10;98:12;100:6;
101:17

**factually (1)**
84:9

**fag (3)**
130:5,13,22

**fail (2)**
41:14;43:2

**failed (1)**
43:3

**Fair (5)**
32:13;37:18;49:7;
67:23;72:19

**fall (1)**
99:9

**familiar (2)**
89:6;90:1

**Family (2)**
105:12;108:1

**far (9)**
23:17;41:23;58:21;
70:15,16;84:10;
127:22;131:19;140:3

**fast (2)**
102:15;138:13

**fatso (2)**
36:23;38:9

**favorable (1)**
84:12

**favorably (9)**
69:10,12;70:18,22,
25;81:22;83:11;84:7,
10

**FBI (1)**
15:10

**fear (7)**
43:7;47:22;48:6;
49:10,11;53:1,17

**feared (4)**
47:20;48:8,25;49:4

**February (16)**
18:18,21;22:21;
27:10,13,18;28:6,21;
52:2,9,18;53:6;
126:15,19;128:5;
131:2

**feel (9)**
35:3;45:24;92:4;
100:9,15,21;104:12;
108:10;133:18

**feet (1)**
103:16

**fell (1)**
99:7

**fellow (2)**
86:14;87:3

**felt (11)**
27:5;28:1;42:24;
46:3;61:9;69:23,24;
70:4;88:17;101:8;
108:17

**few (1)**

44:20

**Fidel (2)**
101:11,16

**Fifth (1)**
4:8

**figure (1)**
101:21

**file (4)**
73:17;75:9;120:17;
138:4

**filed (11)**
65:7;73:13;75:7;
109:14;110:14,18;
111:6,8,25;112:2;
140:23

**files (2)**
134:2,5

**Filing (1)**
75:6

**final (2)**
104:23;132:15

**financial (3)**
105:10,16,21

**financially (2)**
93:16;125:1

**find (4)**
52:22;105:11;
110:14;111:5

**fine (2)**
125:23;136:21

**finish (1)**
5:20

**finished (1)**
97:18

**fire (5)**
55:5;70:15;76:13;
129:6;131:18

**firearms (1)**
15:11

**fired (9)**
44:24;50:8,12;
73:22;74:20;81:16;
114:1;119:8;122:23

**firefighter (1)**
133:24

**fireworks (2)**
100:19;104:18

**first (38)**
4:17;5:11;6:20;
9:14,18;15:14;23:4;
34:7;35:18,20;36:3;
50:14,22;53:5;61:20;
73:3;83:12;91:4;96:8;
97:7,14;104:25;
105:3,3,5;106:14;
107:10;117:17,22;
119:16,16,20,24;
120:7,13;123:6;
139:9;140:13

**five (10)**
7:16;21:15,24;
56:22;57:4;73:18;
77:22;106:23;118:10;

140:15

**flight (2)**
124:21;125:5

**flights (1)**
125:7

**flip (1)**
35:21

**Floor (1)**
4:8

**Florida (4)**
97:13,15,16,17

**fluctuated (2)**
21:16,17

**folder (3)**
73:24;119:4,17

**followed (1)**
60:22

**following (3)**
27:4;35:5;57:4

**follows (1)**
4:19

**follow-up (1)**
142:9

**footage (3)**
31:5,7,11

**footnote (1)**
31:20

**forbearance (14)**
106:2,4,10,14,18;
125:10,14;126:10,11;
127:25;128:1,2,4,13

**forced (1)**
94:6

**Foreclose (1)**
126:25

**foreclosed (1)**
93:19

**foreclosure (2)**
101:23;106:19

**forehead (8)**
66:16;67:8,12;68:5,
18;82:21,23,24

**foreign (1)**
83:19

**former (7)**
39:7,8;42:15;44:18;
50:18;128:25;131:14

**forward (1)**
103:24

**forwarded (1)**
25:9

**found (2)**
110:17;137:18

**foundation (1)**
30:5

**four (7)**
18:19;56:22;57:3;
70:1;95:6;124:22;
126:25

**Freelove (36)**
53:19,20,25;54:6,
10,13,22;59:23,25;
61:14,15,23,24;62:10;

66:16;67:8,23;68:19;
69:11,12,21;70:6,8,
19;71:13,16;78:16,21,
24;79:4,8;80:3,5;
82:2,22;83:23
**Freelove's (1)**
69:23
**frequently (1)**
9:18
**Friday (1)**
109:24
**friend (3)**
60:11;89:11;108:1
**friendly (1)**
82:17
**friends (15)**
47:23,24;48:3,7;
49:11,14,16;59:21,22;
60:2,16,19;102:23;
131:18,19
**friendship (1)**
49:13
**front (10)**
23:20,22;26:7,13;
33:21;40:14,17;
72:20;74:25;128:19
**fuel (1)**
129:6
**full (2)**
5:9;31:17
**full-time (9)**
9:12;10:15;13:20,
22;14:1,9;20:7;60:5;
105:13
**fully (2)**
97:11;140:6
**fun (2)**
36:22;38:8
**funding (3)**
93:17,20;125:8
**further (8)**
36:12,17;43:13;
45:4;69:19;79:5;
85:19;103:6
**Future (3)**
85:5;94:16;95:11

**G**

**gainfully (1)**
105:16
**gallery (1)**
32:4
**Galloway (1)**
40:21
**gas (2)**
100:12,13
**gastrointestinal (2)**
137:10,21
**gave (4)**
12:13;65:19;72:19;
123:5
**gay (1)**

130:2
**Geary (5)**
90:1,5,10,13,19
**gender (4)**
62:21;64:10,13;
117:11
**gender-based (3)**
63:6;64:7;65:24
**general (9)**
5:15;10:8,9;94:22;
98:25;100:23;103:16;
104:17;109:1
**generally (1)**
7:25;13:9;43:8
**genitals (1)**
91:18
**gift (1)**
125:9
**girl (1)**
61:8
**girlfriend (2)**
139:8,9
**given (14)**
11:17,18;18:10;
20:16,17,18;22:3,5;
24:16,24;45:3;56:15;
84:8;141:21
**goes (2)**
46:18;119:1
**good (6)**
5:25;55:3,4,9;67:2;
133:23
**Gotcha (2)**
73:5;87:9
**Governor (2)**
133:6,15
**grabbed (1)**
119:3
**graduated (2)**
7:4,6
**Graham (26)**
5:2;26:15,16,18;
74:13;107:3,11,17;
113:18,19;114:10,17,
23,24;115:2,25;116:4,
24;117:9,12;118:9;
120:14;121:5;123:21;
124:9;142:4
**Graham's (3)**
35:7;74:6;120:18
**grand (3)**
128:12,15;138:5
**grievances (3)**
140:23,25;141:3
**ground (2)**
5:15;82:9
**group (7)**
69:2;129:18,20,22;
130:1,5,19
**guess (1)**
23:17
**gun (1)**
104:15

**guy (1)**
104:15
**guys (3)**
66:9;104:15;119:20

**H**

**hall (1)**
119:5
**hand (6)**
4:14;73:23;106:24;
119:17,23;122:18
**handed (5)**
35:12;40:11;91:11;
123:7;142:2
**handle (1)**
15:9
**handled (4)**
11:18;113:13,16;
117:6
**handling (3)**
27:4;33:3;48:9
**hang (1)**
68:20
**hanging (1)**
68:5
**happen (2)**
25:13;99:2
**happened (12)**
18:14;24:24;25:21;
53:7;70:6;92:6;98:16;
99:3;100:1;101:2;
124:5;139:3
**happening (2)**
97:6;137:5
**harassed (7)**
42:13;45:1,24;
46:21,23;47:1;51:5
**harassing (4)**
39:4;41:17;44:3,9
**harassment (39)**
33:25;34:7,14,15,
18,22;35:4;37:1;40:5,
8;41:22,23,25;42:2,9,
20;43:2,6;44:2;45:21;
46:4,11,15,17;47:9;
48:15;49:7;50:13;
51:3;52:21;53:2,9,16;
61:9;72:3;95:11;
110:7;117:11;130:9
**harassment/hostile (1)**
110:11
**Harbor (9)**
7:14,15,20;8:1,2;
15:15,19;16:1,4
**hard (1)**
30:21
**harder (1)**
59:16
**hardship (1)**
83:20
**Hartford (13)**
9:11,14,20;10:10,

15,18,22;14:2,6,8,12;
16:20,25
**Haven (4)**
58:2,14;100:19;
104:18
**head (9)**
5:24;35:6;48:20,21,
23;49:3;52:3,5,7
**Headquarters (1)**
36:8
**health (2)**
102:20;138:16
**heard (5)**
44:8;50:16,18;
53:14;101:5
**held (1)**
4:11
**helping (2)**
130:16;138:1
**herein (1)**
4:16
**here's (2)**
119:18;124:5
**herself (1)**
91:19
**heterosexual (6)**
71:17;79:25;81:25;
82:1,15;83:18
**hey (1)**
57:6
**high (4)**
6:16,17;139:2,5
**highest (2)**
6:2;21:21
**highlighted (1)**
112:11
**himself (3)**
60:20;70:21;78:17
**hire (9)**
44:20;59:18,22,23;
60:1,2,17,19,20
**hired (13)**
12:11,23;13:2,21;
19:20,23,25;20:1,3;
34:21;60:11,12,13
**hiring (5)**
11:21;14:25;53:5;
60:5,16
**historical (1)**
136:19
**history (1)**
138:16
**hit (2)**
103:18,20
**hitting (2)**
133:6,15
**Hoekstra (1)**
135:22
**holes (1)**
31:17
**home (3)**
9:6;118:22;137:2,3
**homosexual (9)**

71:17;78:18,21;
79:1,22;82:18,20;
83:2;131:5
**homosexuality (1)**
80:4
**honeymoon (1)**
124:16
**hooked (1)**
89:25
**hope (1)**
117:5
**hospital (1)**
136:18
**hostile (10)**
55:23,25;56:4;
57:12,18;62:6,9;72:3;
83:19;110:7
**hotel (2)**
36:10;45:8
**Hothman (4)**
4:6,10,15;5:11
**hour (4)**
56:22;100:20;
105:14;141:15
**hourly (1)**
21:1
**hours (5)**
14:8,11,12;15:6;
56:19
**house (5)**
93:18;106:2;125:2,
10,11
**HUD (1)**
127:2
**hung (3)**
132:17,17,18
**Hydrocodone (1)**
139:21

**I**

**Ibuprofen (1)**
139:20
**idea (3)**
50:10;89:19;132:22
**identified (2)**
83:2;103:10
**identifies (1)**
82:7
**identify (2)**
4:20;83:9
**ie (1)**
68:19
**immediate (1)**
21:13
**immediately (1)**
125:14
**implies (1)**
50:16
**important (1)**
42:25
**inaccurate (4)**
112:18;134:6,20,21

**inappropriate (6)**
38:5;61:11;91:24;
92:1;108:10,12
**inaudible (4)**
82:4;128:3;130:15;
132:3
**incentive (1)**
20:24
**incident (8)**
36:13;107:18;
110:13;121:8;136:3,
12,23;137:10
**incidents (2)**
41:24;138:22
**include (3)**
15:5;70:21;116:24
**included (3)**
112:18;114:16;
130:4
**Including (1)**
90:19
**inclusive (1)**
50:14
**incomparable (1)**
83:22
**incompetent (2)**
50:6,9
**incorrect (6)**
51:24;107:14;
116:11;117:21;
118:12;126:20
**incumbent (1)**
48:14
**incurred (1)**
105:11
**Indiana (1)**
45:13
**indicate (1)**
100:3
**individual (2)**
79:18,19
**individuals (9)**
68:17,17;71:1;79:5;
85:23;90:25;95:1;
98:19,24
**inform (1)**
22:14
**information (4)**
72:17,19;99:4;
116:7
**informed (3)**
22:6,12;116:3
**initial (1)**
97:19
**initially (1)**
9:13
**initiated (1)**
110:15
**injuries (2)**
93:3;139:20
**injury (1)**
141:23
**Inquiry (1)**

83:13
**instance (1)**
137:13
**instances (5)**
45:20;51:19;66:10,
13;106:14
**instead (11)**
11:8;48:8;49:17;
85:9;119:7,8;124:7,9;
129:1,11;140:20
**Intent (1)**
126:24
**Interact (1)**
134:12
**interactions (1)**
76:23
**intercourse (2)**
36:2,9
**interest (1)**
68:7
**interests (1)**
68:18
**interfered (2)**
59:1;60:24
**interfering (4)**
55:22;56:9,11,14
**internal (10)**
16:2,5,8,17,24;17:6,
12,15,23;30:13
**Interrogatories (4)**
35:18;83:5;103:10;
105:10
**Interrogatory (3)**
72:20;73:1;106:3
**intersection (1)**
138:2
**interview (10)**
13:1,5,6;24:5,5,8,
10,12;30:10;102:5
**interviewed (6)**
13:10;32:17,21;
66:6;102:6;115:6
**interviewing (1)**
138:5
**interviews (5)**
59:19;66:4,11,12;
122:8
**intimidating (1)**
55:23
**into (9)**
23:13;60:5;78:9;
108:19;110:5;116:8;
120:10;128:4;138:3
**investigate (1)**
23:10
**investigated (2)**
24:1;116:2
**investigation (18)**
23:13,15;24:7;27:8;
31:18,18;33:4,14;
113:18;114:8,12;
115:3,6;116:1,6,14;
124:8,10

**investigations (1)**
30:25
**investigator (1)**
138:8
**involved (8)**
38:15,17;41:20;
48:22;85:10;92:25;
116:9;135:9
**involvement (3)**
46:8;85:6;115:24
**involves (1)**
42:23
**issue (13)**
27:25;49:5;59:25;
61:19;68:12;69:20;
77:3,4;105:20;109:6;
126:2;129:11;136:20
**issues (29)**
26:21;46:1,2;68:15;
69:19;70:20,24;71:1;
77:1;79:6;85:11,12,
13,14,15,19;103:14;
116:19;117:6;123:25;
125:20,23;130:2;
131:22;137:7,10,15,
21;139:10
**italics (1)**
74:8

**J**

**jail (1)**
96:14
**jammed (1)**
138:3
**January (4)**
34:4;36:4;128:5;
137:13
**Jay (3)**
25:16;29:19,20
**jerker (1)**
80:22
**Jerol (10)**
40:12,13;41:1;
84:20;91:16,21;
92:15;130:13;131:21;
132:18
**Jerol's (1)**
132:22
**jest (2)**
92:22,24
**job (30)**
6:20;9:7,9,16;43:9;
47:20,22;48:6,25;
49:10,14;53:1;55:6;
58:15;59:16;86:7,11;
93:11,15;97:8;102:2;
104:14;105:11;
116:25;117:1,5;
122:13;132:13;137:5,
6
**jobs (2)**
96:23;121:15

**John (3)**
48:2;50:2;53:13
**joke (3)**
122:23;132:21;
133:21
**jokes (2)**
68:7;87:25
**joking (1)**
38:16
**Joseph (2)**
6:17,18
**journal (4)**
24:16,21;29:14,19
**journals (2)**
24:24;25:17
**JOZWIAK (12)**
5:1,1;63:24;106:25;
107:2,2,9;110:24;
111:23;114:14;
141:24;142:7
**judged (1)**
61:9
**July (13)**
10:14,16;11:13,14,
14;12:11,13;13:17;14:7,
16;17:22;37:19;91:7;
125:9
**June (5)**
102:25;137:25;
139:25;140:13,14
**jurors (3)**
32:16,21,24
**justice (1)**
6:8
**Justin (36)**
46:8,10;60:5,10;
64:22,23;65:3,5,6,9,
10,17,21,22;69:11;
70:17,19;71:6;79:20;
80:6,16,21,24;81:6,
10;82:13,14;83:24;
84:6,20,25;85:16;
104:1,6;111:20;
142:14

**K**

**Kalamazoo (13)**
5:12;6:6,9,20;7:4,8;
101:3,14;104:2;
118:23;121:18,19;
122:2
**Karr (8)**
52:2,3;53:7;110:19;
111:6;112:21,24;
122:18
**Karr's (1)**
112:14
**Kathleen (2)**
5:1;107:2
**KDPS (1)**
101:12
**Keeley (2)**

29:2,23
**keep (2)**
99:7;134:2
**keeping (1)**
85:9
**Kent (3)**
122:6;127:7,8
**kind (8)**
42:5;87:15,25;88:2;
102:19;103:5;139:19;
141:13
**kinds (1)**
91:23
**kiss (2)**
67:11;82:23
**kissed (2)**
67:8;82:23
**kisses (1)**
68:18
**kissing (4)**
66:16;68:5;79:2;
82:21
**knee (1)**
80:22
**knew (6)**
78:19;99:2,5;101:4;
123:4;129:24
**knowledge (12)**
13:24;15:12;30:7;
37:4;56:6;63:23;
71:16;73:15;76:2;
94:1;95:22;115:7
**known (1)**
131:21
**knows (1)**
30:5

**L**

**lack (1)**
83:20
**lag (1)**
95:6
**laid (3)**
106:17;125:18,24
**Lane (1)**
5:12
**language (3)**
87:16;88:2,14
**last (13)**
5:11;27:12,14;34:2;
50:22,23;51:21;
64:25;66:25;83:8;
89:17;103:9;117:8
**lasted (1)**
128:5
**late (1)**
91:5
**later (4)**
33:10;81:9,13;
123:3
**Law (10)**
4:8;8:10,15;15:1;

36:14;61:5;69:14;
71:23;108:13,14
**laws (2)**
79:10,15
**lay (1)**
107:15
**leading (1)**
101:9
**leads (1)**
82:14
**learned (4)**
27:4;42:14,17;61:7
**least (1)**
95:22
**leave (3)**
8:1;9:1,3
**leaving (3)**
39:11;54:15;104:23
**led (3)**
49:23;50:11;
123:25;124:8
**Lee (2)**
23:8,24
**left (6)**
8:3;39:8;53:23;
54:14;59:25;136:5
**legal (7)**
37:3,5;56:3,5;
63:21;75:25;78:9
**Lendahl (1)**
67:1
**lengthy (1)**
103:9
**less (1)**
100:1
**letter (3)**
101:23;119:10;
127:4
**level (1)**
6:2
**levels (1)**
7:24
**license (2)**
8:16,18
**lied (1)**
61:17
**life (11)**
61:10;86:13,18;
87:6,7;88:22,24;93:8;
103:16;104:9;136:22
**ligament (1)**
137:24
**liked (1)**
43:13
**likes (1)**
66:9
**limited (1)**
93:4
**Lindahl (1)**
66:25
**line (3)**
21:9,11,12
**lines (1)**

119:25
**list (1)**
124:12
**listened (1)**
50:1
**literally (1)**
122:23
**little (3)**
51:10;109:21;
121:22
**lives (3)**
86:25;87:4,20
**living (1)**
104:13
**local (2)**
92:13;99:15
**LOL (2)**
40:24;91:22
**long (14)**
7:15;8:24;10:10;
11:9;13:17;14:14;
18:3,16;19:5;23:1;
93:13;99:8;126:11;
135:6
**longer (12)**
19:15;43:24;54:7;
55:16;56:18;57:2;
59:13;66:23;85:16;
94:2,4;126:1
**look (3)**
33:20;49:16;66:8
**looked (3)**
42:6,7;103:24
**looking (2)**
104:14;108:18
**looks (3)**
91:21;112:1;132:23
**loose (2)**
24:22,23
**loose-leaf (2)**
24:19,20
**lose (3)**
43:9;105:18,25
**losing (3)**
125:2;137:5,6
**loss (12)**
93:4,5,7,8,23;
95:24;98:11;104:20;
105:17,21,22,22
**losses (2)**
93:15;105:10
**lost (7)**
31:16;32:18;98:20;
104:10,11;105:24,25
**lot (10)**
15:4;56:12;63:1;
102:23;122:19;123:2;
130:19;131:21;132:1;
139:12
**lowest (1)**
21:18
**lying (1)**
74:13

**M**

**makes (5)**
60:14,15;87:24;
94:13;95:9
**making (14)**
36:22;38:7,8;40:22;
65:23;105:13;107:11;
113:6;127:9,17;
128:6,8;141:15,17
**male (1)**
83:18
**males (1)**
79:7
**MALHIOT (11)**
5:3,3;30:4;37:2;
44:16;56:2;63:20;
72:24;75:11,24;142:8
**malicious (1)**
93:1
**man (2)**
35:23;91:21
**management (2)**
15:7;134:13
**manager (6)**
35:5;36:21;65:8;
74:10,16;99:12
**Manager/Police (1)**
26:23
**mandatory (1)**
67:7;127:3
**manifested (1)**
103:13
**manila (1)**
119:17
**manner (8)**
68:4;78:17;95:12,
13;102:3;108:12;
109:1;113:8
**many (10)**
14:8;21:14;24:10;
66:10,13;96:3;
121:18;122:11;
128:17;140:13
**March (50)**
27:2;39:10;44:19;
63:19,25,25;64:2;
72:6,17;73:19;76:7;
78:1;94:5,9,15;98:3;
106:6;107:13;109:9,
11,25;110:4,16;111:9,
10,11,12;112:8;
114:16,17;116:23;
117:19;118:10,14,14,
15,17,18;120:9;
122:19;123:9,15,21;
125:11;127:23;
128:18;140:25;142:1,
12,12
**mark (4)**
110:21;111:23;
114:14;133:10

**Marked (20)**
23:7,19;26:5,6;
33:19,20;35:11,12;
40:10,11;91:10,11;
92:8,9,10;110:25;
111:24;114:15;
123:18;133:11
**Marko (1)**
4:8
**married (2)**
83:18;91:6
**Mattawan (2)**
60:3;70:12
**matter (4)**
4:9,11;68:10;
125:25
**matters (7)**
28:12,13;53:15,16;
57:23;89:2;90:16
**maximum (2)**
126:13;127:24
**May (12)**
6:13;51:21;64:25;
65:1;87:3;102:20,25;
104:8;107:5;125:16;
126:10,18
**maybe (2)**
102:9;104:8
**Mayor (67)**
5:2;35:5;37:24;
40:8;41:21;48:19,20,
21;64:18;72:4,14;
73:13,15,20,20;74:3,
24;75:17;76:7,8,12,
13,18,21,23;77:1,5,
25;78:6;94:14;107:4,
11,16,18,22;108:22,
25;109:2,6,13;
110:15;111:9,13,16;
112:25;113:6,17;
114:21;116:25;
117:12;118:8,13,19,
24;120:4,8,17,23,24;
121:4,10;123:3,14,21;
142:2,3,14
**mayor's (1)**
77:10
**mean (17)**
16:12;38:18,22;
43:8;47:4;49:14;58:9;
60:13;64:9;65:5;
67:16;70:23;77:9;
85:21;99:11;105:23;
131:7
**meant (3)**
25:8;68:13;93:1
**measures (1)**
104:9
**medical (8)**
102:19;103:4;
105:20;125:19,23;
126:2;136:20;137:7
**medically (1)**

137:18
**medications (3)**
139:16,19,22
**meet (6)**
27:18;73:16;
118:14,23;119:16;
123:3
**meeting (26)**
22:18;27:9,12,13,
14,20,24;28:6,8;
31:21;67:4,5,6,7,7,10;
73:17;109:5;118:6;
120:2;123:9,16,22;
142:2,12,16
**meetings (4)**
12:9;59:3;95:15,20
**member (2)**
108:1;109:19
**members (8)**
59:6,7;80:22,23,25;
81:2,4;116:24
**Memorandum (1)**
26:20
**men (1)**
131:17
**mend (1)**
46:1
**Mendoza (9)**
23:8,11,24;28:4;
29:16;31:22;32:11,
12;135:10
**mental (5)**
93:6;100:5;101:18;
102:20;138:16
**mention (2)**
38:7;113:3
**mentioned (5)**
36:21;53:20;
123:20,24;130:21
**mentioning (3)**
124:2,4;133:8
**mentions (1)**
112:15
**message (12)**
91:12,13,17;92:1,
18;107:19;113:7;
114:11,13,17;131:1,
11
**messages (8)**
40:13;61:16,20,22;
98:17;99:17;131:3,14
**messaging (1)**
129:1
**messing (1)**
98:21
**met (5)**
13:9;27:3;28:21;
55:7;121:14
**Michael (1)**
4:24
**Michigan (18)**
4:9,12;5:12;6:18;
8:20,21;9:4,5,8;

13:12;15:1,5;36:7;
45:13;90:2;105:12;
108:13,14
**MICR (1)**
  15:8
**mid (1)**
  102:10
**Mike (2)**
  49:25;99:1
**millions (1)**
  130:14
**mine (4)**
  87:22;113:2;
  115:24;132:23
**minute (5)**
  27:12,14;35:9;
  77:23;106:24
**Misane (16)**
  4:6,10,15;5:7,8,9,
  11,13;6:2;26:22;
  27:10,11,14;29:18,25;
  31:16
**Misane's (2)**
  31:17;74:11
**mischaracterizes (1)**
  75:12
**miserable (1)**
  129:24
**misery (1)**
  83:21
**misidentification (2)**
  16:10,12
**Miss (3)**
  89:9;90:10,13
**missing (1)**
  133:23
**mode (1)**
  103:15
**molesting (3)**
  138:19,24;139:14
**mom (1)**
  139:6
**moment (1)**
  61:17
**money (1)**
  124:20
**month (5)**
  10:13;18:5;23:17;
  126:21;141:22
**monthly (1)**
  141:22
**months (9)**
  18:19,20;44:20;
  93:14;95:6;101:2;
  126:13,14;127:24
**Morales (2)**
  101:11,16
**more (28)**
  13:3;28:20;34:13;
  38:25;42:11,25;
  50:16;59:17;61:13;
  67:13;69:10,12;70:7,
  18,22;74:21;78:18;

79:1;80:10;81:21;
83:11;84:7,9,12;
96:21;129:6,12;
138:12
**morning (1)**
  110:1
**mortgage (8)**
  103:17;106:19;
  126:18,21;127:9,14,
  15,17
**motivated (1)**
  75:21
**motivating (1)**
  76:20
**move (3)**
  9:4,5,8
**moved (3)**
  8:3;13:12;62:11
**moving (1)**
  114:23
**much (3)**
  103:19;107:6;
  141:15
**multifaceted (1)**
  56:12
**multiple (3)**
  7:24;20:22;46:21
**multitude (2)**
  46:5,6
**Muslin (1)**
  83:18
**must (4)**
  15:5,7,11;140:24
**Mutually (2)**
  38:19,21
**myself (6)**
  12:6;41:20;42:23;
  89:5;103:19;140:4

## N

**naked (1)**
  131:15
**name (20)**
  4:22;5:9,11,15;8:8;
  29:1;48:1;50:21,22,
  22,23;66:25;67:2;
  69:25;101:15;103:9;
  107:2;113:3;133:24;
  134:1
**names (2)**
  99:23;121:17
**narrow (1)**
  41:9
**nature (22)**
  12:1;42:10;47:5;
  56:25;69:7;82:18,20;
  85:4;87:10,12,13,16,
  25;88:14;89:2,5;
  90:16;91:1;98:17,23;
  110:13;131:25
**Nearly (1)**
  8:25

**necessarily (1)**
  12:5
**need (13)**
  5:21,22;57:2;69:25;
  78:9;82:8;88:22;92:4;
  106:16;132:25;
  135:20;142:5,6
**needed (2)**
  27:6;135:13
**negative (8)**
  59:8;80:16,19;81:6,
  8,10;98:22;100:11
**negatively (2)**
  5:23;106:9
**new (9)**
  9:7,9;11:21;35:8;
  105:1;120:23;126:17;
  129:10;131:4
**next (13)**
  7:10;44:24;50:17;
  56:17,18;103:23;
  105:7;109:24;118:15;
  122:3;138:13;140:16,
  17
**night (3)**
  22:15,16,18
**nights (1)**
  101:20
**nine (6)**
  21:23,24;56:18;
  57:3;126:13,14
**nodding (1)**
  5:24
**non- (1)**
  81:24
**non-coworkers (1)**
  133:4
**none (9)**
  19:24;64:20;83:4,
  16,19;130:3;134:7;
  141:23;142:6
**nonheterosexual (5)**
  81:20,23;82:4,6,11
**no-no (1)**
  132:2
**non-sexual (1)**
  53:16
**non-white (1)**
  83:18
**Nope (1)**
  128:13
**nor (1)**
  132:23
**Nordic (1)**
  67:2
**norm (1)**
  57:24
**normal (2)**
  88:3;135:2
**notes (1)**
  31:21
**Notice (1)**
  126:24

**November (12)**
  7:18;18:6,21;20:9;
  45:13,19;47:5,6;66:5;
  86:4;95:3;120:22
**number (11)**
  4:13;21:16,20;
  72:20;83:6,6,7,7,14,
  15;135:24

## O

**object (6)**
  30:4;37:2;56:2;
  63:20;75:11,24
**obviously (6)**
  78:9;93:4;104:2;
  129:7,10,24
**occur (5)**
  43:12;67:3;88:8;
  103:23;106:13
**occurred (9)**
  51:6;67:21;68:15,
  15;94:23;95:12,13;
  118:16;136:24
**occurrence (1)**
  49:24
**occurrences (4)**
  16:9;49:20,21,22
**occurring (3)**
  63:10;86:3;92:24
**October (13)**
  7:18;11:10,14;
  14:16,17;17:22,25;
  66:5;124:20;136:3;
  137:1;140:21,25
**Off (23)**
  23:6;25:24,25;26:2,
  9,11;35:9,9,10;62:7;
  68:5;77:24;88:9;
  106:17;107:1;110:2;
  122:24;125:18,24;
  138:9,10;141:11,23
**offender (6)**
  16:11;23:9,24,25,
  25;24:1
**offensive (1)**
  55:23
**offer (1)**
  102:8
**offered (3)**
  13:25;22:9;122:13
**office (25)**
  25:1,3,16;27:15;
  29:4,13,20;33:3;50:2;
  66:8;69:1;70:3;73:21;
  89:7;97:25;121:20,
  20,21;122:7;126:8;
  131:4;134:2,6,16,19
**officer (34)**
  7:21,22;8:10,14,16;
  9:17;19:14;20:4;
  36:14,22;37:8,15,25;
  38:8;39:6,7,15,19;

41:4,11,12,17;44:1,
18;45:1;60:7;66:23,
24;70:6,8;71:16;77:7;
84:11;101:3
**officers (10)**
  11:24;21:13,14,24;
  85:16;86:14;88:3;
  113:1;140:22;141:4
**offices (1)**
  122:6
**official (1)**
  56:19
**officially (1)**
  60:9
**often (6)**
  10:5;90:6;134:22;
  135:2
**OIC (1)**
  135:15
**old (2)**
  83:17;138:20
**Once (14)**
  13:12,25;55:15;
  59:24;103:18,19,20;
  110:2;128:3;131:24;
  139:21;140:2,18;
  141:22
**one (55)**
  5:16;16:10;20:24;
  22:5;24:11;32:24;
  36:12;42:2;43:21;
  48:16;49:24;50:9,16,
  16,17;53:19;56:15,17,
  21;57:12,15,23;59:6;
  60:2,10,12,14,15;
  61:15;63:4;68:22,23;
  69:17;72:23;73:16;
  74:19;77:3;82:21;
  83:16,24;93:8,8;
  103:10;106:15;
  107:18;118:19,21;
  122:3,7;126:25;
  132:17;133:5;137:13;
  138:9;141:25
**ones (4)**
  34:11;52:16;96:8;
  122:5
**one-year (1)**
  141:11
**only (24)**
  11:8;13:5;19:10;
  21:3;30:2,19;51:19;
  60:10,12,16,19;63:18;
  64:4,4;68:16;87:6;
  97:20;106:18;107:21;
  108:21;120:7,24;
  128:17;137:13
**open (2)**
  96:16;129:16
**Opinion (1)**
  26:20
**opportunities (5)**
  21:1;43:16;93:5,23,

95:24
**opportunity (7)**
    10:24,25;45:3,5;
    46:1,3;54:23
**opposed (1)**
    108:18
**ordeal (1)**
    101:25
**order (5)**
    27:10,24;75:4;
    85:18;93:17
**ordered (5)**
    27:23;28:8;77:5;
    108:15,17
**ordinances (1)**
    79:15
**ordinary (2)**
    93:7;104:9
**organize (1)**
    110:1
**organized (1)**
    109:5
**orientation (3)**
    78:11;79:3;81:19
**original (2)**
    25:17;29:19
**originally (5)**
    12:23;19:20;20:1;
    29:21;30:9
**originals (1)**
    25:13
**others (2)**
    13:6;87:6
**otherwise (7)**
    21:7;57:24;89:2;
    90:16;99:15;102:22;
    136:1
**out (33)**
    8:3,4;23:4;25:24;
    40:24,24;43:7;47:3;
    49:16;51:6;62:12;
    68:5,20;101:21;
    103:21;106:19;
    107:15;109:3;110:14,
    17;111:5,16,19;
    113:20;114:10;
    115:25;119:4;126:25;
    128:11;132:17,17,18;
    138:1
**outcome (9)**
    32:11;71:2;77:15;
    80:9;84:13;101:24;
    115:10;116:6;132:14
**outlet (1)**
    131:8
**outside (7)**
    68:20,25;69:5;
    100:17;101:20;
    132:17,23
**over (23)**
    12:2;25:1,2;36:18;
    50:7,7;62:8;66:7;
    71:3,5,13,14;72:9;

82:17;96:6;100:22;
    104:19;106:24;109:8;
    119:5;128:3;132:13;
    135:8
**overall (1)**
    46:17
**overdo (1)**
    100:14
**overdrive (1)**
    103:15
**overlap (1)**
    54:16
**oversee (2)**
    12:4;21:25
**overtime (1)**
    21:1
**owe (1)**
    128:13
**own (3)**
    37:4;57:11;85:18
**owners (1)**
    99:16

## P

**pad (1)**
    104:15
**page (15)**
    27:1;31:14,15;34:2,
    24;35:21;44:19;45:6;
    74:7;83:7,8;112:9;
    123:6,19;126:25
**pages (3)**
    73:4;127:1,2
**paid (2)**
    125:4;128:2
**Paige (1)**
    40:21
**pain (1)**
    137:9
**pains (1)**
    136:3
**Palm (1)**
    8:9
**Palms (1)**
    15:23
**panic (1)**
    136:2
**paper (7)**
    24:19,20,22,23;
    92:13;111:3,8
**paragraph (15)**
    27:2;29:17;31:3,14;
    32:16;35:2;62:18;
    71:22;73:9;75:2,19;
    78:8;81:18;82:12;
    83:12
**parked (2)**
    119:3;123:2
**parking (2)**
    122:19;123:1
**part (21)**
    12:9;24:5,7,21;

43:10,11;55:24;
    57:19;73:8;80:1;
    88:11;109:2;114:3;
    115:6;125:8;130:18;
    131:23;133:4;134:10,
    25;135:12
**particular (1)**
    16:13
**particularly (2)**
    56:4;74:1
**Partly (1)**
    31:23
**partner (1)**
    36:14
**parts (1)**
    43:11
**part-time (9)**
    9:13,18,19,23;
    10:10,12;12:15;
    13:18;60:4
**pass (2)**
    138:6,7
**past (4)**
    46:24;47:1;128:5;
    141:10
**pasted (2)**
    73:7,8
**patrol (5)**
    7:23,25;9:17;10:9;
    19:4
**pay (6)**
    20:24,24;93:21,21;
    128:3,8
**paying (1)**
    103:16
**payments (11)**
    106:3;126:18,21;
    127:9,14,15,17;128:6,
    8,17,20
**peace (2)**
    57:14;101:7
**people (7)**
    49:22;68:4,8,9;
    98:14;99:25;130:2
**per (3)**
    41:21;106:19;
    141:15
**percent (1)**
    141:9
**perform (1)**
    80:19
**performance (10)**
    55:22;56:10,11,14;
    57:13;59:2,17;60:25;
    115:14;123:15
**perhaps (1)**
    49:17
**period (5)**
    43:17;101:7;
    127:24;128:13;
    141:11
**permissible (1)**
    61:5

permission (2)
    61:3;65:12
**person (9)**
    16:13;52:22;65:5;
    74:22;82:7;98:18;
    99:22;121:14;129:5
**personal (23)**
    24:16;45:12,19,25;
    46:19;47:4,7,15;
    58:22;66:15;69:7,21;
    86:13;87:4,8,9,20;
    88:22,24;119:5;
    133:1,3;137:7
**personally (6)**
    64:21,22,24;66:2;
    68:1;70:2
**personnel (4)**
    134:2,5;138:4;
    140:24
**person's (1)**
    29:1
**phone (12)**
    28:23,24;51:14;
    72:9;78:6;98:16;
    99:18;110:15;120:9;
    122:21;135:24;
    140:19
**phones (1)**
    129:4
**photograph (1)**
    40:22
**physical (5)**
    36:23;38:8;102:20;
    111:3;140:20
**picture (7)**
    57:19,20;91:18;
    92:13,14,17;131:4
**pictures (3)**
    131:15;134:5,18
**piece (2)**
    92:13;111:8
**pieces (2)**
    24:22,23
**Pine (2)**
    5:12;125:11
**place (8)**
    7:10,11;48:17;
    50:15;54:9;105:1;
    115:7,8
**placed (8)**
    23:20,22;25:4,12,
    20;26:7,12;85:18
**places (4)**
    49:22;93:17;94:1;
    98:5
**plaintiff (1)**
    81:22
**plaintiffs (1)**
    5:4
**plaintiff's (1)**
    62:19
**plan (5)**
    46:14,16;50:5;

104:19;122:25
**planned (1)**
    50:3
**planning (1)**
    124:20
**plate (1)**
    131:5
**plates (1)**
    131:4
**playing (1)**
    91:19
**please (13)**
    4:20;5:10,22,23,24;
    6:1;19:9;35:4;38:6;
    57:7,22;107:15;
    121:17
**pleasure (1)**
    104:13
**pleasures (1)**
    93:7
**plenty (1)**
    68:10
**PLLC (1)**
    26:15
**plural (1)**
    82:10
**pm (7)**
    56:22;73:19;
    118:10,19,21,24;
    142:18
**point (28)**
    10:6;17:19;18:10;
    20:7;28:15;32:8;
    35:23;36:12;37:9;
    43:18,21;46:21;
    55:11;59:6;69:17;
    75:8,9,10,15,16;82:5;
    84:3;113:19;117:1;
    122:14;125:3;128:2;
    133:5
**pointed (2)**
    74:4;76:19
**points (1)**
    35:2
**police (80)**
    6:9;8:1;9:11,20;
    10:1,2,5,10,15,19,22;
    11:6,8;12:10,17,24;
    13:11;14:2,6,9;15:16,
    19;16:1,4,20;18:11,
    12,16,17,19,22;20:12;
    22:3,4;25:7;30:24;
    36:8;37:13;39:7,9;
    50:25;53:21;54:15;
    58:3;59:4,5;60:3;
    61:6;65:8,13;67:10;
    70:13;71:6,7,10;
    83:17;88:3,4;93:25;
    95:17,18,23;96:24;
    99:12;104:24;111:17;
    113:1;119:3;121:19,
    24,25;122:1,4;131:20,
    24;134:3,9,11,23;

138:5

**policies (4)**
34:16,19;48:18;
79:9

**policy (18)**
30:23;31:4,6,11;
34:1,7,15,22,24;
41:22,23;42:1;48:17;
52:21;61:5;68:12;
69:15;116:18

**poor (2)**
58:3,5

**pornographic (1)**
88:15

**posed (1)**
83:13

**position (44)**
7:19;8:12,13,14;
9:10,12,13;11:1,2,4;
12:4,13;13:4;14:1,2,5,
17,20;15:15;16:16;
18:7,10,17,24;19:3,5;
20:7,17;42:3;52:20;
56:8;60:6;71:5;83:16;
96:2,13,15,25;97:16,
20;101:5;115:18,20,
23

**positions (2)**
96:3,20,22;99:7,11

**positive (5)**
55:17;59:8;67:14,
16;94:1

**possible (3)**
86:6,10,12

**post (1)**
40:18

**potential (1)**
93:4

**power (1)**
42:3

**practice (1)**
95:21

**practices (4)**
62:21;63:6;64:7;
65:25

**precedence (2)**
28:1,11

**preoccupied (1)**
103:19

**preparation (1)**
27:9

**prescribed (3)**
103:5;139:16,25

**present (6)**
21:2;22:17;31:22;
32:21;39:22;142:15

**pretty (1)**
107:5

**prevent (1)**
85:18

**previous (6)**
34:11;46:4;76:14;
89:12;90:8;129:18

**previously (3)**
47:11;53:20;59:10

**printed (1)**
92:13

**prior (49)**
6:16;12:14;34:14;
39:11;42:14;45:9,18,
24;49:24;51:10;53:4,
23,23;54:2,14,15;
62:5,17;64:19;65:15;
71:25;73:14;75:17;
76:23;77:2,25;78:4;
96:18;97:3,5,6;102:6,
9;111:14,20;113:10;
115:14;117:24,25;
118:2,5,12;121:5;
126:6;131:22;134:12;
137:15,21;139:16

**priority (1)**
140:4

**probably (3)**
102:15;132:19;
133:22

**probationary (1)**
141:11

**problem (5)**
46:25;47:2;57:18;
63:2;85:7

**problematic (2)**
38:11,14

**problems (3)**
77:1;84:14,16

**procedure (1)**
61:5

**procedures (1)**
116:18

**proceed (2)**
27:6;49:6

**process (5)**
11:22;97:11,12,19,
21

**produce (2)**
61:20;99:17

**produced (2)**
40:12;99:19

**professional (2)**
58:22;94:24

**program (3)**
125:15;126:10,12

**prohibited (1)**
59:6

**promoted (9)**
68:8;69:17,18,18;
71:3,5,13;80:18;
84:15

**promotional (1)**
43:16

**prosecuting (8)**
25:16;28:16,18,22,
25;29:12;33:2;135:21

**prosecution's (2)**
32:2,18

**Prosecutor (3)**

27:3,19;31:15

**prosecutors (2)**
27:5,8

**prosecutor's (5)**
25:1,2;27:15;29:4,
19

**protected (5)**
42:19;75:21,23;
76:1,3

**protecting (2)**
42:24,25

**Protection (1)**
71:21

**provide (9)**
57:9,10,21,22;
109:3;113:17;120:1;
127:3;129:12

**provided (7)**
29:18;56:20;99:24;
104:22;116:7;119:9;
129:10

**psychologist (1)**
140:1

**psychology (2)**
138:6,7

**PTSD (1)**
103:2

**Public (15)**
7:14,21,22;8:7,9,
14;15:22;47:16,25;
48:11,24;49:8,24;
51:3;101:14

**pull (1)**
23:4

**pulled (3)**
100:22;129:8,19

**purchased (1)**
125:11

**purpose (1)**
55:21

**purposes (1)**
129:19

**push (1)**
138:1

**pushed (1)**
51:6

**put (7)**
31:19;40:14,17;
52:23;82:15;93:16;
128:11

**putting (1)**
5:19

**Q**

**quarter (1)**
123:6

**Quick (1)**
142:9

**quite (1)**
102:23

**quote (2)**
40:24,25

**quotes (2)**
31:21;119:25

**R**

**race (1)**
78:12

**Rachel (2)**
29:2,23

**raise (6)**
4:14;37:23;141:9,
12,13,14

**raised (1)**
51:2

**raises (1)**
141:5

**Rapids (1)**
138:5

**reach (2)**
111:19;115:25

**reached (5)**
6:3;109:3;111:16;
113:20;114:10

**reactivated (1)**
106:18

**read (12)**
26:23;27:16;32:19;
35:1,2;64:11;74:7;
83:12,14;120:4;
123:5;128:21

**reading (1)**
123:5

**ready (1)**
50:6

**really (1)**
133:9

**reason (8)**
21:2;22:3;27:19,22;
28:9;123:24;134:24;
139:4

**reasonable (1)**
68:10

**reasons (5)**
20:22,23;28:11;
124:7,12

**recall (31)**
28:14,15,21;30:22,
23;31:1;33:9,16;
34:17;41:2;50:21;
51:12;52:17;64:20;
66:22;67:19;92:16;
96:5;112:3;114:13,
13,18;120:1;122:4;
129:21,21,22;130:1;
133:8,13;139:21

**receive (4)**
69:9;81:8;98:16;
140:25

**received (14)**
18:6;25:17;44:8;
77:10;80:8;81:6;83:3;
84:12;103:1;126:24;
141:5,12,18,23

**recognize (6)**
23:19;33:21;35:13;
40:14;91:12;92:9

**recollect (1)**
17:5

**recollecting (1)**
130:16

**recollection (2)**
65:2;130:12

**record (17)**
4:4,21;5:10,19,25;
23:6;25:24,25;26:2,3,
9,11;35:9,10;69:18;
77:24;107:1

**recorded (2)**
5:18;24:12

**recording (2)**
62:20;120:2

**records (2)**
15:4,6

**recovered (1)**
140:6

**recovery (1)**
140:4

**red (2)**
73:24;119:4

**redundant (1)**
33:13

**RE-EXAMINATION (1)**
142:10

**reference (9)**
30:3;39:14;63:14;
65:8;82:10,11;87:14,
15;115:4

**referenced (2)**
15:3;70:17

**referred (1)**
23:23

**referring (6)**
49:23;62:24;63:25;
81:23;111:1;115:21

**refinance (2)**
127:5,7

**refinancing (1)**
127:6

**refused (4)**
57:9,10;85:17;
113:17

**regard (13)**
61:11;79:2;82:7;
83:24;93:15;94:2;
100:10;104:4,17;
107:18,22;129:16;
132:14

**regarded (1)**
65:10

**regarding (11)**
29:15;30:23;61:2;
64:6;65:23;66:11,12;
116:1;124:14,14;
137:4

**regards (10)**
68:7;102:21;

112:15,22;113:7,15;
114:20;115:11;
120:17,24
**registration (1)**
15:11
**regular (1)**
58:7
**regularly (3)**
15:8;56:20;58:8
**reject (1)**
59:20
**related (4)**
29:13;30:24;45:16;
65:17
**relates (1)**
26:21
**relating (3)**
23:11;36:2;65:22
**relationship (20)**
55:4,10,12,16;58:4,
6,10,22;79:12;80:23,
24;81:1;89:9,20;90:4;
94:24;132:20;133:1,
3,23
**relationships (2)**
87:8,9
**relatives (1)**
102:23
**relay (1)**
44:22
**relayed (4)**
39:22,24;44:1;70:2
**remained (1)**
10:12
**remedy (3)**
62:22;63:7,12
**remember (8)**
10:13;29:1;66:24;
67:21;97:10;130:15,
17,17
**reminder (1)**
101:8
**repeat (7)**
7:6;38:6;90:20;
102:14;107:4,6;
123:12
**rephrase (3)**
15:17;30:9;39:16
**replaced (1)**
29:23
**report (27)**
23:23;31:17;35:4,7;
40:7;41:21;42:2,12,
18,22;43:2,3,4,5,6;
71:23;72:5,8,12,16;
74:6,14;76:8;128:21;
130:8,24;134:13
**reported (7)**
21:14;42:8;71:23,
25;72:1,17;84:23
**REPORTER (6)**
4:4,20;25:25;26:3,
9;110:23

**Reporting (1)**
34:25
**reports (4)**
15:10;25:4;134:9,
11
**represent (2)**
5:16;107:3
**re-pull (1)**
129:9
**reputation (2)**
93:6;98:11
**request (3)**
114:7;116:13,25
**requested (3)**
10:23;36:15;129:2
**requesting (1)**
108:18
**Requirements (1)**
34:25
**resign (4)**
14:2,5;70:12,14
**respect (2)**
116:19;135:12
**respond (2)**
114:7;130:14
**responded (2)**
116:13;129:23
**response (5)**
72:19;83:6;105:9;
106:3;130:13
**responses (3)**
39:14;53:6;123:18
**responsibilities (2)**
10:8;21:3
**responsibility (1)**
7:24
**responsible (2)**
11:7;134:8
**rest (2)**
37:13;136:22
**restart (1)**
96:1
**restate (3)**
5:22;56:8;65:21
**restaurant (2)**
103:25;104:2
**result (8)**
94:18;95:10;
102:12,16;136:3;
137:10;138:23;
139:13
**resumes (2)**
128:14,15
**retake (1)**
138:11
**retaliate (2)**
62:14;74:1
**retaliated (5)**
42:12,15;53:10;
54:20;76:6
**retaliating (1)**
75:5
**Retaliation (8)**

42:4,5,24;43:7,8;
53:18;55:1,8
**retaliatory (3)**
73:11,12;75:4
**retention (1)**
141:20
**retracted (3)**
81:8,13,14
**retread (1)**
82:8
**returned (1)**
55:15
**review (4)**
11:25;142:4,5,6
**reviewed (1)**
134:11
**reviewing (1)**
134:8
**rid (5)**
50:4,5;54:1,3,21
**ride (2)**
61:8;62:3
**ride-along (2)**
61:4;62:11
**right (22)**
4:14;33:10;49:17;
61:17;67:9;71:9;
73:22,25;78:22;91:9;
100:8;106:23;116:15;
117:20;118:1;125:6,
7;127:10,11,18;
133:14;137:24
**rights (1)**
127:2
**road (5)**
7:23,25;9:17;10:9;
19:4
**Robert (2)**
96:12,13
**role (1)**
132:1
**roles (4)**
11:15,17;12:8;21:6
**roll (1)**
56:23
**room (3)**
32:7;73:22;135:11
**rotation (4)**
85:18,19,21,22
**roughly (2)**
21:16;24:14
**round (1)**
138:13
**Rubbing (1)**
82:21
**rug (1)**
68:16
**rule (1)**
5:15
**running (1)**
104:16

**S**

**safe (1)**
104:12
**Safety (8)**
7:14,21,22;8:7,9,
14;15:22;101:14
**salary (1)**
21:1
**same (19)**
7:11;14:21,24;
21:16;28:11;36:3;
42:16;45:7,8;53:15;
57:4;63:19;67:4,5;
100:25;101:5;106:3;
108:11;126:8
**sampling (1)**
36:17
**save (1)**
30:19
**saved (4)**
30:2;31:12;33:14;
128:14
**saw (6)**
104:1,2,5;123:1,7;
139:13
**saying (4)**
38:22;50:6;57:16;
91:21
**Saylor (3)**
48:2;50:3;53:13
**scattered (1)**
134:18
**scene (1)**
19:4
**schedule (8)**
56:15,16,19;57:8,
10,11,14,17
**scheduled (5)**
27:9,13;109:5,24;
110:3
**scheduling (9)**
11:21;14:24;43:16,
20,21,24;44:4,10;
58:25
**Schmidt (21)**
39:6,16,19;40:21,
21;41:4,11,12,17;
44:1,5,7,12,18;45:1,2;
77:7,7,17,18;84:21
**Schmidt's (1)**
40:2
**school (6)**
6:16,17;7:3;139:2,
5,12
**Schoolcraft (2)**
121:24;122:1
**schools (1)**
27:25
**score (2)**
106:9,12
**Scott (17)**

5:2;26:15,15,18;
74:13;107:3,17;
113:18;114:17;
116:24;118:9;120:14,
18;121:4;123:21;
124:9;142:4
**scratch (1)**
96:1
**screen (3)**
40:18,19,20
**screwed (1)**
104:19
**second (3)**
23:4;25:23;83:7,8;
112:9;141:25
**secret (2)**
134:2,5
**security (1)**
6:25
**seeing (2)**
91:3;102:21
**seeking (1)**
69:24
**seemed (2)**
47:17;80:6
**seems (1)**
33:13
**send (2)**
131:11,12
**sending (4)**
29:9;12;55:5;
131:14
**sense (10)**
40:3;42:10;57:7,14;
62:12;67:13,18;91:3;
103:4;129:6
**sent (11)**
15:10;41:1;54:22;
61:22;92:15;107:19;
113:7;116:23;127:4;
130:10;140:21
**September (1)**
126:7
**sergeant (54)**
11:1,2,4,8,9,20;
12:13,14,15,17;14:15,
21,24;17:4,7;19:23;
20:1,5,15,16,20,21,
25;21:2,3,6,19,22;
22:10;23:1;26:22;
27:3,9,11,13;29:18,
25;31:16;37:11,12,
18;43:18;60:4,9;
71:19;74:11;79:21;
80:12;81:3;82:23;
86:7,9;94:10;96:24
**sergeants (2)**
87:3;134:9
**serious (1)**
125:25
**set (3)**
73:16;85:19;101:9
**settled (1)**

103:18

**seven (3)**
56:21;57:5;128:11

**several (23)**
36:3;45:20;49:20;
52:14,16;70:20,20,23;
73:4,13;95:1;98:19;
103:23;112:25;
121:22;127:3;128:25;
130:19;134:11;136:8,
11;141:3,4

**sex (18)**
62:20;63:6;64:6,12,
13;65:24;78:11;
81:19;86:18,25;87:4,
6,7,14,20;133:7,16,25

**sexual (60)**
23:10;33:25;34:7,
14,15,18,21;35:3;
36:25;40:4;41:11,22,
23,25;42:2,8,19;43:2,
6;44:2;45:20;46:10,
14,16;48:15;49:7;
50:12;51:2;52:21;
53:2,9;66:14;68:6,18;
72:3;78:11,17;81:18;
87:10,12,13,16,25;
88:14;89:1,2,5,17;
90:10,12,15,16;91:1;
95:11;110:7,11;
117:11,14;131:17;
133:23

**sexually (10)**
41:17;42:13;44:3,8;
46:20,23;47:1;51:5;
138:19,24

**shared (1)**
132:16

**sheriff (3)**
51:8;54:23;99:4

**Sheriffs (1)**
99:10

**Sheriff's (10)**
19:2,7,11;89:7;
97:25;121:20,20,21;
122:6,7

**Shiener's (1)**
128:21

**shift (4)**
56:22;57:1,3;85:22

**shit (2)**
31:19;101:6

**shot (3)**
40:18,19,20

**shoulders (1)**
82:21

**show (4)**
40:20;56:21;120:2;
122:16

**showed (2)**
109:5;123:2

**shown (3)**
61:16;92:12,17

**shows (2)**
40:21;129:23

**sic (1)**
40:13

**side (2)**
78:18;113:1

**sign (2)**
77:11;120:25

**signature (2)**
34:2,14

**signed (7)**
34:11,15;41:22,23;
48:17;52:21;74:19

**signing (1)**
141:18

**sign-on (1)**
141:20

**similar (2)**
83:16;113:2

**similarly (3)**
83:10;84:3,4

**simple (1)**
100:12

**simply (4)**
49:10;54:22;55:5;
58:3

**Simpson (126)**
4:23,25;5:16;12:25;
13:6,7,10,24;19:22;
22:13,23;25:11;
26:23;27:2,23;28:8;
31:15;33:7,8;35:22;
36:1,9,13,21;37:23;
39:15,18;40:1;41:3,
10,12,14,18;42:14;
44:6,9,14,20;45:13;
46:20;47:8,25;50:3;
53:12,25;54:21;
55:10,13,17;56:16,24;
57:9;58:3,7,19;60:1,11;
61:7,12,25;63:9;65:4,
6,7,18,19;66:20;67:8,
17;68:6,21;69:23;
70:3,21;71:24;73:12;
74:1,5,10,16,19;75:5;
76:12,19;79:6,13;
80:17,20,21;81:4;
82:24;85:2,20;86:6,
16,21;87:18;89:3,5,
21;90:13;98:20;
109:4,15,18;110:6,8;
112:16,23;115:13,22;
116:9;117:18;119:7;
121:3,7,12,13;131:16,
18;132:10,15,16,25;
133:25;135:20;
142:15

**Simpson's (10)**
35:17;62:4,20;63:6;
64:6;65:24;85:5;
117:23;120:8,14

**simultaneous (1)**
7:2

**simultaneously (3)**
6:22;7:1;84:14

**single (1)**
127:4

**sit (6)**
73:24,25;109:3;
119:9;135:10,18

**sitting (1)**
32:2

**situated (3)**
83:10;84:3,4

**situation (8)**
27:11;62:11,15,16,
22;63:7,13;88:20

**situations (2)**
38:25;39:3

**six (2)**
56:17;140:15

**size (2)**
36:23;38:8

**skip (1)**
139:12

**skipped (1)**
140:19

**slammed (1)**
138:2

**Sleep (7)**
36:22;37:8,15,25;
38:8;66:22;84:20

**Sleep's (1)**
37:20

**slept (1)**
89:16

**small (1)**
133:9

**Snapchat (1)**
135:22

**soda (1)**
100:13

**sold (1)**
127:7

**someone (14)**
42:3;51:24;52:19;
53:2;55:2;57:17;62:3;
84:2,3;87:15;88:21;
100:22;109:17;
131:11

**sometime (1)**
59:15

**Sometimes (7)**
12:6,7;69:8;86:15,
20;100:9;131:23

**somewhere (2)**
21:24;117:4

**soon (5)**
57:5;73:22;94:23;
128:2;132:1

**sorry (13)**
7:6;13:14;16:3;
17:19;44:5;63:3;
90:20;112:9;115:1;
116:16;117:8;121:9;
122:3

**sort (1)**
84:8

**South (4)**
58:2,14;100:19;
104:18

**Southern (1)**
4:12

**sowing (1)**
85:7

**special (2)**
85:18,21

**specific (25)**
11:17;13:3;34:13;
42:11;52:25;57:25;
59:21,22;64:8,9;
68:17;70:7;73:2;
74:21;79:2;80:3,10;
87:12;96:21;98:24;
107:15;114:23;115:1;
117:17;130:20

**specifically (24)**
37:10;41:10;42:11,
15;46:13;52:16;57:9;
66:7;70:1;72:16;
78:12,16;80:7;81:22;
83:1;87:20,21;96:7;
99:25;100:2;104:10;
113:3;117:9;118:16

**specifics (11)**
49:22;52:17;58:21;
97:17;110:5,13;
115:9;120:10;123:4;
130:1,17

**specify (5)**
19:9;41:15;53:10;
102:18;109:15

**speeding (1)**
120:25

**spent (1)**
68:25

**spoke (4)**
28:23,24;53:7;
103:14

**sprain (1)**
137:24

**St (2)**
6:17,18

**stand (1)**
58:20

**standard (3)**
15:3;95:21;136:19

**Standards (2)**
15:1,7

**start (9)**
9:14;10:2;45:10;
56:13;91:4;98:1;
106:15;123:5;140:1

**started (14)**
53:23;54:14;61:3;
97:21;98:2;105:1,3,5,
7,8;118:21;121:23;
124:19;131:20

**starting (3)**

37:19;93:12;102:9

**state (34)**
8:3,4,5,20,21,22;
15:5;33:17;35:21;
36:1,8,12,21;39:17;
44:18;45:9,11;47:14;
55:19;56:24;62:19;
63:2,4;64:5;71:22;
73:9;75:2;83:15,23;
84:6;97:13,15;99:25;
100:2

**stated (2)**
99:5;130:21

**statement (6)**
38:22;39:24,25;
40:22,23;81:3

**statements (18)**
24:22;31:20;36:22,
25;37:25;38:4,7,12,
14;39:15,18,21;41:4;
44:2,3,9;45:18;87:25

**States (8)**
4:11;31:6;48:19;
74:14,16;101:18;
112:7;138:4

**stating (1)**
130:13

**station (2)**
100:13,14

**stay (2)**
56:18;57:2

**stem (1)**
107:12

**stemming (1)**
138:18

**stepfather (3)**
138:19,24;139:14

**Stezowski (1)**
140:10

**still (11)**
7:11;8:10,18;21:4;
81:15;93:17;98:6;
118:22;128:14;140:7,
8

**stop (4)**
77:11;120:25;
126:6;129:4

**stopped (3)**
106:15;119:7;132:1

**stories (5)**
36:17;66:14,15;
88:21;132:24

**story (2)**
36:1,4

**straight (1)**
118:13

**strategies (2)**
54:1,3

**strategy (2)**
54:21,24

**Street (1)**
4:8

**stress (1)**

101:18
**stressful (1)**
    101:24
**stressors (2)**
    137:2,2
**strike (9)**
    15:16;24:6;31:2;
    35:8;38:3;45:9;62:17;
    71:15;82:8
**stuff (1)**
    132:1
**subject (12)**
    16:2,5,17,21,24;
    17:3,6,9,16,22;68:10;
    69:16
**subjected (2)**
    81:19;82:3
**submit (2)**
    112:21;118:8
**submitted (1)**
    112:8
**subordinate (9)**
    38:1;39:11;41:18;
    42:8,13,19,23,25;
    88:23
**subordinates (4)**
    42:3;87:3;88:12;
    90:23
**subpoenaed (1)**
    129:8
**suddenly (3)**
    50:7;95:15,16
**suffer (3)**
    137:9,21;138:23
**suffered (11)**
    93:3,9,24;95:25;
    100:6;101:19;103:12;
    104:20;106:21;136:2,
    8
**suit (2)**
    66:8;129:2
**Sullins (2)**
    49:25;99:1
**summer (2)**
    10:12;35:24
**superior (7)**
    37:8,20;44:23;
    88:24;132:8,11,12
**superiors (1)**
    85:11
**supervision (3)**
    21:9,11,12
**supervisor (9)**
    12:24;21:13;40:7;
    48:12;60:7,8,9;65:11;
    132:5
**supplement (1)**
    25:4
**supposed (3)**
    27:18;105:19;
    125:19
**supposedly (1)**
    115:4

**Sure (17)**
    5:11,20;7:8;38:24;
    53:11;58:1,13;59:18;
    61:1;74:22;87:8,17;
    88:16;93:14;122:12;
    125:23;136:20
**surrounding (1)**
    98:15
**survive (1)**
    93:18
**suspension (2)**
    73:10;75:3
**swear (1)**
    12:2
**swept (1)**
    68:16
**swine (1)**
    92:14
**switch (4)**
    131:4,5,7,9
**switched (1)**
    29:22
**sword (2)**
    99:8,9
**sworn (3)**
    4:17;8:10,12
**system (2)**
    30:14;134:13

# T

**table (2)**
    32:2;59:21
**tagging (1)**
    40:21
**talk (18)**
    35:20;41:3,10;
    52:18,24;54:24;58:2;
    59:5,10,13;69:5;87:7;
    96:15;102:22;114:7;
    115:25;129:5;133:2
**talked (9)**
    38:20;67:3;76:7,8;
    84:8;87:6;99:20;
    104:3;133:5
**talking (8)**
    38:16;51:15;58:25;
    61:3;70:3;85:16;
    129:4;131:17
**Tardiness (2)**
    16:9,10
**tasks (2)**
    11:18,19
**Taylor (33)**
    50:21;53:19,19,20,
    25;54:6,10,13,22;
    59:23,24;61:14,15,23,
    24;62:10;66:15;67:8;
    68:19;69:11,12,20,23;
    70:19;78:16,20,24;
    79:8;80:3,4;82:2,22;
    83:23
**technician (1)**

19:4
**telling (5)**
    49:5,6;54:6;66:14;
    98:20
**tells (1)**
    88:23
**ten (2)**
    98:8;121:16
**term (2)**
    55:20;130:22
**terminate (5)**
    10:18,21,23;59:24;
    74:11,17
**terminated (52)**
    42:6,8;43:25;45:4;
    49:25;51:2;53:3,8,10;
    58:16;59:24;63:19;
    64:1,16;70:8;71:25;
    72:1;73:25;74:23;
    78:4;93:11,13;94:6;
    109:6;113:9;114:8,
    12;115:5;117:19,24,
    25;118:1,4,6,11;
    119:12,14;120:5,19;
    121:16;122:19;124:4,
    7,11,13,24;127:20,22;
    128:4,18;136:24;
    142:13
**termination (53)**
    17:17;26:21;37:19;
    51:10;63:17;65:16;
    73:10,11,14;74:3;
    75:3,18;78:1;94:11;
    96:19;98:9;101:3,9;
    102:4,6,13,17;104:25;
    106:17;108:23,24;
    109:1;112:4,5;113:9,
    10,13;114:4;115:15;
    116:19,20;118:6,7,12;
    119:10;121:5;123:20,
    24;124:1,8,17,22;
    125:6;126:5;134:12,
    19;135:23;137:22
**terms (2)**
    130:4,20
**terrible (1)**
    31:18
**test (2)**
    138:7,7
**testified (10)**
    4:19;48:18;58:25;
    79:21;82:22;87:23;
    106:12;111:15;
    115:16;125:17
**testify (5)**
    4:17;31:24;43:20;
    78:20;115:13
**testifying (6)**
    32:1,9;54:4;55:9;
    63:18;65:15
**testimony (2)**
    75:12;123:23
**testing (2)**

122:10,16
**tests (2)**
    136:11,17
**texts (2)**
    129:1,19
**therapist (3)**
    102:21,24;103:8
**therapy (1)**
    140:20
**therefore (6)**
    43:14;49:5;58:9;
    69:24;83:22;138:9
**thereupon (1)**
    4:16
**thinking (2)**
    81:25;139:8
**third (2)**
    34:24;128:20
**though (10)**
    52:7;68:9;75:7;
    76:8;100:11;102:7;
    108:10;116:15,17;
    125:1
**thought (2)**
    44:13;63:4
**thousand (1)**
    132:19
**three (12)**
    5:4;10:7;18:20,20;
    56:21;75:17;95:6;
    98:2;101:2;111:14;
    124:21;125:6
**throughout (4)**
    28:20;37:13;41:8;
    134:19
**thumb (2)**
    137:24;138:3
**ticket (2)**
    77:10;120:25
**tickets (1)**
    125:5
**till (1)**
    126:19
**timeline (2)**
    7:17;130:25
**times (11)**
    28:20;36:3;46:21;
    69:3;88:18,19;
    103:21,24;130:19;
    132:18,19
**title (1)**
    19:10
**titles (1)**
    19:13,17
**today (2)**
    5:18;122:21
**together (7)**
    5:19;12:2;31:19;
    44:22;52:23;69:2;
    76:15
**told (55)**
    31:15;33:6;36:1,9,
    13;44:7,12,13,19,22;

45:3;51:5,7;52:9,13;
61:13,15;67:18;74:4,
22;76:13,18;78:19;
86:1;88:21;98:18;
99:1,3;101:5;109:13,
16,17,19,24,25;
112:24,24,25;115:18,
23;118:20,21,25;
119:8;123:2;124:10;
128:25;129:4,18;
132:24;133:25;
135:19;137:1;138:8,
12
**Tommy (121)**
    4:23,25;5:16;12:25;
    13:5,7,10,24;19:22;
    22:13,23;25:11;
    27:23;28:8;33:7,8;
    35:17,22;36:1,9,12,
    15;37:23;39:15,18;
    40:1;41:3,10,11,14,
    18;42:14;44:6,9,13;
    45:13;46:20;47:8,25;
    50:3;53:12,25;54:21;
    55:10,13,17;56:16,24;
    57:9;58:3,7,19;60:11;
    61:7,12,24;62:4;65:4,
    6,7,17,19,24;66:16,
    20;67:8,17;68:6,20;
    69:23;70:3,21;73:12;
    74:1,5,19;76:12,19;
    78:19;79:3,6,13;
    80:17,19,21;81:1,4;
    82:24;85:2,5,19,24;
    86:6,16,21;87:18;
    89:3,5,21;90:13;95:1;
    98:19,20;99:6;109:4,
    14,18;110:8;113:2;
    115:22;116:9;119:7;
    121:3,7,11;132:15,16,
    25;135:19,20;142:15
**Tommy's (2)**
    121:8;131:4
**took (5)**
    12:9;45:12;54:9;
    100:19;132:1
**total (2)**
    113:10,12
**toward (1)**
    80:19
**towards (5)**
    41:19;55:7;74:4;
    80:17;133:12
**town (1)**
    118:25
**Township (1)**
    121:18
**toy (1)**
    91:19
**track (1)**
    138:13
**traffic (4)**
    107:25;108:5,18;

121:9
**training (3)**
6:9;15:6;36:7
**transfer (1)**
97:13
**transport (1)**
19:14
**trauma (2)**
138:18,21
**treated (19)**
30:25;69:10,12;
70:18,22,25;78:10,12,
13,15,23;79:24;80:7,
12,16;81:21;83:11;
84:7,9
**treating (3)**
103:8;140:1,11
**treatment (14)**
62:23;63:14;64:15;
65:10;69:9;81:20;
82:4;83:3;102:12,15,
18,19,24;103:4
**treatments (1)**
103:6
**trial (17)**
27:6,9;31:22,24;
32:1,11,25;33:4,10,
11,12;115:4;134:24;
135:10,12,15,18
**tribal (5)**
8:7,14,24;15:22;
16:16
**tried (3)**
11:25;59:23;60:18
**trip (10)**
36:7;45:12,19,23,
25;46:19;47:7,15;
62:5;124:18
**trooper (3)**
92:14,23;97:15
**true (2)**
134:15;136:4
**trunk (1)**
138:3
**trust (3)**
100:8,16;103:14
**trustworthy (1)**
52:22
**truth (3)**
4:17,18,18
**trying (7)**
52:22;58:15,15;
60:19;101:21;103:15;
121:21
**Tuesday (2)**
4:1,7
**tumors (1)**
126:3
**turn (9)**
27:1;43:14,15;
73:23;75:16;119:6,
11,23;141:9
**turned (10)**

25:1,2;35:16;55:12;
63:16;107:12;117:18;
118:3,5;119:13
**turning (3)**
119:8,22;122:22
**twelve (1)**
138:19
**twice (1)**
114:10;135:4
**two (18)**
9:20;13:21;16:9;
23:3;51:19;60:17;
66:11;75:17;78:15;
92:16;93:14;97:6;
106:14;111:14;
122:12;124:17;
127:24;140:14
**Tyler (6)**
36:22;37:20;66:22;
71:13;84:20;132:18
**type (1)**
88:13
**typically (2)**
88:8;135:15

**U**

**UCR (1)**
15:10
**Uh-hum (1)**
5:24
**ultimately (7)**
60:14,15;62:2;70:6;
77:16,20;83:15
**unclear (1)**
80:6
**uncomfortable (4)**
45:24;46:22;47:15;
117:3
**under (6)**
15:2;34:24;52:20;
68:16;108:13,14
**underage (2)**
24:8;30:10
**underneath (1)**
92:14
**understood (2)**
39:1;132:2
**undertaken (2)**
102:12,16
**unfair (1)**
65:10
**unfairly (1)**
80:16
**United (1)**
4:11
**unlawful (3)**
68:11;108:13,14
**unless (1)**
59:21
**unnecessary (2)**
129:5,7
**unreasonably (3)**

55:21;56:9,10
**unrelated (1)**
28:2
**unsecured (1)**
134:15
**unspoken (1)**
39:3
**unwelcome (1)**
55:19
**up (27)**
41:14,16;45:5;
50:12;53:1,3,9;56:21;
57:11;67:9,11;68:6;
73:16;89:25;95:19;
96:4,7;98:21;101:4,9,
25;109:5;116:11;
122:16;123:22;
131:23;140:2
**upcoming (1)**
83:17
**updated (3)**
15:5,8;33:25
**upload (1)**
30:13
**uploaded (1)**
30:1
**upon (6)**
42:6,7;57:8;61:6;
63:17;76:16
**upset (1)**
33:3
**urinate (1)**
36:15
**use (3)**
77:23;119:21;
126:13
**used (3)**
30:24;62:11;120:1
**uterus (1)**
126:3
**utilize (1)**
126:11
**utilized (2)**
125:17;126:10

**V**

**V2 (1)**
29:19
**vaginas (1)**
131:15
**Valley (4)**
6:6,20;7:4,9
**value (2)**
31:5,7
**valve (1)**
136:5
**Van (4)**
51:8;89:6;99:4,10
**varied (3)**
11:17;12:6;135:7
**various (5)**
15:9;28:20;79:9;

99:15;139:20
**vehicle (2)**
119:3,5
**vendor (2)**
30:1,18
**vent (1)**
102:23
**ventricle (1)**
136:5
**verbal (2)**
67:3;141:3
**verbalize (2)**
58:18,19
**verbally (1)**
112:25
**versus (1)**
4:10;21:1;124:5
**Via (3)**
29:7,8;135:22
**viable (1)**
74:9
**Vicksburg (2)**
121:25;122:4
**victim (5)**
29:15;30:11;35:3;
44:8;55:1
**victims (1)**
24:8,8
**video (9)**
29:25;30:2,3,10,13,
16,19,21;33:13
**videos (1)**
30:24
**videotaped (1)**
4:5
**violate (4)**
69:14,15;79:15,17
**violation (1)**
120:25
**violations (2)**
71:23;79:9
**visits (1)**
140:13
**vote (1)**
18:14

**W**

**wage (2)**
104:20,23
**wages (5)**
105:2,24,24,25;
106:1
**wait (2)**
52:18;139:25
**walk (1)**
49:21
**walked (1)**
119:5
**Walker (8)**
89:6,10,18,21,24;
90:19,22,24
**walking (1)**

123:1
**warrants (1)**
12:3
**was/is (1)**
83:17
**watch (4)**
100:14,15;135:9,15
**Watched (2)**
49:19;50:1
**water (1)**
77:23
**way (16)**
10:12;29:3,6;45:16;
50:9;71:15;73:22;
78:13,23;79:1;84:22;
93:1;94:18;100:20;
103:13;106:19
**ways (1)**
78:25
**weakness (1)**
32:17
**Weber (42)**
27:3;31:16;46:8,10;
60:5,10;64:22,23;
65:3,5,6,9,10,17,23;
69:11;70:17,19;71:6,
19,19;79:20,22;80:6,
12,16,21,24;81:3,6,
10;82:13,14,23;
83:24;84:6,25;85:16;
86:7;104:1,6;142:14
**Weber's (1)**
65:22
**wedding (2)**
91:9;125:9
**week (7)**
9:20;10:7;14:13;
102:9;135:4;140:17,
18
**weekly (1)**
140:15
**weeks (7)**
13:21;23:3;86:3;
97:6;124:17;128:11;
140:19
**welcome (2)**
61:13;138:12
**weren't (4)**
117:3;127:17;
134:11;135:9
**West (1)**
105:12
**Western (1)**
4:12
**what's (26)**
6:2;25:6;33:20;
35:12;40:11,14,17,23;
50:17;63:22;67:5;
77:4;84:11;91:11,20;
95:13;112:18;114:23;
124:2;131:13,15;
132:7,11;133:20,24;
141:8

**whatsoever (2)**
61:10;115:5
**whenever (1)**
94:9
**wherever (1)**
56:13
**Whistle (2)**
71:21;109:2
**white (1)**
79:7
**Whitmer (2)**
133:6,15
**whole (7)**
4:18;18:14;109:17;
127:9,14;128:15;
141:21
**who's (3)**
103:22,22;104:5
**Whose (2)**
48:1;62:2
**wife (15)**
61:2;91:3,4;101:22;
104:6;105:11,16;
106:17;124:15;
125:18;132:22;137:5,
6;140:5,6
**Wild (1)**
101:1
**Williams (48)**
5:2;40:12,14;41:1;
64:18;73:20;74:3,24;
77:5;84:20;91:16,21;
92:15;107:4,11,16,18,
22;108:22,25;109:2,7,
13;111:10,13,16;
113:6,11,17;114:21;
117:12;118:9,13;
120:4,8,18,24,24;
121:4,10;123:14,21;
130:13;131:21;133:5;
142:2,4,14
**Williams' (1)**
110:15
**Wings (1)**
101:1
**wish (1)**
35:1
**withdrew (1)**
122:17
**Within (4)**
13:21;51:17;70:24;
86:3
**without (2)**
65:11;104:18
**witness (3)**
4:16;32:7;135:10
**witnessed (3)**
49:19;53:12;55:3
**woman's (1)**
91:18
**women (1)**
131:15
**word (2)**

60:8;65:13
**worded (1)**
64:10
**wording (1)**
67:20
**words (6)**
63:1;67:12,19;76:3;
119:22;120:1
**work (57)**
11:21,23,23;14:22;
43:13;45:16;47:14;
50:24;54:11,13;
55:22,23,25;56:4,10,
11,14;57:12;59:1,17;
60:24;61:18;62:6;
68:20;69:5;72:3;
83:20;85:17,22;92:3;
100:8;101:13;104:12,
13,16;105:18,20;
106:1;109:23;110:2,
8,11;118:15,20,22;
121:24;122:24;126:1,
4,6;128:11;129:12;
132:13,17;135:7;
140:9;141:23
**worked (6)**
8:7;15:6;23:9;
49:19;54:11;105:19
**working (46)**
6:22,23,24;7:1,5,9;
9:19,22;10:2,5;12:12;
14:8;15:14,15,18,22;
16:4,16,20,25;17:2,4,
7;37:15;43:17;54:7,8;
58:10;88:8;96:9,18,
23;97:8,21;101:22;
105:1,4,5,12,21;
125:19;126:6,8;
127:6,16;140:8
**workplace (3)**
82:18;100:16;117:3
**work-related (1)**
139:20
**works (7)**
47:16,25;48:11,24;
49:8,24;51:4
**worry (2)**
125:2;129:15
**worse (1)**
55:7
**worsen (1)**
64:15
**worsened (3)**
62:23;63:14;64:15
**write (1)**
30:6
**write-ups (1)**
132:14
**writing (13)**
35:4;64:20;65:4;
66:18;72:10,11,13,14,
15;73:17;121:7,12;
141:2

**written (15)**
24:17,22;75:10,13,
15,16;76:9;77:6;
117:19,22;118:2,2,5,
8;119:11
**wrong (6)**
16:13;57:16;
132:10;137:18;139:7,
11
**wrongdoing (3)**
107:16;108:21;
142:3

**Y**

**year (9)**
8:25;28:20;102:25;
120:23;126:17;127:9;
128:22;141:10,10
**years (6)**
7:16;83:17;89:13;
90:8;136:5;138:20
**year's (1)**
128:20
**Yellow (2)**
5:12;125:11
**Yep (1)**
86:17

**Z**

**zero (2)**
71:1;136:10

**1**

**1 (2)**
23:19;72:20
**1,300 (1)**
126:23
**1:23 (1)**
142:18
**10 (7)**
74:7;83:6,6,7,15,
15;114:14
**10:03 (2)**
4:2,5
**10:30 (1)**
26:10
**10:48 (1)**
26:1
**10:49 (1)**
26:4
**107 (1)**
75:19
**10th (10)**
72:7;73:15;78:2;
94:15;111:9,11,12;
112:8;118:14;137:1
**11 (2)**
83:13;133:10
**111 (1)**
78:8

**11th (3)**
44:19;63:19,25
**12 (5)**
64:2;117:20;
118:15;123:21;142:1
**12th (13)**
63:25;72:18;73:19;
107:13;109:25;110:4;
118:10,17,18;122:19;
123:9,15;142:12
**1300 (1)**
4:8
**13th (2)**
116:23;142:12
**14th (3)**
34:4;114:18;116:23
**15 (4)**
96:6;98:8;121:16;
136:5
**16 (1)**
105:13
**18th (1)**
45:14
**19th (3)**
27:10,18;114:16
**1st (3)**
39:10;94:5,9

**2**

**2 (8)**
4:1;26:7;29:17;
31:3;32:16;35:7,21;
74:6
**20 (2)**
128:12,15
**20,000 (1)**
127:12
**2008 (1)**
6:15
**2011 (3)**
6:13;7:18;131:21
**2015 (1)**
7:18
**2016 (1)**
7:18
**2017 (8)**
9:2,7,15;10:4;
13:14,15,17;139:16
**2018 (3)**
35:24;89:19;91:5
**2019 (9)**
12:20,21;20:6;
23:16,18;24:14;36:3,
8,12
**2020 (50)**
10:12,16,19,22;
11:10,12,14,14,15;
12:11,13;13:14,17;
14:7,16,16,18,18;17:22,
22,25;18:6,21;20:9;
36:4;37:19;45:14,20;
59:15;66:5;86:5;91:7;

95:3;106:6;120:23;
124:20;125:9,12,16;
126:7,11,18;127:9,17;
128:9,18;136:3;
137:1;140:14,21,25
**2021 (52)**
18:18,21;19:6;
22:21;27:2,18;28:6,
21;31:10;34:4,14;
36:4;39:10;44:19;
52:2,9,18;53:7;64:3;
72:6;73:19;93:12;
94:5;105:6;107:13;
109:12,25;110:4,16;
111:9;112:9;114:16,
18;116:23;117:20;
118:10,16,18;120:9;
122:20;123:9,15,22;
126:15,19;127:23;
128:10,18;131:2;
141:1;142:1,13
**2022 (11)**
4:1,7;102:25;104:8;
127:13;128:5,23;
137:13,25;140:1,13
**21 (3)**
83:8;120:23;141:10
**21-487 (1)**
4:13
**22 (1)**
141:10
**23rd (4)**
27:13;28:6,21;
140:1
**25.45 (1)**
141:17
**25th (1)**
91:7
**28 (1)**
81:18
**29 (3)**
8:9;15:23;27:2
**29th (1)**
140:21

**3**

**3 (2)**
33:21;53:6
**30 (5)**
29:17;30:2,16,19;
31:3
**30th (4)**
19:6;93:12;105:5,8
**31 (1)**
31:14
**33 (1)**
83:17
**38 (1)**
32:16
**3rd (1)**
98:3

94:15;109:9,12;
110:16;111:10,11,12;
118:14;120:9

## 4

**4 (9)**
27:1;31:14;35:12;
44:16,19;72:24;73:1;
74:25;123:19
**40 (1)**
14:12
**4843 (2)**
5:12;125:11
**49004 (1)**
5:12
**4th (1)**
98:3

## 5

**5 (4)**
31:15;40:12;45:6;
141:9
**5:00 (2)**
110:4;118:24
**500 (1)**
141:22
**550 (1)**
106:13
**5th (1)**
27:2

## 6

**6 (1)**
91:12

## 7

**7 (4)**
92:9,10,12;110:22
**700 (1)**
106:12
**71 (1)**
62:18
**75 (1)**
71:22
**77 (2)**
73:9;75:2

## 8

**8 (3)**
110:23,24;112:14
**8th (1)**
78:1

## 9

**9 (4)**
111:23;112:10,19;
123:19
**9th (18)**
4:7;72:6,6,12;
73:14;76:7;78:1,2,3;